1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF ILLINOIS
2

3  UNITED STATES OF AMERICA,
                                     Docket No. 07-20009
4            Plaintiff,

5       vs.                          Urbana, Illinois
                                     October 18, 2007
6  GENE SUTTON,                      2:20 p.m.

7            Defendant.

8

9                      MOTION TO SUPPRESS

10       BEFORE THE HONORABLE MICHAEL P. McCUSKEY
            CHIEF UNITED STATES DISTRICT JUDGE
11

12
   A P P E A R A N C E S :
13
   For the Plaintiff:      EUGENE L. MILLER, ESQUIRE
14                          Assistant United States Attorney
                            201 South Vine Street
15                          Urbana, Illinois   61802
                            (217) 373-5875
16
   For the Defendant:      STANLEY L. HILL, ESQUIRE
17                          Stanley L. Hill & Associates, P.C.
                            651 West Washington Blvd., Suite 205
18                          Chicago, Illinois   60661
                            (312) 917-8888
19

20

21

22 Court Reporter:         LISA KNIGHT COSIMINI, RMR-CRR
                            Official Court Reporter
23                          201 South Vine Street, Suite 344
                            Urbana, Illinois   61802
24                          (217) 384-2290

25 Proceedings recorded by mechanical stenography; transcript
   produced by computer.

# I N D E X

Page

October 18, 2007:

GENE SUTTON (SR.)
    Direct Examination by Mr. Hill ...................... 11
    Cross-Examination by Mr. Miller .................... 25
    Redirect Examination by Mr. Hill ................... 40
    Recross-Examination by Mr. Miller .................. 43

CHRISTOPHER HOYT
    Direct Examination by Mr. Hill ...................... 44
    Cross-Examination by Mr. Miller .................... 71
    Redirect Examination by Mr. Hill ................... 74

GENE SUTTON (JR.)
    Direct Examination by Mr. Hill ...................... 77
    Cross-Examination by Mr. Miller .................... 89

ROBERT BODEMER
    Direct Examination by Mr. Miller ................... 110


November 5, 2007:

ROBERT BODEMER
    Continued Direct Examination by Mr. Miller ......... 133
    Cross-Examination by Mr. Hill ...................... 166
    Redirect Examination by Mr. Miller ................. 205
    Recross-Examination by Mr. Hill ................... 212
    Further Redirect Examination by Mr. Miller ......... 213
    Further Recross-Examination by Mr. Hill ............ 214

JEFFREY MARTIN
    Direct Examination by Mr. Miller ................... 215
    Cross-Examination by Mr. Hill ...................... 235
    Redirect Examination by Mr. Miller ................. 241
    Recross-Examination by Mr. Hill ................... 243

1

2                                                    Page

3

4  JOSEPH R. POWERS
       Direct Examination by Mr. Miller .................... 245
       Cross-Examination by Mr. Hill ....................... 258
5      Redirect Examination by Mr. Miller ................. 261
       Recross-Examination by Mr. Hill .................... 261
6

7  CLAYT WOLFE
       Direct Examination by Mr. Miller .................... 269
       Cross-Examination by Mr. Hill ....................... 289
8      Redirect Examination by Mr. Miller ................. 298
       Recross-Examination by Mr. Hill .................... 300
9

10 CHRISTOPHER HOYT
       Direct Examination by Mr. Miller .................... 302
       Cross-Examination by Mr. Hill ....................... 309
11     Redirect Examination by Mr. Miller ................. 315
       Recross-Examination by Mr. Hill .................... 316
12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            THE COURT:   This is the United States of America

 2    versus Gene Sutton, Case Number 07-20009.

 3            Present in open court is the defendant, Gene

 4    Sutton, accompanied by his attorney, Mr. Stanley L. Hill; the

 5    United States of America represented by its assistant U.S.

 6    attorney, Eugene Miller.

 7            And, Mr. Miller, who joins you at counsel table?

 8            MR. MILLER:   This is Special Agent Christopher Hoyt

 9    of the Drug Enforcement Administration, and he is the case

10    agent in this case.

11            THE COURT:   The last time that the defendant was in

12    court, the Court had a chance to see Mr. Sutton's condition,

13    which the Court determined required medical assistance; and

14    the Court directed that he would be taken by the marshal to an

15    appropriate facility for medical observation and treatment if

16    necessary.   And he was taken to the Springfield Medical Center

17    in Springfield, Missouri, and has been transported back to the

18    Central District of Illinois for a hearing today relative to a

19    motion to quash arrest and suppress evidence.   That motion was

20    filed back in June, June 4th, docket number 14. Thereafter,

21    the government responded, docket 18, on June 18th; and then

22    the defendant replied to the government's response to the

23    defendant's motion to suppress.   That reply, docket 25, came

24    on July 10th.   That is the evidentiary matter before the Court

25    today which the Court has set a hearing on.

USA v. GENE SUTTON, No. 07-20009

1          I think, Mr. Miller -- correct me if I'm wrong --

2     the United States of America agreed that it would accept the

3     burden of going forward; is that correct?

4          MR. MILLER:  Yes, Your Honor.

5          MR. HILL:  Your Honor, --

6          THE COURT:  And let me ask:  Are you prepared to do

7     that?

8          MR. MILLER:  We are, Your Honor.

9          THE COURT:  Okay.  Mr. Hill, you may be heard.

10         MR. HILL:  Good afternoon, Your Honor.

11         THE COURT:  Good afternoon.

12         MR. HILL:  Your Honor, it was my understanding --

13    or I was under the assumption that I would be calling the

14    witnesses and proceeding first since it was my motion.

15         THE COURT:  That's -- in fact, that's even better.

16    Most of the defense lawyers usually defer to the government;

17    but, obviously, it's your burden, and you may go forward in

18    that manner, and the Court certainly is not trying to prevent

19    that.

20         MR. HILL:  Thank you, Your Honor.

21         THE COURT:  So we do have Christopher Hoyt here at

22    counsel table, and he -- obviously, Mr. Hoyt is mentioned

23    frequently in your filings as the -- not just the case agent;

24    but he is the individual who filed the affidavit in support of

25    the criminal complaint sworn to before U.S. Magistrate Judge

1   David G. Bernthal back on December 15, 2006.  So he certainly

2   is available to be called by the defense in support of the

3   motion.

4                MR. Miller, who else do you have here today?

5                MR. MILLER:  Your Honor, we have Director Bob

6   Bodemer of the Kankakee Area Metropolitan Enforcement Group.

7   We have Special Agent Jeffrey Martin of the Kankakee Area

8   Metropolitan Enforcement Group.  We have Special Agent Joseph

9   Powers, --

10               THE COURT:  How's that last name spelled?

11               MR. MILLER:  P-o-w-e-r-s.

12               THE COURT:  Joseph Powers.

13               MR. MILLER:  -- of the Kankakee Area Metropolitan

14  Enforcement Group; Special Agent Clayt -- that's C-l-a-y-t --

15  Wolfe, W-o-l-f-e, also out of KAMEG.

16               THE COURT:  So, Mr. Hill, you have five different

17  people -- at least the government has here -- to choose from;

18  and I'll certainly let you decide how you wish to proceed on

19  your motion.

20               MR. MILLER:  And, Your Honor, if we may, I know --

21  I believe it's Mr. Sutton's father in the courtroom.  Mr. Hill

22  informed me that he may be a witness.  We would make a motion

23  to exclude all witnesses during the testimony in the case.

24               THE COURT:  Other than the case agent, Christopher

25  Hoyt, and, of course, Mr. Sutton, the defendant, all other

1   individuals that may be called as witnesses, either by the

2   defense or the government, in the motion and the response to

3   the motion to quash arrest and suppress evidence are to be

4   excluded from the courtroom.  So if that applies to any of

5   those three --

6              MR. HILL:  Only Mr. Sutton.  But he's going to be

7   my first witness, Judge.

8              THE COURT:  Okay.

9              MR. HILL:  But he just arrived.  I need to just

10   speak with him just one moment, and then I'll put him on.

11              THE COURT:  Why don't we start at 2:35 so you can

12   decide the order of your witnesses.

13              MR. HILL:  That's fine.

14              THE COURT:  And then when we come back at 2:35, you

15   can tell me what order you wish.

16              MR. HILL:  And, Judge, I would ask that after he

17   testifies he would be allowed to remain in the courtroom at

18   that point because he would have testified --

19              THE COURT:  Unless you're going to call him as a

20   rebuttal witness.

21              MR. HILL:  I wouldn't be calling him in rebuttal.

22              THE COURT:  That's fine.  He may stay after his

23   testimony.

24              But we'll give you about seven minutes to talk to

25   Mr. Sutton and also to determine your order, and then I'll ask

1    Mr. Miller who you wish to call and then you may keep all
2    these people here in case you want to use them as rebuttal or
3    not; and you may decide that if Mr. Hill doesn't want to call
4    somebody and you don't want to call somebody, we can send them
5    on their way.  But I'll leave it to the two of you during the
6    break, and I'll come back at 2:35.
7                    MR. HILL:  Thank you, Your Honor.
8                    THE COURT:  Thank you.
9                       (Recess, 2:27 p.m. to 2:35 p.m.)
10                   THE COURT:  You may be seated.  Everyone is now
11   present.
12                   Mr. Hill, have you determined the order of the
13   witnesses you wish to call?
14                   MR. HILL:  I have, Your Honor.
15                   THE COURT:  Okay.
16                   MR. HILL:  At this point, I'd like to call Gene
17   Sutton Sr. at this point.
18                   THE COURT:  Okay.  And then following Mr. Sutton?
19                   MR. HILL:  And then it will be Agent Hoyt.  And,
20   Judge, I would ask that you give me an opportunity to decide
21   what I need after those two are called.
22                   THE COURT:  Okay.
23                   MR. HILL:  Judge, I would also make a motion to
24   exclude Mr. Hoyt.  I know he is the case agent; but in this
25   case -- and customarily as a courtesy to the government, the

1    case agent is permitted to be here.  I anticipate calling Mr.

2    Hoyt as my second witness, but I would prefer that he not be

3    in the courtroom to hear what my first witness has got to say

4    since there's some issues regarding fact -- there's a

5    difference.  I suspect the testimony will differ regarding

6    certain facts, and I would prefer that he not be present.

7         THE COURT:  Mr. Miller.

8         MR. MILLER:  Your Honor, I mean, I understand that.

9    We certainly -- the government deals with that with defendants

10    all the time, and I believe under the law is it proper to have

11    the case agent present to assist, especially during the

12    testimony, for example, of any witnesses for defense, to

13    consult with as to cross-examination and other matters.  And

14    so we believe is it proper for him to stay in the courtroom.

15         THE COURT:  I believe it's a matter of discretion,

16    and the Court does not see anything here out of the ordinary

17    that would cause -- you know, there's always obviously going

18    to be disputes as to testimony, whether it's a detention

19    hearing, whether it's a revocation hearing, whether it's a

20    motion to suppress and quash arrest, or during trial.  And the

21    Court does not see anything out of the ordinary that would

22    require the Court to vary from the standard rule that the case

23    agent is present in court.

24         If the government was asking for more than one case

25    agent, I would certainly consider that; probably only need one

1    case agent, and that's all the government's requesting out of

2    the five witnesses that they have called here to be available

3    this afternoon.

4              So the motion is denied.  Mr. Hoyt alone will be

5    able to be present in the courtroom.  And Mr. Sutton, is it?

6    Mr. Gene Sutton Sr., --

7              MR. HILL:  Yes, Your Honor.

8              THE COURT:  -- you may come forward.

9              MR. MILLER:  And, Your Honor, we certainly have no

10   objection to him calling Special Agent Hoyt first as well.

11   It's his decision, but we would like him to assist during the

12   presentation of evidence.

13             THE COURT:  Well, he certainly knows he has the

14   right to call not only any of the five witnesses you have

15   present but Gene Sutton Sr. and then in the order he wishes.

16   So he certainly has that opportunity if he wishes to have

17   Agent Hoyt called first. Of course, if that's true, Mr. Sutton

18   Sr. will be outside of the courtroom during that testimony,

19   but I'll let Mr. Hill try his own case.

20             MR. HILL:  Thank you, Your Honor.

21             THE COURT:  And you'll need to pull that microphone

22   over if you're going to remain there at counsel table.

23             MR. HILL:  Judge, may I remain?  Thank you.

24             THE COURT:  You just make sure my court reporter

25   can hear you through the mic.

```
 1              MR. HILL:  Yes, Judge.
 2                   GENE SUTTON, sworn, 2:40 p.m.,
 3                   DIRECT EXAMINATION BY MR. HILL:
 4        Q     Sir, would you state your name, please?
 5        A     Gene Sutton.
 6              THE COURT:  And you'll need to speak -- yeah, pull
 7     that microphone up a little higher.  There you go.  Let's see
 8     how that works.  Say your name again.
 9              THE WITNESS:  Gene Sutton.
10              THE COURT:  I don't think that's on, Sherry.
11                   (Discussion off the record regarding
12                   the sound system.)
13     BY MR. HILL:
14        Q     Okay, Mr. Sutton, why don't you spell your name for
15     the record?
16        A     Gene, G-e-n-e, Sutton, S-u-t-t-o-n.
17        Q     And where do you live, Mr. Sutton?
18        A     I live 10748 East 4000 South Road, St. Anne,
19     Illinois.
20              THE COURT:  Where?
21              MR. HILL:  St. Anne?
22              THE WITNESS:  St. Anne.
23              THE COURT:  St. Anne, okay.  Thank you.
24     BY MR. HILL:
25        Q     Okay.  Now, I'd like you to speak slowly and
```

1    clearly so that Judge McCuskey can follow your testimony.

2    Okay?

3                    THE COURT:   And I appreciate that, Mr. Hill.

4        Q    Do you understand that?

5        A    Yes, sir.

6        Q    I'd like to direct your attention to December the

7    14, 2006.  Were you at your home on that day?

8        A    Yes, I was.

9        Q    Did you have occasion to come out of your home on

10   that day?

11       A    Yeah.  Well, I --

12       Q    Yes or no?

13       A    Yes.

14       Q    And when you came out of your home on that day,

15   approximately what time was it, Mr. Sutton, if you recall?

16       A    I don't recall, but it was near noon, some-- around

17   near noon.

18       Q    And when you came out of your home on that day,

19   what did you do?

20       A    Well, stirred around in my yard, working as I

21   usually be doing.

22       Q    And while you were in your yard, did you have

23   occasion to observe anything out of the ordinary?

24       A    Yes, I did.

25       Q    What was that?

1    A    I observed some people standing up on the, on the

2    hill on my other property.

3    Q    And when you observed those people standing on the

4    hill, what did you do?

5    A    Well, I didn't know who they are.  Only thing I

6    could tell was that they was a couple of white guys.  So I

7    didn't know what they was doing over there.  So I just decided

8    to go over there and see what they was doing.

9    Q    How far were these men from where you were standing

10   when you first saw them?

11   A    Maybe about 200 yards.

12   Q    Did you go to where the men were?

13   A    Yes, I did.

14   Q    When you arrived at where the men were, would you

15   tell Judge McCuskey what you saw?

16   A    Well, I saw this officer, Mr. Hoyt.  He was over

17   there.  I saw my son.

18   Q    And by Mr. Hoyt, you're speaking about the

19   gentleman, --

20   A    Yeah.

21   Q    -- Christopher Hoyt?

22   A    Yeah, this gentleman here.

23        MR. HILL:  Your Honor, can the record reflect that

24   he's identified Chris Hoyt?

25        MR. MILLER:  We'd stipulate, Your Honor.

1          THE COURT:  The record will so reflect.

2   BY MR. HILL:

3      Q    And by your son, you're referring to the defendant,

4   Gene Sutton, who's seated here?

5      A    Correct.

6          MR. HILL:  The record so reflect, Judge?

7          THE COURT:  Yes.

8   BY MR. HILL:

9      Q    All right.  And what else did you see, Mr. Sutton?

10     A    Well, I saw, I saw my son all swoll up and bloody

11  and dirty.

12     Q    What do you mean "swoll up, bloody and dirty"?

13     A    Well, his face was all swoll up.  His mouth was

14  bleeding.  He had dirt all on his head.  So I asked them what

15  was going on.

16     Q    Asked who?

17     A    I asked Mr. Hoyt what was going on.

18     Q    Did he respond?

19     A    No.  He just said -- all he said was that he

20  wanted, had to ask Gene some questions.

21     Q    What happened next?

22     A    Well, what happened next was my son asked me not to

23  leave because he didn't -- he said the other two cops had

24  stomped and beat him.  That's why he was all messed up and

25  bloody like he was.

1    Q    Now, in addition to Mr. Hoyt being there, you said

2    that there -- did you see two other individuals?

3    A    Yeah.  There was two other officers.

4    Q    Describe -- two other police officers?

5    A    Yeah.

6    Q    Were they in uniform or were they in plain

7    clothing?

8    A    They all was in plain clothes.

9    Q    No uniforms?

10    A    No uniforms.

11    Q    And do you know what those two officers, what their

12    names are?

13    A    No.  I really ain't that familiar with their names.

14    Q    Okay.  But they were officers -- so there were a

15    total of three policemen who were there?

16    A    Yeah, three, three officers.

17    Q    None of them were uniformed?

18    A    None of them.

19    Q    Okay.  So after your son said what he said, what

20    did you do?

21    A    Well, I asked Mr. Hoyt -- 'cause he told me that he

22    was gonna take him in.  And I asked him; I say, "Hey, would

23    you please not let them guys jump on my son again?"  He told

24    me that he wouldn't.

25    Q    Now, describe what you mean by his face was -- was

1    his face swollen; is that what you mean?

2          A     All of this was, was messed up and dirty.

3          Q     You're pointing -- all of this?

4          A     His face.  His mouth was bleeding.  He had dirt in

5    his head, you know, and he -- he asked the other two officers:

6    Why did, why was they stomping and kicking him?

7                All three of them was standing there.  The other

8    two officers didn't say nothing.  Mr. Hoyt, only thing he said

9    was he wasn't gonna let them do that, you know, mess with him

10   no more and that he was taking him in.

11         Q     All right.  Now, what happened next?

12         A     Well, then they left.

13         Q     What do you mean they left?

14         A     I mean they, they walked back down here to where

15   they two vehicles was at.

16         Q     Okay.  Now, sir, when you were on, at the location,

17   did you see any vehicles?

18         A     I saw two vehicles.

19         Q     In addition --

20         A     I saw, I saw a maroon -- I think it was like maybe

21   a Chevy and a black Jeep.

22         Q     All right.  How about your son's vehicle?

23         A     His vehicle was, was out there, too.

24         Q     All right.  And your son's vehicle -- describe your

25   son's vehicle.

1          A      A black Chevy pickup truck.

2          Q      Okay.  And you said, in addition, there was a

3     maroon vehicle that you recall being a Chevy?

4          A      That's what I think it was.  I ain't for sure, you

5     know.

6          Q      All right.

7          A      I'm pretty sure it was a Chevy.

8          Q      But it was maroon?

9          A      It was maroon or burgundy; it was -- maroon, I

10    would say.

11         Q      And you said that there was also a Jeep?

12         A      A black Jeep.

13         Q      Were there any other vehicles at that location?

14         A      Just the, just those three.

15                MR. HILL:  Your Honor, may I approach the witness?

16                THE COURT:  You may.

17    BY MR. HILL:

18         Q      Mr. Sutton, I'm going to show you what I have

19    marked as Defendant's Exhibit Number 1 for identification.  It

20    has three photographs on it, and I'd like you to take a look

21    at Defendant's Exhibit 1 and tell me:  Do you recognize the

22    three photographs on Defendant's 1?

23         A      I recognize -- yes.

24         Q      You do?

25         A      Yes, this one.  This is the one because it --

1        Q    Well, do you -- first off, do you recognize it?

2        A    I said yeah.

3        Q    That's a yes?

4        A    Yes, yes.

5        Q    All right.  Now, these are photographs of, of the

6    same vehicle, correct?

7        A    Yes.  Looks to be the same vehicle.

8             MR. MILLER:  We'd stipulate it's the same vehicle,

9    Your Honor.

10            THE COURT:  Which is the same?  I've got three

11   vehicles.

12            MR. HILL:  It's one vehicle, three different --

13            THE COURT:  Right.  But I'm saying it's one of the

14   three that he just talked about or it's a -- three pictures of

15   another vehicle that he is identifying?

16            MR. HILL:  Okay.

17            THE COURT:  Which is it?

18            MR. HILL:  Got it.

19   BY MR. HILL:

20       Q    Mr. Sutton, is Defen-- is the -- first of all, this

21   is three different phot-- we have three different photographs

22   of the same vehicle, correct?

23       A    Yeah.

24       Q    All right.  And --

25       A    Which one did I see?

1    Q    No, no.

2    A    Go ahead.

3    Q    They're all the same car.

4    A    Right.

5    Q    You understand that?

6    A    Right.

7    Q    Is this the car, one of the cars that you saw out

8    there with your son that day?

9    A    Right.  That's one of them.

10    Q    All right.  This is the burgundy vehicle, --

11    A    Yeah.

12    Q    -- correct?

13    A    Yeah.  That's the burgundy vehicle.

14    Q    All right.

15    THE COURT:  The one that you said could also be a

16    maroon Chevy?

17    THE WITNESS:  This one right here.

18    THE COURT:  The one that -- Defendant's Exhibit

19    Number 1 is what you talked about being a maroon or a burgundy

20    Chevy that you saw as one of the three vehicles?

21    THE WITNESS:  Right.

22    THE COURT:  Okay.

23    MR. HILL:  Is that correct?

24    THE WITNESS:  That's correct.

25    THE COURT:  Thank you.

```
 1              MR. HILL:  And, Judge, we have a stipulation that
 2    they're the three -- I would -- and is it -- is Plaintiff's,
 3    not Plaintiff's, excuse me -- Defendant's Exhibit 1 a true and
 4    accurate -- are these true and accurate photographs of the
 5    vehicle, the maroon vehicle that you saw that day?  Yes or no?
 6              THE WITNESS:  Yes.
 7              MR. HILL:  All right.  Your Honor, I would offer
 8    these into evidence at this time.
 9              MR. MILLER:  No objection.
10              THE COURT:  Defendant's Exhibit, Group Exhibit
11    Number 1 is admitted without objection.
12    BY MR. HILL:
13        Q    All right.  Now, Mr. Sutton, on Defendant's Exhibit
14    1 -- well, strike that.
15              Now, you said you also saw a Jeep there, correct?
16        A    Correct.
17        Q    A black Jeep?
18        A    Yes.
19        Q    All right.  And in addition to the black Jeep,
20    there was also Gene's pickup truck, correct?
21        A    Correct.
22        Q    Mr. Sutton, were there any marked police vehicles
23    at that location?
24        A    No.  There was not.
25        Q    Would you tell Judge McCuskey what a marked police
```

1    vehicle is?

2        A      A marked police vehicle is the car that's got the

3    county wrote on it.  It's got county or whatever.  It's got

4    lights that shine -- that reflect in the, at nighttime,

5    stripes on the side of it.  It's got "sheriff" written on it.

6        Q      Now, the sheriff in the locale where you would be

7    would be the Kankakee --

8        A      County.

9        Q      -- Sheriff, County Sheriff's Department, correct?

10       A      Correct.

11       Q      Were there any Kankakee County Sheriff's vehicles

12   at the scene when you arrived?

13       A      No.  There was not.

14       Q      Were there any vehicles that were marked police

15   vehicles at the scene when you arrived?

16       A      No.  There was not.

17       Q      Were there any markings on the black Jeep?

18       A      No.  There was not.

19       Q      Were there any markings on the maroon car that

20   you've just identified?

21       A      No.  There was not.

22       Q      And the only other vehicle was Gene's pickup truck;

23   is that correct?

24       A      Correct.

25       Q      Now, when you arrived at the scene, Gene was out of

1    the car; is that correct?

2         A    That's correct.

3         Q    I mean, Gene was standing up --

4         A    Mr. Hoyt brought him up.

5         Q    He brought him up?

6         A    Right.

7         Q    And you've described what Gene looked like at the

8    time, --

9         A    Right.

10        Q    -- correct?

11        A    Correct.

12        Q    Now, did you see the police put Gene in the

13   vehicle?

14        A    No, I didn't.  No, I didn't.

15        Q    Did you see the vehicles leave?

16        A    No.  I saw his vehicle come past my house.

17        Q    Who's "his"?

18        A    Mr. Hoyt's, his Jeep.

19        Q    The Jeep?

20        A    Yeah.

21        Q    All right.  But you -- did you see any other police

22   vehicles arrive on the scene?

23        A    No.

24        Q    Only the two vehicles that you described; is that

25   correct?

1      A      That's correct.

2      Q      And Gene's pickup truck?

3      A      That's correct.

4      Q      And none of them had markings on them,

5   police-marked vehicle markings, correct?

6      A      Correct.

7      Q      You say your property.  How much property do you

8   have in that, at that location, sir?

9      A      I got ten acres.

10     Q      Okay.  And so you had to walk about how far from --

11  and how far were Gene and the three policemen in relationship

12  to your house?

13     A      About 200 yards.

14     Q      200 yards?

15     A      Yeah.

16     Q      During -- as you were walking that 200 yards, did

17  you ever see any of the vehicles moving?  Were they all

18  stopped when you first made your observations?

19     A      When I -- they was -- yeah.  They was all stopped.

20     Q      Okay.  So you never saw any cars moving, correct?

21     A      Correct.

22     Q      You never saw any cars speeding, correct?

23     A      Correct.

24     Q      They were all stopped when you arrived; is that

25  correct?

1      A      That's correct.

2      Q      Do you know how long the vehicles had been at that

3    location before you decided to go and make an inspection?

4      A      No.  Only --

5      Q      Yes -- do you know?

6      A      No.

7      Q      What were you about to say?

8      A      I was about to say I went to make the inspection

9    after I saw the two white guys, like I said, standing up on

10   the hill.

11     Q      You don't know how long they had been there,

12   though, do you?

13     A      Not -- no longer than, I guess, from the time I saw

14   them standing up there.

15     Q      No.  My question is:  Did you see them when they

16   first arrived, I guess, is my question?

17     A      Well, no.  I can't say I saw them when they first

18   arrived.

19     Q      Because you didn't see any vehicles moving; is that

20   correct?

21     A      No.  I didn't see any vehicles moving.

22     Q      So when you arrived -- when you made your

23   observations, everybody was out of the cars and -- outside of

24   cars -- outside of cars, correct?

25     A      Right.

|    |   |                                                      |
|----|---|------------------------------------------------------|
| 1  | Q | No cars moving?                                       |
| 2  | A | No cars moving.                                      |
| 3  | Q | Okay.                                               |

4           MR. HILL:  May I have a moment, Judge?

5           THE COURT:  You may.

6                (Brief pause in proceedings.)

7           MR. HILL:  I have no further questions.

8           THE COURT:  Mr. Miller.

9                CROSS-EXAMINATION BY MR. MILLER:

10      Q    Mr. Sutton, you're the defendant's father?

11      A    Yes, I am.

12      Q    And you testified as to what, in your opinion, a
13 marked squad car was, right?

14      A    Right, correct.

15      Q    In this case, you said you came out of your house
16 sometime around noon?

17      A    I would -- I'm just guessing that time.

18      Q    And how far is your house from the road that passes
19 in front of your house?

20      A    About 50 feet.

21      Q    And in this case, did you come out of your house
22 because you heard police sirens outside your house?

23      A    No, I didn't.

24      Q    Why did you come out of your house?

25      A    Because I always be out my house in the yard.  I

1    don't stay in the house.  I stay outside.

2        Q    And did you ever hear any police sirens on December

3    14, 2006, around noon?

4        A    No, I didn't.

5        Q    Did you see what we refer to as blue and red

6    flashing take-down lights on the car that's, you identified in

7    Government Exhibit 1?

8        A    No, I didn't.

9        Q    Were you able to observe on that day the, the --

10   what we'll show here on -- I'm sorry, on Defense Exhibit 1.

11   On Defendant's Exhibit 1, were you able to observe the

12   spotlight that was on that vehicle?

13            THE COURT:  You should be able to see it right next

14   to you if that's on.  Is that on?

15       A    Oh.  No.

16       Q    You didn't observe that on that day?

17       A    I didn't really pay attention to it because I was

18   concerned about my son.

19       Q    You indicated that no officers were in uniform.  Do

20   you see in Defendant's Exhibit 1 a picture of a person next to

21   the car?  Does that appear to be what the, the officers that

22   you saw were wearing that day?

23       A    That's what they was wearing.

24       Q    And so when you say they weren't wearing a uniform,

25   you don't mean that they weren't wearing something that said

1    "police" on it?

2         A    Well, if that's what you call a uniform.

3         Q    I'm just asking what they were -- that's what they

4    were wearing that day; is that right?

5         A    Yeah.

6         Q    Okay.

7              THE COURT:  Well, let me ask clearly so he doesn't

8    get confused.  Put that back.

9              It appears on that picture -- that could be a blue

10   shirt or a black shirt.  Would you agree it's blue or black?

11             THE WITNESS:  I would agree.

12             THE COURT:  Okay.  Now, I can't tell which color.

13             But it looks like up on the top, left-hand top part

14   of the shirt there is some lettering; and from, right now I

15   can't read it.  Maybe Mr. Miller could make it even larger.

16             Okay.  Yeah.  Now I can read it, and it says

17   "police" on that upper left-hand side of that shirt which now

18   looks blue to me.

19             Did you see any lettering on the shirt that you saw

20   on either of the two officers?  Did they have any lettering

21   that said "police"?

22             THE WITNESS:  I didn't see no lettering.

23             THE COURT:  Okay.  How close were you to them when

24   you talked to Officer Hoyt?

25             THE WITNESS:  We was pretty close.

```
1              THE COURT:  Less than ten feet?

2              THE WITNESS:  I would say.  Yeah.

3              THE COURT:  Okay.  You may continue.

4              MR. MILLER:  Thank you, Your Honor.

5    BY MR. MILLER:

6         Q      And do you recall what Special Agent Hoyt was

7    wearing that day?

8         A      He was wearing -- I guess like it's a SWAT outfit

9    or whatever.  You know, some blue jeans, I think, and just a

10   T-shirt or something.

11        Q      And --

12             THE COURT:  What's the exhibit number on that one,

13   Mr. Miller?

14             MR. MILLER:  This is Defendant's Exhibit Number 1.

15             THE COURT:  Oh, okay.  And that -- I hadn't looked

16   at the picture of the three cars.  So that's actually already

17   in evidence.

18             MR. MILLER:  Yes, Your Honor.

19             THE COURT:  Thank you.

20   BY MR. MILLER:

21        Q      And your testimony was there were only three

22   officers present when you went over to where your son was?

23        A      Correct.

24        Q      Did you ever see any other officers arrive?

25        A      No, I didn't.
```

1      Q      So you saw only three officers?

2      A      Just three.

3      Q      And you indicated that you saw three vehicles,

4  right?

5      A      Correct.

6      Q      Your son's black Chevy pickup truck?

7      A      Right.

8      Q      The maroon car that's been identified on

9  Defendant's Exhibit 1?

10     A      Right.

11     Q      And then a black Jeep?

12     A      Correct.

13     Q      Did you see any other vehicles in addition to those

14  three vehicles?

15     A      That's all.

16     Q      During the entire time you were there, did you see

17  any additional vehicles?

18     A      No.

19     Q      Now, you stated that when you first saw your son

20  his face was swollen up, bloody, and dirty; is that right?

21     A      Correct.

22     Q      Now, during the time that you were there, did you

23  ever see your son struck?

24     A      No, I didn't.

25     Q      Did you ever see your son kicked?

30

1    A    No.

2    Q    And so your knowledge of that was based on

3    information that your son said to you?

4    A    Well, my knowledge of that was based on the fact

5    that Mr. Hoyt told me I didn't -- that he was not gonna let

6    them do that to him no more.

7    Q    Well, he told you that he would not let them beat

8    your son; is that what you're saying?

9    A    That's what he told me.

10   Q    But you didn't see your son being beaten; is that

11   right?

12   A    No, I didn't.

13   Q    Did -- you testified, though, that his face was

14   bloody?

15   A    Yeah.

16   Q    Could you tell where the blood came from?

17   A    Looked like out of his mouth.

18   Q    And did you see, did you see any cuts?

19   A    Just, just swollen.  His face was swollen.

20   Q    I'm going to show you what's been previously marked

21   as Government's Exhibit 2 for identification.

22        Is Government Exhibit 2 a photograph of your son?

23   A    Yes, it is.

24   Q    Is that the way he appeared when you observed him

25   on December 14, 2006?

| | | |
|---|---|---|
| 1 | | THE COURT:  And you can see it next to you. |
| 2 | | THE WITNESS:  Oh, okay. |
| 3 | A | He wasn't cleaned up.  He was dirty. |
| 4 | Q | Okay.  And what other differences are there besides |
| 5 | | the fact that he was dirty when you saw him on December 14th? |
| 6 | A | Well, his mouth was all bloody. |
| 7 | Q | Is that what you would say; his face -- is that -- |
| 8 | | what I want to know is in Government's Exhibit 2, is that what |
| 9 | | you would describe as a swollen face? |
| 10 | A | Yeah, it is. |
| 11 | Q | I'm sorry.  Was that a yes? |
| 12 | A | Yes. |
| 13 | Q | So you don't believe he, on that date when you |
| 14 | | would typically see him, that he would look like that? |
| 15 | A | Yes.  I mean, no.  He wouldn't normally look like |
| 16 | | that. |
| 17 | Q | Okay.  Now, did you -- in your interaction with the |
| 18 | | officers, did you yell at the officers? |
| 19 | A | No, I didn't. |
| 20 | Q | Did you use any profanities with the officers? |
| 21 | A | No, I didn't. |
| 22 | Q | Now, you do have a prior felony conviction; is that |
| 23 | | right? |
| 24 | A | Yes, I do. |
| 25 | Q | You were convicted in 2002 of -- |

1          MR. HILL:  Your Honor, I'm going to object as to

2    what he was convicted of.  I think the fact that he's got a

3    felony is sufficient to impeach.

4          MR. MILLER:  What it was and when it was, I

5    believe, is the permissible impeachment, Your Honor.

6          THE COURT:  I think it is, since it's -- he's not

7    on trial, that the Court is not precluded from hearing.  If we

8    were at trial, obviously, I would -- and he was the defendant,

9    I'd obviously grant that motion and might consider it as to

10   other witnesses; but I believe that it's not inappropriate at

11   this time.

12         MR. MILLER:  You were convicted --

13         THE COURT:  Objection overruled.

14   BY MR. MILLER:

15     Q     You were convicted in 2002 of the possession of

16   marijuana with the intent to distribute it?

17     A     Yes, I was.

18     Q     And that was in the United States District Court

19   for the Central District of Illinois; is that right?

20     A     Yes, it was.

21     Q     And were the, the officers involved --

22         THE COURT:  Okay.  That's -- now that's come in.

23   The reason the Court did allow that was to see if he had been

24   convicted of a crime of dishonesty; and possession of

25   marijuana the Court does not consider to be a crime of

1  dishonesty, but he's acknowledged the felony conviction.

2  BY MR. MILLER:

3      Q    Were the officers involved in that investigation

4  KAMEG officers?

5      A    County.

6      Q    Kank--

7      A    County.

8      Q    Kankakee County officers?

9      A    Right.  They the ones that took me to jail.

10     Q    Okay.  Now, you testified that, that the officers

11 were always in plain clothes, right?

12     A    Say that again.

13     Q    You testified that the officers are always in plain

14 clothes?

15     A    Not always.

16     Q    Well, that was your testimony.  He asked if they

17 were in plain clothes, and you said they're always in plain

18 clothes.

19     A    What you mean?  I don't --

20     Q    You don't recall testifying -- when you were asked

21 if the officers were in plain clothes on December 14, 2006,

22 that you stated, "They're always in plain clothes"?

23     A    Yeah.  I mean, agents be in plain clothes.  Agents

24 and KAMEG, they don't wear uniforms.

25     Q    So that's what you meant when you said they're

1    always in plain clothes?

2        A    Yeah.

3        Q    And what is the basis for your knowledge that the

4    KAMEG officers are always in plain clothes?

5        A    Because you just asked me:  Was I a felon?  And I

6    told you:  Yes.  I'm familiar with the police.

7        Q    Okay.  So based on prior interactions with them?

8        A    Right.

9        Q    Okay.

10            THE COURT:  Doesn't the KAMEG officers, though,

11    always drive around in unmarked vehicles, too?

12            THE WITNESS:  Well, I think they do both of them.

13            THE COURT:  Okay.  Because I've heard that

14    testimony before in cases involving KAMEG officers in the City

15    of Kankakee, that they're always driving around in unmarked

16    vehicles but the people know them because of their antennas.

17            THE WITNESS:  But, see, I live in the country.

18            THE COURT:  Okay.

19            THE WITNESS:  They don't be out there.

20            THE COURT:  Got you.

21            THE WITNESS:  Just the County.

22            THE COURT:  Okay.  Thank you.

23            MR. MILLER:  I don't believe I have any further

24    questions, Your Honor.

25            THE COURT:  Well, both of you may want to re-- to

35

1    redirect questions.  If you have a follow-up, Mr. Miller, to

2    what I'm going to ask, you may; and then, Mr. Hill, obviously

3    will have that opportunity.

4              I didn't get the address where you were at.  I did

5    hear St. Anne; but before that, what was the address?

6              THE WITNESS:  10748 East 4000 South Road.

7              THE COURT:  10748 East 4000 South Road.

8              That's not in St. Anne proper, right?

9              THE WITNESS:  No, not in the town.

10             THE COURT:  That's right.  That's what I thought.

11             THE WITNESS:  That's in the country.

12             THE COURT:  Okay.  And where's that in relation to

13   Hopkins Park?

14             THE WITNESS:  Well, there's -- St. Anne -- I'm in

15   the corner of St. Anne; and then across the road is Hopkins

16   Park.

17             THE COURT:  Okay.  So how far are you from Hopkins

18   Park?

19             THE WITNESS:  From the beginning of Hopkins Park or

20   Hopkins Park?

21             THE COURT:  Well, actually, the town.

22             THE WITNESS:  I would say about maybe two miles.

23             THE COURT:  Okay.  And how far are you from the

24   town of St. Anne?

25             THE WITNESS:  I'm about seven miles.

1          THE COURT:  So you are out in the country?

2          THE WITNESS:  Yeah.

3          THE COURT:  Now, I've been up in that area -- it's

4     been a while -- because I used to campaign in Kankakee County

5     and Hopkins Park and St. Anne.  So, obviously, you know I'm a

6     democrat.  Republicans don't spend a lot of time up there.

7          A lot of that's fairly flat out there.  So when you

8     talked about a hill -- I come from north of Peoria, the

9     Illinois River Valley.  When we talk about a hill, we're

10    talking about something that may go up 100 feet.

11         THE WITNESS:  Oh, no.

12         THE COURT:  But some people talk about a hill just

13    because it's a little rise.  Are you talking about a little

14    rise in the road?

15         THE WITNESS:  Right, correct.

16         THE COURT:  Okay.  So not the hill that I'm talking

17    about that may be where you've got to walk up 50 or 100 feet.

18         What kind of day was it on December 14, 2006, at

19    noon?

20         THE WITNESS:  It was a nice day.

21         THE COURT:  And so you were able to see?

22         THE WITNESS:  Right.

23         THE COURT:  And you said it was about 200 yards

24    away, and you saw -- I think you said two white guys?

25         THE WITNESS:  Yeah.  It was two of the officers

1    standing up on the hill.

2              THE COURT:  But, eventually, you end up seeing four

3    people, right?

4              THE WITNESS:  Yeah.  Eventually, I end up seeing

5    four.

6              THE COURT:  Okay.  And were the vehic-- when you

7    said the hill, which really now I understand is a rise because

8    when you said that I was thinking, "Boy, that's awful flat out

9    there between St. Anne and Hopkins Park."  Now I understand

10   what you meant.

11             How far were the cars away from these people that,

12   that you first saw, the two people?

13             THE WITNESS:  Well, from the angle that I was

14   looking at them, I could just see two, two people standing on

15   the hill.

16             THE COURT:  And then so you walked the 200 mile --

17   200 yards closer to them; and were the vehicles between you

18   and them as you walked, or were the vehicles on the other side

19   of the hill?

20             THE WITNESS:  Okay.  So, just like I'm going this

21   way.

22             THE COURT:  Yep.

23             THE WITNESS:  Okay.  The little rise -- I won't

24   call it a hill.

25             THE COURT:  The rise.

```
1              THE WITNESS:  The little rise was down there,

2    right.  So I could see them because I'm at the bottom where I

3    can see it.

4              THE COURT:  All right.

5              THE WITNESS:  So they up on the rise.  I could see

6    them.

7              THE WITNESS:  Okay.  So I had rode around there to

8    see what was they doing, the two people was doing on the --

9              THE COURT:  You said you rode around there?

10             THE WITNESS:  Yeah.

11             THE COURT:  Okay.  You didn't walk?

12             THE WITNESS:  No.

13             THE COURT:  Okay.  You got in your car; and when

14   you drove, is that -- did you drive right up to those three

15   vehicles you identified?

16             THE WITNESS:  No, no.  They was on the road.

17             THE COURT:  Okay.

18             THE WITNESS:  The three vehicles was on the road.

19             THE COURT:  Yep.

20             THE WITNESS:  Okay.  So I went in at the beginning

21   of my other property, and this was a road through this.  So I

22   just drove around there.

23             THE COURT:  Drove on a road up your, on your

24   property up to the rise?

25             THE WITNESS:  Yeah.
```

1          THE COURT:  Okay.  Was there snow or mud that day?

2          THE WITNESS:  No.

3          THE COURT:  So you didn't have any problem driving

4    up there?

5          THE WITNESS:  No.

6          THE COURT:  Okay.  Now I've got a better idea of

7    where we stand.

8          MR. MILLER:  I have no additional questions, Your

9    Honor.

10          THE COURT:  Judge, I do in light of the --

11          THE COURT:  And you've got follow-up to me --

12          MR. HILL:  Yes.

13          THE COURT:  -- as well as redirect.

14          MR. HILL:  Thank you, Judge.

15          In light of that, I'd like to use the overhead

16    projector.

17          THE COURT:  And this is what --

18          MR. HILL:  This would be Defendant's Exhibit 2,

19    Your Honor.

20          THE COURT:  Okay.  It shows B, but we'll call it 2.

21    Okay, Defendant's Exhibit 2.

22          MR. HILL:  Right.  It's, it's -- actually, it's

23    number -- Exhibit B attached to our pleading; but for this

24    hearing, --

25          THE COURT:  You can just strike the B.  I see.

1    You've got Defendant's Exhibit 2 written on there.  That's

2    good.  Okay.

3            And, Mr. Miller, do you have any objection to

4    having this admitted?

5            MR. MILLER:  No, Your Honor.

6            THE COURT:  Okay.  It's admitted into evidence.

7                    REDIRECT EXAMINATION BY MR. HILL

8        Q    Mr. Sutton, I'm showing you what's been marked as

9    Defendant's Exhibit 2 for identification -- I mean, actually

10   in evidence at this point.

11           THE COURT:  It's in evidence.

12       Q    It's in evidence at this point.

13           It purports to be the area in or about St. Anne,

14   Illinois.  Are you familiar with this?

15       A    I can't see nothing on this.

16           THE COURT:  Yeah, the --

17           MR. HILL:  Well, let me --

18           THE COURT:  The lettering -- yeah.  You may have to

19   hand it to him.

20           MR. HILL:  Let me hand it to him.

21           THE COURT:  The lettering's pretty hard for me to

22   read --

23           MR. HILL:  Okay.

24           THE COURT:  And I'm sure for him, too.  He's got

25   glasses on, also.

1          MR. HILL:  Okay.  May I approach, Judge?

2          THE COURT:  You may.

3     BY MR. HILL:

4          Q    Mr. Sutton, I want to show you the road here, East

5     4000 Road.  Can you see East 4000 Road here?

6          A    Yes.

7          Q    And East 4000 Road, does it run east and west, sir,

8     as indicated on Defendant's Number 2?

9          A    Yes, it do.

10         Q    And East 4000 Road runs and becomes Central Street

11    at some point; does it not?

12         A    Yeah.  That's what it says.

13         Q    Is that correct?

14         A    Yes.

15         Q    And it also becomes Doney, D-o-n-e-y, Street at

16    another location; is that correct?

17         A    That's what it says.

18         Q    And when you get to South 13000 East Road, there's

19    an intersection there between East 4000 South Road and South

20    13000 East Road, correct?

21         A    Right.

22         Q    Now, are you familiar -- you are familiar, are you

23    not, with the roadway that goes from South 13000 East Road

24    west to East 4000 along East 4000 South Road; are you not?

25         A    Yes.  That's correct.  I mean, I'm aware of the

1    road.

2         Q    Okay.  And would that -- would you describe that

3    road as being a straight road, sir, from at least 13000 East,

4    South 13000 East Road to where your property is at or about

5    East 4000 South Road?

6         A    Well, it's exactly two, two miles.

7         Q    It's a two-mile stretch of highway; is that

8    correct?

9         A    It's exactly two miles.

10         Q    Okay.  Is it --

11         A    Two miles and one quarter.

12         Q    All right.  Listen to my question.

13              Is it hilly, or is it flat?

14         A    It's one hill.  There's a couple hills.

15              THE COURT:  A couple rises in the road?

16              THE WITNESS:  Rises, right.

17    BY MR. HILL:

18         Q    Okay.  The other near where your home is, how would

19    you describe that?  Is that where this Y is?  Do you see where

20    the Y is?

21         A    Yeah.  I see the Y.

22         Q    Would that be at or about where you observed Gene's

23    stop?  Or do you know?  Can you tell?

24         A    I can't tell that.

25              THE COURT:  A little more than two miles west of

1    Hopkins Park where they've got that Y marked?

2              THE WITNESS:  Okay.  Yeah.  Well, then, it would

3    have to be because it's two miles from, from that four-way

4    back to my house.

5              MR. HILL:  Okay.  Thank you.

6              I have no further questions.

7              THE COURT:  Thank you.

8              Mr. Miller.

9              MR. MILLER:  I just want to clarify.

10             RECROSS-EXAMINATION BY MR. MILLER:

11       Q    In looking at this Defendant's Exhibit 2 and this Y

12   that is on there, it appears that the Y is on the north side

13   of East 4000 Road.  Do you live on the north side or the south

14   side of East 4000 Road?

15       A    I live on the south side.

16       Q    And was the defendant actually stopped, where you

17   saw your son, on the south side of 4000 Road?

18       A    Yes.

19       Q    Okay.  So this Y that shows it on the north side,

20   the stop is actually on the south side of the road?

21       A    Yes.  That's what caused the [inaudible].

22             MR. MILLER:  Okay.  No further questions, Your

23   Honor.

24             THE COURT:  Any follow-up to that, Mr. Hill?

25             MR. HILL:  No, Judge.

1           THE COURT:  You may step down, and you're free --

2      and do you expect to call him as a rebuttal witness?

3           MR. HILL:  I do not, Judge.

4           THE COURT:  Okay.  Mr. Sutton Sr., you're free to

5      stay in the courtroom now.

6           MR. HILL:  Thank you.

7                (Witness Sutton excused, 3:17 p.m.)

8           THE COURT:  And you may call your next witness.

9           MR. HILL:  I'd call Agent Hoyt.

10           CHRISTOPHER HOYT, sworn, 3:17 p.m.,

11           DIRECT EXAMINATION BY MR. HILL:

12      Q    Sir, would you state your name and spell your last

13      name for the record?

14      A    Christopher Hoyt, H-o-y-t.

15      Q    And are you -- what's your employment, Mr. Hoyt?

16      A    I'm a special agent with the Drug Enforcement

17      Administration out of Chicago.

18      Q    Were you so employed on December 14, 2006, in that

19      capacity?

20      A    Yes, I was.

21      Q    Directing your attention to December 15, 2006, the

22      next day, did you have occasion to --

23                (Brief pause in proceedings.)

24           MR. HILL:  Excuse me, Judge.

25           THE COURT:  No problem.

1              (Brief pause in proceedings.)

2    BY MR. HILL:

3        Q    Directing your attention to December 15, 2006, did

4    you have occasion to appear before United States Magistrate

5    Judge David G. Bernthal, sir?

6        A    Yes.

7        Q    And at that time, did you have occasion to take an

8    oath to tell the truth, nothing but the truth, so help you

9    God?

10       A    Yes.

11       Q    Did you have occasion to swear to a criminal

12   complaint?

13       A    Yes.

14       Q    Sir, I'd like to direct, show you that criminal

15   complaint and ask you whether or not Defendant's Exhibit 2 is

16   the criminal complaint that you swore to?

17            THE COURT:  It will have to be 3 because the road

18   map out there around Hopkins Park is 2.

19       Q    I'm sorry.  I show you 3.

20       A    Okay.

21       Q    All right.  Did you get my question?  Did you swear

22   to this complaint?

23       A    Yes.

24       Q    You prepared this complaint, correct?

25       A    Yes.

1          Q     Sir, I'd like you to read what you wrote in, what

2     you swore to with respect to paragraph 6.

3                MR. MILLER:  Your Honor, I guess I'd object.  I

4     think this is impeachment, but we don't have any testimony

5     from the witness yet to impeach him; so I'm not sure where

6     we're going --

7                THE COURT:  Well, how is it impeachment?

8                MR. MILLER:  Well, otherwise, it's hearsay.

9                MR. HILL:  Judge, I'm laying the foundation for the

10    main allegation in my case.

11               THE COURT:  That it was a warrantless arrest --

12               MR. HILL:  That's correct.

13               THE COURT:  -- and no probable cause?

14               MR. HILL:  That's correct.

15               THE COURT:  Objection overruled.  You may proceed.

16    BY MR. HILL:

17         Q     Would you read to the judge what you said in

18    paragraph 6 of that affidavit?

19         A     "On December 14, 2006, I and other law enforcement

20    agents were conducting surveillance on Sutton.  We observed

21    Sutton drive to a residence in the area between 12000 East and

22    13000 East at 4000 South in rural Kankakee County, Illinois.

23    Sutton left the area in a pickup truck.  I began following

24    Sutton, and he began to drive away from me very quickly.

25    Officers and marked squad cars in the area turned on their

47

1    take-down lights and attempted to stop Sutton.  Sutton

2    continued to drive very quickly and attempted to flee from

3    officers.  His pickup truck finally came to a stop when he was

4    unable to negotiate a turn and drove the truck into a sandy

5    area."

6        Q    Now, Mr. Hoyt, what you stated in paragraph 6 of

7    that affidavit leaves out, does it not, various locations that

8    Mr. Sutton went to prior to him being stopped by yourself and

9    other KAMEG agents; does it not?

10        A    That's correct.

11        Q    In fact, you say in your affidavit that when

12   Sutton -- you say in your affidavit that you saw Sutton

13   between 12000 East and 13000 East at 4000 South in rural

14   Kankakee County, Illinois, at a residence, correct?

15        A    He left --

16        Q    You say that?

17        A    He left a residence.

18        Q    You say that when he left he left in a pickup

19   truck, correct?

20        A    Correct.

21        Q    You then say that he -- you began following Sutton,

22   and he began to drive away from you very quickly at that

23   point, correct?

24        A    Correct.

25        Q    You then say that officers in marked squad cars in

1    the area turned on their take-down lights and attempted to

2    stop Sutton, correct?

3        A    Correct.

4        Q    You say that Sutton continued to drive very

5    quickly, and you -- and attempted to flee from the officers,

6    correct?

7        A    Correct.

8        Q    Now, Mr. Hoyt, when Sutton left the residence

9    between 12000 East and 13000 East at 4000 South in rural

10    Kankakee County, officers in marked squad cars at that time

11    did not attempt to take him down, did they?

12        A    Not when he first left the residence.

13        Q    And, of course, in your affidavit, you tell

14    Magistrate Judge Bernthal that they did, didn't you?

15        A    No.

16        Q    Yes or no?

17        A    They ultimately did take him down.

18        Q    You didn't say "ultimately" in your affidavit.  You

19    said that after he left that area, they immediately began to

20    go after him to try to stop him; did you not?

21        A    And that's correct.

22        Q    But the fact of the matter is that when he left the

23    residence, when Gene Sutton left the residence at 12000 East

24    to 13000 East at 4000 South, he actually drove east on East

25    4000 South Road to South 13000 East Road, which is Main

1      Street; isn't that correct?

2          A      That's correct.  I wrote that in the report.

3          Q      Okay.  And then after that, at the intersection of

4      East 4000 South Road and South 13000 East Road, which is Main

5      Street, Sutton drove his pickup truck north to East, East

6      Spinning Wheel Road; isn't that correct?

7          A      That's correct.

8          Q      And he wasn't speeding at that time, was he?

9          A      I don't believe so.

10          Q      And there weren't officers in marked squad cars

11      attempting to take him down at that point, were there?

12          A      Yes.  They were trying to get to the location where

13      he was traveling.

14          Q      He was not speeding, though, was he?

15          A      Not at that time.

16          Q      All right.  And then after he got to East Spinning

17      Wheel Road, he then proceeded east on East Spinning Wheel Road

18      approximately one-fourth mile to a driveway where he pulled

19      into the driveway on the north side of East Spinning Wheel

20      Road, parked his vehicle, and exited the truck; isn't that

21      correct?

22          A      That's correct.

23          Q      You did not indicate that to Magistrate Judge

24      Bernthal when you swore to the criminal complaint before

25      Judge -- Magistrate Judge Bernthal on December 15, 2006, did

1    you?

2               MR. MILLER:  Objection, Your Honor, --

3      A    My complaint's not all-inclusive.

4               MR. MILLER:  -- as to what he told Judge Bernthal

5    as to the suppression hearing.  I fail to see --

6               MR. HILL:  Judge, --

7               MR. MILLER:  -- the relevance of this.

8               THE COURT:  Well, the -- I don't know what the

9    relevance is -- he'll tie that together -- or what weight, if

10    any, the Court will give the omission.  But I think he has the

11    right to ask the questions.  So the objection's overruled.

12    BY MR. HILL:

13      Q    You never indicated in the affidavit that after

14    Sutton left the trail-- the residence and drove to East

15    Spinning Wheel Road that he parked his car and got out of his

16    car and, and exited his truck, did you?  You didn't tell him

17    that, did you?

18      A    I did not.

19      Q    And, in fact, you didn't tell him that Sutton

20    remained at that location for approximately five to seven

21    minutes, did you?

22      A    He remained there briefly as we watched each other.

23      Q    In fact, he remained at that location out of his

24    truck for approximately five to seven minutes; isn't that

25    correct?

```
1          A       It was a few minutes.

2          Q       What's -- a few minutes.  Is that two minutes, you

3     say?

4          A       I don't recall.  I was watching him, not the clock.

5          Q       In the affidavit, you do not say that Sutton got

6     out of his truck and, after pulling into a driveway.  You

7     leave the impression in your affidavit that he immediately

8     sped away from the residence; do you not?

9          A       I just outlined the facts.

10         Q       But the fact of the matter is that after he left

11    the residence, he drove to another residence; did he not?

12         A       That's correct.

13         Q       And he got out of his car; did he not?

14         A       That's correct.

15         Q       And he had a conversation with somebody, didn't he?

16         A       No.

17         Q       Well, there was another person standing in the

18    driveway of where Mr. Sutton went, wasn't there?

19         A       No, there wasn't.

20         Q       You didn't see a Ms. -- a female standing in the

21    driveway of where Sutton went?

22         A       I saw Gene Sutton only standing next to his vehicle

23    as he stared at me as I drove by.

24         Q       But he went into a driveway, correct?

25         A       That's correct.
```

1      Q      And he was out of his vehicle, correct?

2      A      That's correct.

3      Q      And you don't state that in paragraph 6 of this

4   affidavit that you swore to before the magistrate, do you?

5      A      No.

6      Q      You say that he immediately sped away, speeding,

7   didn't you?

8      A      He left the area; and when we tried to take him

9   down, he sped away.

10     Q      No, no.  I think you understand.  My question is

11  that you omitted from your affidavit that the man got out of

12  the car and was actually standing next to his car; isn't

13  that the -- that's left out, right?

14     A      It's not in the affidavit.  That's correct.

15     Q      And if he's standing next to his car outside of his

16  vehicle, he can't be speeding away; isn't that correct?

17     A      Not at that time.

18     Q      Now, you say he stood outside of his car for a

19  matter of two min-- approximately two minutes, by your

20  estimation?

21     A      A few minutes.

22     Q      After he stood at that location, he then got back

23  in his black Jeep Liberty, correct?

24     A      No.

25     Q      Well, he was -- he pulled into a driveway when he

1     was out of the vehicle; isn't that correct?

2          A     He pulled up in a pickup truck.

3          Q     I'm sorry.  You drive -- excuse me.  I stand

4     corrected.

5                He got back into his pickup truck while he was --

6     he pulled into a driveway, correct?

7          A     That's correct.

8          Q     And the driveway that he pulled into was at the

9     north side of East Spinning Wheel Road, correct?

10         A     Correct.

11         Q     And he parked the vehicle, correct?

12         A     Correct.

13         Q     Which means he stopped the vehicle, right?

14         A     Correct.

15         Q     When the vehicle was stopped, it wasn't speeding

16    away, was it?

17         A     Not at that time.

18         Q     He exited the truck; did he not?

19         A     Correct.

20         Q     When he exited the truck, it wasn't speeding away,

21    was it?

22         A     Not at that time.

23         Q     He remained at that location for approximately, you

24    say, several minutes, two minutes.  When he was at that

25    location for that two minutes, he wasn't speeding away, was

he?

    A    No, he wasn't.

    Q    Now, during that time, you say that you did not observe him talking to anyone?

    A    That's correct.

    Q    You only saw him standing there, and you say he eyeballed you at that time?

    A    That's correct.

    Q    Well, when he was eyeballing you at that time, he wasn't speeding away in his black pickup truck, was he?

            MR. MILLER:  Your Honor, --

    A    That's correct.

            MR. MILLER:  -- he called this witness on direct. I don't believe the witness has been hostile to him.  He's been yelling and --

            MR. HILL:  I'm sorry.

            MR. MILLER:  -- leading the witness, and I would ask that he perform a direct examination by asking questions.

            MR. HILL:  I did ask "was he?" at the end, Judge. I don't know --

            MR. MILLER:  They're leading questions, Your Honor.

            THE COURT:  Objection overruled.

            MR. HILL:  Thank you.

BY MR. HILL:

    Q    When Sutton got back into his truck, he had been at

1    the driveway, in a driveway on the north side of East Spinning

2    Wheel Road, correct?

3         A    Correct.

4         Q    He got into his car, correct?

5         A    Correct.

6         Q    Did you see him getting tools out of his truck

7    while he was in the driveway, sir?

8         A    No.

9         Q    You didn't include anything about him being in this

10   driveway and out of his truck in your affidavit to the

11   magistrate, did you?

12            MR. MILLER:  Same objection, relevance.

13            THE COURT:  How about asked and answered?

14            MR. HILL:  And going on --

15            THE COURT:  Overruled as to irrelevance.

16            MR. HILL:  I'm sorry.

17   BY MR. HILL:

18        Q    He then gets back in the truck; does he not?

19        A    Correct.

20        Q    When he gets back in the truck, he drives out of

21   the driveway; does he not?

22        A    Correct.

23        Q    When he drove -- when he's driving out of the

24   driveway, he's not speeding, is he?

25        A    Um, --

```
 1          Q     Yes or no.

 2          A     Yes.   He began -- he begins to accelerate toward

 3     the stop sign at that intersection --

 4          Q     When --

 5          A     -- when he's driving westbound.

 6          Q     When he is driving out of the driveway, he is not

 7     speeding, is he?

 8                THE COURT:  He's now asking about the East Spinning

 9     Wheel Road driveway.

10                Is that correct, Mr. Hill?

11                MR. HILL:  That's correct.

12          A     He pulls out of the driveway.

13          Q     He is not --

14                THE COURT:  Well, he asked:  Was he speeding out of

15     the driveway?

16                THE WITNESS:  He didn't speed out of the driveway.

17                THE COURT:  Okay.

18     BY MR. HILL:

19          Q     When he got out of the driveway, he turned --

20                THE COURT:  South?  Left or right?

21                MR. HILL:  I'm on page 3 of my affidavit, Judge.

22                THE COURT:  I'm just looking at the map.

23                MR. HILL:  I'm on page 3 of the affidavit.

24     BY MR. HILL:

25          Q     You didn't see him getting tools out of the, out of
```

1    his truck?

2         A    No.  I did not.

3         Q    You didn't see him talking with a woman who was on

4    a porch at that driveway, sir?

5         A    I only saw Gene Sutton.

6         Q    Okay.  But you did see him get back into his truck

7    and drive out of the driveway, correct?

8         A    Correct.

9         Q    Is that correct?

10        A    Correct.

11        Q    And when he drove out of the driveway, he turned

12   west onto East Spinning Wheel Road, correct?

13        A    Correct.

14        Q    And then he proceeded to a stop sign at South 1300

15   [sic] East Road, which is Main Street, correct?

16        A    Correct.

17        Q    And he stopped his truck at the stop sign, didn't

18   he?

19        A    Yes, he did.

20        Q    All right.  So when he stopped at the stop sign, he

21   wasn't speeding away from the residence as you indicated in

22   your affidavit; isn't that correct, sir?

23        A    [No response.]

24        Q    He stopped at the stop sign --

25        A    Not at that time.

1    Q    Sutton then turned north on South 13000 East Road,

2    which is Main Street; isn't that -- he turned north, --

3    A    North.

4    Q    -- right?

5         And north on South 13000 East Road is also known as

6    Main Street; is that correct?

7    A    Correct.

8    Q    Or do you know?

9    A    Yes.

10   Q    And then he proceeded north?

11   A    Correct.

12        THE COURT:  Let me stop you, Mr. Hill.

13        When you're observing him on East Spinning Wheel

14   Road, where were you located?

15        THE WITNESS:  I was actually east of him, more

16   towards -- I didn't realize -- he had turned down a road

17   that's a dead-end road, and I wasn't familiar with the area.

18        THE COURT:  Yeah.  The map showed it as a dead-end

19   road.

20        THE WITNESS:  Right.

21        THE COURT:  But it also shows it as East Spinning

22   Wheel Road.  I just wondered where you were --

23        THE WITNESS:  I was further east.  I was further

24   east.  I went past the hill, and then I made a U-turn waiting

25   for him to leave.

1          THE COURT:  Okay.  So you were on East Spinning

2   Wheel Road, too?

3          THE WITNESS:  Yes, I was.

4          THE COURT:  So when he approached East Spinning

5   Wheel Road intersection with Main Street, which is also 1300

6   East Road, he had to drive by you?

7          THE WITNESS:  No.  He was -- no.  I drove past him

8   once he was parked in the driveway on East Spinning Wheel

9   Road.

10          THE COURT:  Okay.  Then you're --

11          THE WITNESS:  I followed him in.

12          THE COURT:  At that point, you were east of him?

13          THE WITNESS:  I am east of him.

14          THE COURT:  And so when he leaves, he's west of

15   you?

16          THE WITNESS:  Correct.

17          THE COURT:  And then you follow him going west to

18   that intersection --

19          THE WITNESS:  Correct.

20          THE COURT:  -- that you're talking about?

21          THE WITNESS:  Correct.

22          THE COURT:  Okay.  I wanted to get that straight,

23   Mr. Hill.  Thank you.

24          When you were stopped and he was stopped and you

25   said you observed him out of the, out of his pickup truck, how

1    far away were you?

2            THE WITNESS:  Well, he was pulled into the

3    driveway, and it wasn't very far.  Maybe -- I don't know.  He

4    just pulled, like, halfway up the driveway, and I drove past;

5    and we actually looked at each other.  It was -- and I, but I

6    continued past not realizing it was a dead-end road.

7            THE COURT:  Okay.  You may continue, Mr. Hill.

8            MR. HILL:  Thank you.

9    BY MR. HILL:

10       Q    Now, when you were stopped and Mr. Sutton's car

11   was, truck was stopped, he wasn't speeding as you alleged in

12   the affidavit, correct?

13       A    Correct.

14       Q    Now, Sutton turned north on South 13000 East Road

15   and proceeded north; did he not?

16       A    He did.

17       Q    And when he was proceeding north, he wasn't

18   speeding, was he?

19       A    I remained on Spinning Wheel Road.

20       Q    My question is:  When he proceeded north on South

21   13000 East Road, he was not speeding; --

22       A    I don't --

23       Q    -- is that correct?

24       A    I don't know at that time if he was.  I remained on

25   Spinning Wheel Road.

1       Q    Of course, you never mentioned that in your

2 affidavit to the magistrate, did you?  Yes or no.

3       A    No.

4           MR. MILLER:  Objection, relevance.

5           THE COURT:  Sustained.

6           But let me ask you this.  Did you lose contact,

7 visual contact with him since you were west -- east of him?

8 When he leaves the intersection of East Spinning Wheel Road

9 heading north on Main Street, did you lose visual contact with

10 him because of buildings or vehicles?

11           THE WITNESS:  I was still the only vehicle close to

12 him; so I remained behind, but we had visual from the air.

13           THE COURT:  Okay.  So he was being observed by a

14 plane; but at that point, did you lose visual contact with him

15 because as he's turning there's some buildings there or

16 some --

17           THE WITNESS:  Because I was far enough back from

18 the corner, when he made his turn, I lost visual.

19           THE COURT:  Okay.  So at that point, you wouldn't

20 know whether he was speeding or not because you couldn't see

21 him?

22           THE WITNESS:  Correct.

23 BY MR. HILL:

24       Q    And, of course, you didn't state that in your

25 affidavit to the magistrate, did you?

1     A    No.

2     Q    Okay.  And so at any rate, he continues north on

3  South 13000 East Road, which is Main Street, as far as you

4  know, correct?

5     A    Correct.

6     Q    When he gets to the intersection of East Gamble

7  Road and South 13000 East Road -- do you know, by the way, if

8  there's a garage there known as Mondy Brothers Garage at that

9  location?

10     A    I am not familiar.

11     Q    Okay.  You're not familiar enough with the area --

12     A    No.

13     Q    -- to know?

14          Do you know whether or not there's a garage at that

15  location?

16     A    I do not know.

17     Q    Well, did you see Sutton's vehicle stop near that,

18  near a garage at that location?

19     A    No.  It was radioed to me that he had pulled over

20  to the side of the road.

21     Q    All right.  But you didn't see this, right?

22     A    No.

23     Q    And when he pulled over to the side of the road,

24  obviously, he wasn't speeding either, correct?

25     A    Once he's pulled over?

1          Q      He wasn't speeding, correct?

2          A      I would say no.

3          Q      Now, do you know whether or not Mondy's -- you

4    don't know about Mondy's; so you don't know whether or not

5    Mondy's was open or closed on December the 14th, do you?

6          A      I have no knowledge.

7          Q      You don't know whether or not Sutton stopped his

8    truck on the east side of Main Street because you couldn't see

9    it, right, at that point?

10         A      I was told.

11         Q      But you couldn't see it, --

12         A      Correct.

13         Q      -- right?

14                And when he stopped on the east side of Main Street

15   just a little north of what would have been East Gamble Road,

16   do you know whether or not he backed his truck into a driveway

17   on the east side of Main Street?

18         A      All I was told is he made a U-turn.

19         Q      Sir, you didn't see him make a U-turn, did you?

20         A      I did not.

21                THE COURT:  Let me ask you this.  The defendant's

22   Exhibit 2 would indicate that the distance between East

23   Spinning Wheel Road and East Gamble Road is certainly probably

24   not more than -- well, or less than a quarter of a mile.

25                When did you resume visual contact with Mr.

1   Sutton's pickup truck?

2            THE WITNESS:  That would be when it sped past me

3   going southbound as I sat on Spinning Wheel Road.

4            THE COURT:  So you stayed on Spinning Wheel Road

5   after you lost contact?

6            THE WITNESS:  Because we were unsure whether he was

7   going to travel north or south at that time.

8            THE COURT:  Okay.  How many minutes were you

9   sitting there before you saw him then come past -- come by you

10  going south?

11           THE WITNESS:  It was, it was a very short period of

12  time.  We had -- I had received information that he pulled

13  over to the side of the road, and then moments later he was

14  making a U-turn, and then moments later he was speeding past

15  me.

16           THE COURT:  So you didn't see him pull off the side

17  of the road?

18           THE WITNESS:  I did not.

19           THE COURT:  You didn't see him make the U-turn?

20           THE WITNESS:  I did not.

21           THE COURT:  But it was only a few minutes later

22  that you got visual contact with him as you're sitting on East

23  Spinning Wheel Road; and he comes now past you going south on

24  Main Street?

25           THE WITNESS:  Correct.

```
 1              THE COURT:  Okay.

 2    BY MR. HILL:

 3         Q    But Mr. Hoyt, when you were following Mr. Sutton --

 4    and that's what you were doing, correct?  You were following

 5    him, right?

 6         A    Correct.

 7         Q    You didn't have an arrest warrant for Mr. Sutton at

 8    that time, did you?

 9         A    I did not.

10         Q    You hadn't seen him violate any federal, state, or

11    municipal ordinance violations, had you?

12         A    Yes, we had.

13         Q    No.  You hadn't seen him violate any laws at that

14    point?

15         A    Yes, I had.

16         Q    You didn't describe them in the affidavit, sir, to

17    the magistrate?

18              MR. MILLER:  Objection, relevance as to what he

19    described in the affidavit.

20              THE COURT:  Well, I'm going to let him try to tie

21    it up.  I mean, I'm not going to object to the fact that he

22    left some things out.  I would hate for somebody to give me a

23    verbatim report that goes on page after page and says that Mr.

24    Sutton wore size 12 shoes; they were brown.  He had blue

25    laces, yellow socks, white shirt; looked like a -- you know, I
```

1   don't want every fact in an affidavit, and I don't think Judge

2   Bernthal does.

3          But I'll give him a chance to tie up the relevancy

4   of what's not in the affidavit to see if it's relevant because

5   we all know that there's never an affidavit that contains

6   every fact because if we get to that point they might as well

7   just give me a video.  So I'll see when we're done whether

8   it's relevant.

9          But if you want to object to asked and answered --

10  because I do think he may have repeated himself many times --

11  that I'll accept because I'd like to get this a little more

12  concise because, otherwise, Mr. Hill will be back here in the

13  morning.

14         MR. HILL:  I'll move on, Judge.

15         THE COURT:  Okay.

16  BY MR. HILL:

17     Q    Mr. Hoyt, up until the time that you get to

18  Spinning Wheel Road, you hadn't observed Sutton violating any

19  traffic laws, correct?

20     A    No.

21     Q    Okay.  And, of course, in the affidavit you say

22  that Sutton -- you then see Sutton going southbound on South

23  13000 East Road, right?

24     A    Correct.

25     Q    And when he gets to East 4000 South Road, he goes

1    west, correct?

2          A      Correct.

3          Q      Now, you're not in a position to see him as he's

4    going west on East 4000 South Road, are you?

5          A      As -- no.  I see him as he goes --

6          Q      Is that a no?

7          A      -- through the intersection.

8          Q      Pardon me?

9          A      Correct.  I don't see him as he's driving west.

10         Q      All right.

11                THE COURT:  Did you see him make the turn,

12    right-hand turn to go left?

13                THE WITNESS:  I did.  I saw him make the right-hand

14    turn at the stop sign without stopping and to continue to

15    travel west.

16                THE COURT:  So at that point, you did see a

17    violation of the traffic laws?

18                THE WITNESS:  Correct.

19                THE COURT:  Okay.

20    BY MR. HILL:

21         Q      Were you out on traffic patrol that day?

22         A      No.

23         Q      Did you issue a traffic citation to Mr. Sutton?

24         A      No.  I did not.

25         Q      Was Mr. Sutton issued a traffic citation for

```
1    running a stop sign?

2         A    I don't know.  I'm not sure.

3         Q    All right.  In fact, KAMEG -- does KAMEG

4    customarily issue traffic citations, sir, --

5         A    You'll have to ask them.

6         Q    -- to your knowledge?

7         A    You'll have -- I do not know.

8         Q    Do you issue traffic citations?

9         A    Never.

10        Q    You didn't have a warrant for his arrest, did you?

11        A    I did not.

12        Q    You didn't have a warrant to search his vehicle,

13   correct?

14        A    I did not.

15        Q    And by the way, you say in your affidavit that

16   there were marked squad cars in the area, correct?

17        A    Correct.

18        Q    Now, a marked squad car is a sheriff's car; is it

19   not?

20        A    I use the term "marked car" because for DEA our

21   cars don't have the lights and the spotlights.  So if you want

22   to break down the word and say that I used the wrong word,

23   feel free.

24             But in my, in my mind, the marked car is their cars

25   with the uniformed men inside with the red and blue
```

1    oscillating lights with the front lights that alternate and

2    the spotlights on the side and siren. So for me, not being

3    part of a police, uniformed police department, that was a

4    marked police car.

5         Q    Sir, you would agree that customarily marked squad

6    cars are usually referred to as the marked police cars, as

7    opposed to plain vehicles?

8         A    I --

9         Q    You're aware of that nomenclature; are you not?

10        A    I just explained to you what I use the term for.

11        Q    But you are aware of that nomenclature; are you

12   not?

13        A    I'm aware of -- I'm aware of that as well.

14        Q    Now, you didn't see him proceeding westbound on

15   4000 -- East 4000 South Road, correct?

16        A    Correct.

17        Q    The next time you see him he's stopped, correct?

18        A    Correct.

19        Q    And the next time you saw him he's stopped with,

20   with the car depicted in Defendant's Exhibit Number 1, the

21   burgundy car, having swerved him off the road; isn't that

22   correct?

23        A    When I, when I get to their location, the pickup

24   truck is off the roadway, and the maroon car is on the

25   roadway.

1    Q    Do you know how -- did you see the maroon car
2   swerve Sutton's car off --
3    A    No.
4    Q    -- the road?
5         You weren't in a position to see that?
6    A    No.  I was not.
7    Q    In fact, you lost sight at the intersection of
8   13000 East and East 4000 South Road; is that correct?
9    A    Right.  There's actually a couple hills as you go
10  west.
11   Q    My question is:  You lost sight of it?
12   A    Yes.
13   Q    So you don't know what was happening with Sutton's
14  driving when you lost sight, at least based on your own
15  observations, correct?
16   A    After he sped around that corner, I lost sight.
17   Q    Did you stop Sutton?  Did you stop Sutton to give
18  him a traffic ticket for running a stop sign, --
19   A    I did not --
20   Q    -- allegedly running a stop sign at 13000 East and
21  East 4000 South Road, sir?
22   A    I did not.
23        MR. HILL:  No further questions.
24        THE COURT:  Mr. Miller, you may examine.
25        MR. MILLER:  And, Your Honor, I'm just going to --

 1              THE COURT:  Unless you want to wait and call him as

 2     your own witness.

 3              MR. MILLER:  I'm going to cross just on what he

 4     asked, and then I will call him in my case in chief.  I only

 5     have, really, one question.

 6              THE COURT:  Okay.

 7              MR. MILLER:  Do you have Government Exhibit 3, the

 8     affidavit -- I'm sorry, Defense Exhibit 3?

 9              THE COURT:  Now, Defense Exhibit 3, too, when the

10     government objected earlier to its admission, it's already --

11     the Court can take judicial notice of it because it's already

12     in the Court's file when it was presented to Judge Bernthal.

13     It was filed on December 15, 2006, and is shown in the Court's

14     file as docket number 1.  So the Court can take judicial

15     notice, also, of its own records.

16              MR. HILL:  And, Judge, I only went into paragraph 6

17     of that affidavit on my direct exam.

18              THE COURT:  But the whole thing is in the Court's

19     file.  So the Court can take judicial notice of any part of it

20     if either one of you wish to go there.

21                   CROSS-EXAMINATION BY MR. MILLER:

22         Q    Would you read paragraph 4 of the affidavit,

23     Defendant's Exhibit 3?

24              MR. HILL:  Judge, I would object to its relevancy.

25              THE COURT:  Well, you just said you were going to

1    cross-examine on what he said.

2                MR. MILLER:  This --

3                THE COURT:  And now you're going into --

4                MR. MILLER:  No.  Your Honor, this goes exact--

5    I'll even make it clear --

6                THE COURT:  Why don't you wait -- why don't you

7    just wait --

8                MR. MILLER:  This goes directly, Your Honor.

9                Did you tell --

10                THE COURT:  Okay.  Hold it now.  Let me look at 4

11    because I can take judicial notice of my own records.

12                MR. MILLER:  Defense counsel has made much of --

13                THE COURT:  You're not talking about the specifics.

14    You're now talking about how he prepared the affidavit.

15                MR. MILLER:  Yes, Your Honor.  He's -- defense

16    counsel has tried to point out that he omitted things from

17    Judge Bernthal, and I think it's highly relevant.

18                THE COURT:  Well, he pointed out he omitted things.

19    The Court hasn't determined whether any of that is relevant to

20    the issues of this case because I was going to let him tie

21    that up.

22                I've now looked at 4; so I'll allow you to talk

23    about 4.  Objection overruled.

24    BY MR. MILLER:

25        Q    In paragraph 4, did you tell Judge Bernthal that,

1    "The statements contained in this affidavit are based in part

2    on my own personal observations, information provided by other

3    DEA agents and other law enforcement officers, on information

4    provided by other witnesses, and on my experience and

5    background as a special agent with DEA"?

6         A    Yes.

7         Q    And did you tell him, "The information contained in

8    this affidavit is not an exhaustive account of everything I

9    know about this case"?

10        A    That's correct.

11        Q    And did you tell him, "Rather, it is only the facts

12   that I believe are necessary to establish probable cause to

13   believe that Sutton possessed more than 50 grams of cocaine

14   base, crack, with the intent to distribute it ... and carried

15   a firearm during and in relation to a drug trafficking crime"?

16        A    Correct.

17        Q    Did you believe that the information that you did

18   not include in the affidavit that you were asked by defense

19   counsel was relevant or necessary to establish probable cause

20   for those offenses?

21        A    I did not believe it was relevant for probable

22   cause.

23             MR. MILLER:  I have no further questions, Your

24   Honor.

25             MR. HILL:  But you --

1          THE COURT:  You may respond.

2               REDIRECT EXAMINATION BY MR. HILL:

3     Q     But you did leave the impression that speeding --

4     that Mr. Sutton was speeding his vehicle as soon as he left

5     the residence at 12000 East at 13000 East at 4000 South in

6     rural Kankakee?  You said he began speeding at that point,

7     correct?

8     A     I didn't say he began speeding at that point.

9     Q     Sir, did you say that after he left the area he

10    began to drive away from you very quickly?

11    A     And that's correct.

12    Q     And that officers in marked squad cars at that

13    point attempted to take him down?

14    A     That's correct.

15    Q     But that's not correct, is it?

16    A     It is correct.

17    Q     Because he actually stopped his vehicle, got out of

18    his vehicle; you stopped your vehicle, and no officers were

19    trying to take him down at that point?

20    A     They were trying to get to his location.

21    Q     Were you trying to take him down at that point?

22    A     Not by myself.  That's not our policy.

23    Q     You didn't have an arrest warrant to take him down

24    at that point?

25          MR. MILLER:  Asked and answered, Your Honor.

```
1              THE COURT:  Sustained on that.

2              MR. HILL:  No further questions.

3              THE COURT:  Mr. Miller.

4              MR. MILLER:  Nothing at this time, Your Honor.

5              THE COURT:  You may step down.

6                   (Witness Hoyt excused, 3:50 p.m.)

7              MR. HILL:  I'd call Gene Sutton.

8              THE COURT:  Yes.  You'd indicated before you wanted

9   to have a break.

10             MR. HILL:  No, Judge, I want to get you so that --

11             THE COURT:  No.  I stay till 5:00.  This isn't Cook

12  County.  This isn't the Daley Center.  This isn't the Northern

13  District.  I stay till 5:00.

14             MR. HILL:  I'll stay --

15             THE COURT:  We have another hour.

16             MR. HILL:  I'll stay as long as you want, Judge.

17             THE COURT:  Although they tell me they work harder

18  up there, I do know from my personal experience they stop,

19  but -- off the record.

20                   (Discussion off the record.)

21             THE COURT:  I'm going to give the court reporter a

22  break, and then we'll come back at 4:00; and then we'll go

23  till 5:00.

24                   (Recess, 3:53 p.m. to 4:03 p.m.)

25             THE COURT:  We're back on the record.  Just to let
```

1    everybody know how the last hour here will proceed, I don't

2    want to short anybody on presentation of evidence.  We will go

3    until 5:00 on the presentation of evidence.  If we do need

4    additional time, we've got time to get back on this in the

5    next -- well, tomorrow and anytime in the next two weeks we

6    can do that.

7         If we conclude today, we will allow both of you to

8    put your closing arguments in writing so that we'll have Mr.

9    Hill on behalf of the defendant put what he believes is, in

10   effect, a closing argument, the analysis of the evidence

11   presented; and I'll give him adequate time to do that and then

12   Mr. Miller to respond.

13        Normally we would go past 5:00, especially because

14   of the serious nature of the motion and Mr. Hill having to go

15   back to Chicago; but I made a promise to my wife that I would

16   take her and my 13-year-old son to dinner, and it's her 52nd

17   birthday.  I don't know why anybody would want to celebrate

18   her 52nd birthday; but -- since she's not here, I can say

19   that.  But at 6:00, I better have her at the restaurant.  So

20   that's the lay of land for the next hour.

21        And, Mr. Hill, you may call your next witness.

22        MR. HILL:  Thank you.  Call Gene Sutton.

23        THE COURT:  Please come forward.  You'll be

24   administered an oath here.  Then just get yourself in the

25   chair and comfortable so you can speak directly into that mic.

1                    GENE SUTTON, sworn, 4:05 p.m.,

2                    DIRECT EXAMINATION BY MR. HILL:

3         Q      State your name.

4         A      Gene Sutton.

5         Q      Now, Gene, I'm just going to ask you questions

6    starting with your vehicle being at the intersection of East

7    4000 South Road and East -- and South 13000 East Road on

8    December 14, 2006.  Okay?

9         A      [Nodding head up and down.]

10        Q      You have to answer.

11        A      Yes.

12        Q      Was your pickup truck driv-- did your pickup truck

13   arrive at the intersection of East 4000 South Road and South

14   13000 East Road?

15        A      Yes.

16        Q      Did it have -- did you have occasion to turn north

17   on South 13000 East Road at that point?

18        A      Yes.

19        Q      That would be Main Street; is that correct?

20        A      Yes.

21        Q      Would you tell Judge McCuskey which way your

22   vehicle went at that point?

23        A      Once I got onto Main Street?

24        Q      Onto Main Street, which is South 13000 East Road.

25        A      Once I got onto Main Street, I made a left.

1    Q    Which meant that you would have been going north?

2    A    Correct.

3    Q    All right.  And did you have occasion to go to East

4    Spinning Wheel Road?

5    A    Correct.

6    Q    When you got to East Spinning Wheel Road, did you

7    have occasion to turn east onto East Spinning Wheel Road?

8    A    Correct.

9    Q    And when you got onto East Spinning Wheel Road, did

10   you have occasion to pull into a driveway on that street about

11   a quarter, say about a quarter of a mile from, from Main

12   Street?

13   A    Correct.

14   Q    Did you stop your vehicle?

15   A    Yes.

16   Q    Did you get out of your vehicle?

17   A    Yes.

18   Q    And by the way, were you speeding at all from the

19   time that you just described?

20   A    No.

21   Q    Did you know that you were being followed by

22   anyone?

23   A    No.

24   Q    Did you know that there were any aerial, anybody

25   was following you at all --

1    A    No.

2    Q    -- at that point?

3    A    No.

4    Q    Did you have occasion to get out of your vehicle?

5    A    Yes.

6    Q    When you got out of your vehicle, tell the judge

7    what you were there at that location doing.

8    A    I went, I went to that address to install an

9    alternator on a lady's vehicle.

10            THE COURT:  Installed an alternator?

11            THE WITNESS:  Yes, sir.

12            THE COURT:  Okay.

13    BY MR. HILL:

14    Q    And what is that lady's name?

15    A    Sandra Cozart [phonetic].

16    Q    And did, was Ms. Cozart there?

17    A    Yes.

18    Q    Did you get out of your vehicle and speak to

19    Ms. Cozart?

20    A    Yes.

21    Q    Did you pull into her driveway?

22    A    Yes.

23    Q    Did you get tools out of your truck?

24    A    Yes.

25    Q    To install an alternator?

1      A      Yes.

2      Q      So why didn't you install the alternator?

3      A      I didn't install the alternator because when I went

4   to my toolbox I didn't -- I was missing a ratchet that I

5   needed.

6      Q      A what?

7      A      A ratchet.

8      Q      A ratchet wrench?

9      A      Yes.

10      Q      All right.  And so did you have occasion -- did you

11   talk to Ms. Cozart?

12      A      Yes.

13      Q      How long were you there stopped in your vehicle

14   talking to Ms. Cozart?

15      A      I was at Ms. Cozart house for about five, seven

16   minutes.

17      Q      Okay.  And by the way, you've had occasion --

18   strike that.

19             After talking with Ms. Cozart, did you have

20   occasion to get back in your truck?

21      A      Yes.

22      Q      Did you drive out of your -- oh, by the way, while

23   you were at the driveway, did you have occasion to see

24   anybody?

25      A      While I was going through my toolbox, I noticed a

1    black Jeep Liberty pull up just slight, slightly to the east

2    of her driveway and just park and just sit there.

3        Q    All right.  Did you recognize anybody in that

4    vehicle?

5        A    I noticed a white male in the vehicle, just -- I

6    noticed a white male in the vehicle.

7        Q    All right.  Did you get back in your car at some

8    point, or what happened next?

9        A    I, I had went through my toolbox; and Ms. Cozart,

10   she was standing next to the vehicle talking to me while I was

11   going through my toolbox, and I had handed her a receipt to

12   the alternator, and I gave her the alternator.  And I told her

13   that I would be back once I went and I got the ratchet that I

14   needed.

15       Q    The ratchet wrench?

16       A    Yeah.

17       Q    So did you get back in your vehicle?

18       A    Yes, after I finished talking to her.

19       Q    All right.  Did you then proceed to drive out of

20   the driveway?

21       A    Yes.

22       Q    Did you turn west onto East Spinning Wheel Road?

23       A    Yes.

24       Q    Did you proceed to a stop sign at South 13000 East

25   Road, --

1      A      Yes.

2      Q      -- which is Main Street?

3      A      Yes.

4      Q      Did you stop your truck at that location?

5      A      Yes.

6      Q      Did you then turn north onto South 13000 East Road,

7   which is Main Street?

8      A      Yes.

9      Q      Did you proceed north?

10     A      Yes.

11     Q      Where were you headed or going?

12     A      I was headed to Mondy Brothers Garage.

13     Q      And why were you going to Mondy Brothers Garage?

14     A      Because that's the garage where me and him, we work

15   on cars at that garage.

16     Q      And is that at the intersection of East Gamble Road

17   and Main Street?

18     A      Correct.

19     Q      Was Mondy's closed?

20     A      Yes.

21     Q      Did you stop your vehicle?

22     A      Yes.  I pulled over to the side of the road.

23     Q      Would that have been the east side of the road?

24     A      Correct.

25     Q      Now, when you saw that Mondy's was closed, were --

1    you had gone there to get the ratchet wrench?

2        A    Correct.

3        Q    When you saw that it was closed, was your intent

4    then to go home?

5        A    Correct.  It was to go back to my parents' house

6    and go and borrow a ratchet from my father.

7        Q    Okay.  Now, did you make a U-turn on South 13000

8    East Road?

9        A    No.

10       Q    Well, how did you begin -- how did you go back

11   south on South 13000 East Road?

12       A    Well, whenever I pulled over to the side of the

13   street, I kind of like pulled over slightly like -- it was

14   like a driveway right there; so I backed into the driveway and

15   turned around.

16       Q    And pulled out?

17       A    Correct.

18       Q    And proceeded what would have been southbound on

19   South 13000 East Road?

20       A    Correct.

21       Q    Now, while you were going southbound on South 13000

22   East Road, did you run any traffic signs?

23       A    No, sir.

24       Q    Were you speeding?

25       A    No, sir.

1    Q    When you got to the intersection of South 13000

2    East Road and East 4000 South Road, did you have occasion to

3    turn westbound?

4    A    Yes.

5    Q    Did you stop at the stop sign at the intersection

6    of 4000 South Road and South 13000 East Road?

7    A    Yes.

8    Q    Did you then proceed west?

9    A    Yes.

10    Q    Where were you headed as you were going west?

11    A    I was headed to my parents' house.

12    Q    And what is their address?

13    A    10748 East 4000 South Road.

14    Q    Which is the direction in which you were headed?

15    A    Yes.

16    Q    And that's approximately two and a third miles from

17    Hopkins Park or South 13000 East Road, is it?

18    A    Correct.

19    Q    When you were near where your parents are, or

20    live -- strike that.

21            MR. HILL:    May I approach, Judge?

22            THE COURT:    You may.

23    BY MR. HILL:

24    Q    I'm going to show you Defendant's Exhibit Number 2

25    and ask you whether or not you recognize the map that's

1    depicted on this Google map.  You've had occasion to see this;

2    have you not?

3        A    Yes.

4        Q    You see where the Y is that's listed on the map?

5    You see this Y?

6        A    Yes.

7        Q    Is this -- and it's got "Gene stopped by unmarked

8    vehicle" at that location.  Is that the location approximately

9    where you were stopped?

10       A    Correct.

11              MR. HILL:  Judge, I would ask that Defendant's

12   Exhibit Number 2 be offered into evidence at this time.

13              MR. MILLER:  I believe it already has been.

14              THE COURT:  It already has been admitted into

15   evidence.

16              MR. HILL:  Okay.

17              THE COURT:  But what I think you'll want to do is

18   just make sure that the "X," the "O," and the "I" are

19   confirmed.

20              MR. HILL:  Fine, Judge.

21   BY MR. HILL:

22       Q    Gene, I'd like to show you -- first of all, let's

23   go up to the "X."  Well, I won't -- I don't want to get into

24   the "X."  I want to get into the "O."

25              The "O" that's indicated there, you see that "O"?

1    It says "stop sign"; does it not?

2         A    Yes, sir.

3         Q    Is that where the stop sign was, a stop sign at

4    that location?

5         A    Correct.

6         Q    Okay.  And the, the "I" that's there, you see the

7    "I"?

8         A    Correct.

9         Q    Is that Sandra Cozart's driveway?

10        A    Correct.

11        Q    And the "Y," it says "Gene stopped by unmarked

12   vehicle."  Is that the "Y" -- is that where it is?

13        A    Correct.

14        Q    And, of course, Mondy's Brothers.  You see Mondy's

15   Brothers?

16        A    Correct.

17        Q    Okay.  Is that where Mondy's Brothers --

18        A    Right.

19        Q    -- would be located?

20        A    Correct.

21        Q    Okay.  Now, I've asked you to tell us where you --

22   during any of this period that you've just described, were you

23   at all speeding your vehicle?

24        A    No.

25        Q    Were you obeying the traffic laws?

```
 1         A     Yes.
 2         Q     When you got to where the "Y" is on Defendant's
 3    Exhibit Number 2, --
 4         A     Yes.
 5         Q     -- would you tell the judge what happened at that
 6    point?
 7         A     You mean across the street from Mondy Brothers?
 8         Q     No.  When you were going to your parents' home and
 9    you were stopped by the police.
10         A     When I was --
11         Q     How were you stopped?
12         A     I was ran off the street by a plain vehicle.
13         Q     By a -- when you say a "plain vehicle," what do you
14    mean?
15         A     I was ran off the street by a plain -- it was a
16    plain car.
17         Q     Is that unmarked?
18         A     By an unmarked car.
19         Q     Okay.  Now, there were no marked vehicles in the
20    area?
21         A     There were no marked vehicles in the area.
22         Q     And you hadn't violated any traffic laws?
23         A     I had not violated any traffic laws.
24         Q     So you were stopped by them or by -- well, I'll
25    show you what's in evidence as Defendant's Exhibit -- you've
```

1    seen Defendant's Exhibit 1, the photograph of the, of the

2    vehicle, Gene?

3         A    Yes, sir.

4         Q    Is that the vehicle that ran you off the road?  I'm

5    showing you what's marked as Defendant's Exhibit 1.  Is this

6    the vehicle that ran you off the road?

7         A    This is the vehicle; but I don't, I don't

8    remember -- I don't recall that, that beam light being on that

9    vehicle at the time.

10        Q    Okay.  But you were run off the road by an unmarked

11   vehicle; is that correct?

12        A    Yes, sir.

13        Q    And when you were run off the road, you weren't

14   speeding?

15        A    No, sir.

16        Q    Did you ever receive a traffic citation, Gene, --

17        A    No, sir.

18        Q    -- for speeding?

19        A    No, sir.

20        Q    Did you ever receive a citation for running a stop

21   sign?

22        A    I didn't, I didn't receive any citations at all,

23   sir.

24        Q    For illegal lane usage?

25        A    No, sir.

 1      Q    Were there any marked police cars in the area where
 2  you were stopped?
 3      A    Sir, there were no marked squad cars in the area,
 4  and that's not a marked squad car.
 5      Q    And this is not a marked squad car?
 6      A    That's not a marked squad car.  A marked squad car
 7  is a car with markings on it and with lights on the top of it.
 8      Q    How did you get the injury to your lip --
 9      A    I got the injury to my lip --
10      Q    -- and your face?
11      A    -- and to my face because once the officers got out
12  of the car, they ran up on -- they ran up on my vehicle with
13  their guns on me; and one of the officers reached in the
14  vehicle, ordered me out of the vehicle onto the ground.  And
15  once they handcuffed me, they started beating on me.
16          MR. HILL:  I have no further questions.
17          THE COURT:  You may examine, Mr. Miller.
18              CROSS-EXAMINATION BY MR. MILLER:
19      Q    Let's talk about the car you refer to as the
20  unmarked parked car that's -- the red/maroon car that's shown
21  in Defendant's Exhibit 1.
22          When it was following you that day, it had its
23  siren on, didn't it?
24      A    No.
25      Q    It had its take-down lights on, its blue and red

```
1   take-down lights?

2       A    The car was not -- the car was not following me at

3   all.

4       Q    At some point you -- you testified the car pulled

5   you ov-- drove you off the road, right?

6       A    The car swerved over in front of me and ran me off

7   the -- it ran me off the street.

8       Q    At some point before it came in front of you, it

9   was behind you, right?

10      A    I -- the car just came -- it came from out of

11  nowhere.

12      Q    Did you hear the siren?

13      A    No.

14      Q    Did you see the take-down lights?

15      A    No.

16      Q    I'm just going to play what's been, for

17  identification, marked as Government Exhibit 4.  It's the VCR.

18           THE COURT:  Government Exhibit 4.

19           MR. HILL:  Judge, I would object at this time.  I

20  don't think that this is an exhibit which, which was made of

21  the incident on that day.  I mean, --

22           THE COURT:  Mr. Miller.

23           MR. MILLER:  It's not, Your Honor.  It's like a

24  photograph of the car.  It's a video of the car with the

25  take-down lights, and I want to ask him if that's what he
```

1    observed on that day.

2              THE COURT:  Objection overruled.  You may ask that.

3              MR. HILL:  Judge, but he said something about

4    sound, and I don't think Mr. Sutton said that he heard any

5    sirens.

6              THE COURT:  That's what he said, and I think he's

7    now going to give an example of what --

8              MR. HILL:  Okay.

9              THE COURT:  -- the car looked like, or whatever,

10   and then we'll see if Mr. Sutton says no; and he said it came

11   out of nowhere.

12             MR. HILL:  Okay.

13             THE COURT:  So we'll see what happens.

14             But the objection's overruled.  He may use it to

15   ask questions.

16                  (Brief pause in proceedings; technical

17                   difficulties with audiovisual equipment.)

18             THE COURT:  While we're taking this break, I want

19   to clarify some of the other exhibits.

20             Defendant's Exhibit Number 2, as I indicated, is

21   the -- or, no.  Defendant's Exhibit 3 is the complaint and

22   affidavit, which is docket entry number 1.  The Court

23   indicated it could take judicial notice of the Court's records

24   in this case and did.  Also, there was an objection by the

25   government, and that was overruled.  So Defendant's Exhibit

1    Number 3, docket entry 1 in this case, is admitted over the

2    government's objection.

3            The Defendant's Exhibit Number 2 has been admitted

4    without objection.

5            Defendant's Exhibit Number 1 was admitted without

6    objection.

7            The government offered Exhibit Number 2, a photo of

8    the defendant which was testified to by Gene Sutton Sr.  But I

9    don't think you offered it.  Did you want --

10            MR. MILLER:  Not yet.  We'll offer it in our case,

11    Your Honor.

12            THE COURT:  Okay.  And then we have Government --

13    we have -- that's the only government exhibit until this one,

14    which now is 4, the video; is that right?

15            MR. MILLER:  Yes, Your Honor.

16            THE COURT:  So 1, 2, and 3 -- am I correct now, Mr.

17    Hill? -- those are the three exhibits that have been offered

18    by the defendant.

19            MR. HILL:  Yes, Your Honor.

20            THE COURT:  And they're all in evidence.

21            MR. MILLER:  And I can ask questions here, Your

22    Honor, --

23            THE COURT:  Okay.

24            MR. MILLER:  -- while we wait in this case.

25

USA v. GENE SUTTON, No. 07-20009

BY MR. MILLER:

    Q    It's your testimony that both times you were at the
stop sign at the intersection of what we'll call Main Street
and 4000 that you stopped both times?

    A    Correct.

    Q    And the first time you approached that stop sign
you were coming from the west traveling east?

    A    Correct.

    Q    And where were you traveling from at that time?

         MR. HILL:  Objection, Your Honor.  It's beyond the
scope of my direct examination.

         THE COURT:  Sustained.  You started at the
intersection.

         MR. MILLER:  Well, Your Hon-- oh, okay.
BY MR. MILLER:

    Q    Now, you testified you worked at this place where
you were going to go get tools for the alternator?

    A    Correct.

    Q    You didn't realize, though, that the place would be
closed when you went there on that day?

    A    No.

    Q    Do you know the hours that it's open?

    A    Well, see, me and Leon Mondy, we got a recording
studio there; and we do work at the garage also.  So the
garage -- we work at the studio, and we do work in the garage,

1    too.  We paint cars.

2              THE COURT:  Does that mean it doesn't have regular

3    hours?

4              THE WITNESS:  It don't -- it doesn't have regular

5    hours.

6    BY MR. MILLER:

7        Q    So do you have a key to the garage?

8        A    Do I have a key to the garage?

9        Q    Yeah.

10       A    I got a key to the garage and the studio, but he

11   had lost the keys to the gate; and I didn't have a key to the,

12   to the new lock on the gate.

13       Q    Okay.  That was a new -- when was that new lock put

14   on the gate?

15       A    Probably a couple days before that.

16       Q    Now, you testified you saw this Jeep pass before

17   you when you were stopped on Spinning Wheel Road, right?

18       A    Did I see what?

19       Q    Did you -- you testified you saw a Jeep drive by

20   you when -- on Spinning Wheel Road?

21       A    No.  I never testified to that.

22       Q    Okay.  When you were parked at Spinning Wheel Road,

23   did you see anybody drive by?

24       A    No.  I never testified to that.  No.

25       Q    Did you see anybody drive by?

1          A     No.

2          Q     So you never saw Special Agent Hoyt drive by while

3    you were parked on Spinning Wheel Road?

4          A     No.  I just seen the Jeep pull up and park.

5          Q     So you did see a Jeep?

6          A     Yes.

7          Q     Okay.  And you saw the Jeep pull up and park where?

8          A     I seen it pull up and park just slightly -- what

9    was it? -- east of the driveway.

10         Q     And now you testified that you were -- this car

11   came out of nowhere and pulled you over by your parents'

12   residence; is that right?

13         A     Correct.

14         Q     And as you referred to Defendant's Exhibit 2, you

15   said that that -- the "Y" on Defendant's Exhibit 2 was the

16   correct location where you were pulled over?

17         A     Correct.

18               DEPUTY CLERK:  Are you ready?

19               MR. MILLER:  Yes.

20               DEPUTY CLERK:  Let's try it.

21   BY MR. MILLER

22         Q     If you'll view Government Exhibit 4 here.

23               (Exhibit playing in open court.)

24         Q     Other than the spotlight, does that appear to be

25   similar to the car that pulled you over that day?

1      A     Correct.

2      Q     And it's your testimony you didn't hear that siren?

3      A     I didn't hear that siren or see any Nova lights.

4      Q     And you didn't see any lights?

5      A     No.

6      Q     And you still refer to that car as an unmarked

7 squad car?

8      A     I'm still referring to that car as an unmarked

9 squad car because I didn't see that siren or see any of those

10 lights.  All I seen, that car swerved in the front of me.

11               (Exhibit stopped playing.)

12      Q     Okay.  And you testified that after you were

13 stopped the officers came and pulled you out of the truck?

14      A     Correct.

15      Q     Did the officers tell you, instruct you to get out

16 of the truck?

17      A     No.

18      Q     Did the officers yell to you that you were -- that

19 they were the police and you needed to get out of the truck?

20      A     All I remember is the officers -- all I remember --

21 I didn't even know they were officers.  All I know was that

22 they was white guys that ran up on me with guns.

23      Q     You didn't see that they had "police" written on

24 them?

25      A     They didn't have "police" written on them.  They

1   had on black sweaters.

2          Q     And they didn't have "police" written on them?

3          A     No, sir.

4          Q     And they didn't tell you that they were the police?

5          A     I knew they were police afterwards.

6          Q     Okay.  At the time you're sitting in the truck, did

7   you know they were the police?

8          A     At the time I was sitting in the truck, no, I

9   didn't know that they were police.

10              THE COURT:  They didn't say anything like, "Get

11  out.  Get down.  Police"?

12              THE WITNESS:  They said, "Get out.  Get down."

13              THE COURT:  But they never said "police"?

14              THE WITNESS:   They said, "Get out."  They said,

15  "Get out.  Get down.  Police."  But at the time that the car

16  served in front of me and they got out of the cars, I didn't

17  know that they were police.

18              THE COURT:  Not until they were trying to pull you

19  out --

20              THE WITNESS:  Correct.

21              THE COURT:  -- and they said that?  Okay.

22  BY MR. MILLER:

23          Q     Now, when you were in the truck, did you follow

24  their instructions and get out of the truck?

25          A     Yes.

1    Q    So they didn't pull you out of the truck?

2    A    I was told -- I was told to get -- I was told to

3  hold my hands up.  I couldn't get out of the truck.  One of

4  the officers had to reach in the truck and take my seat belt

5  off of me.  I was told to hold my hands up.  I'm not gonna

6  reach down and try to take no seat belt off when officers got

7  like, when officers got a gun on me.

8    Q    So you -- so they pulled you out of the truck?

9    A    Correct.

10   Q    You didn't get out of the truck on your own?

11   A    No.  I was pulled out of the truck.

12   Q    Do you recall giving a statement at your detention

13 hearing in this case?

14   A    I don't, I don't recall giving a statement.

15   Q    Do you recall reading to the Court, to Judge

16 Bernthal, a statement during your detention hearing in this

17 case?

18   A    I, I don't have recollection of giving a statement

19 at a detention hearing.

20   Q    Do you remember stating -- do you remember stating

21 at any time you had voluntarily got out of the truck and got

22 down into the soldier position?

23   A    I don't, I don't have -- I don't have recollection

24 of give, of giving that statement.

25   Q    So you don't recall ever saying that before?

```
 1          A      I don't, I don't -- I could have given that

 2     statement, but I don't have recollection of giving that

 3     statement.

 4          Q      But your testimony here today is that you were

 5     pulled out of the truck by the officers?

 6          A      Yes, sir.

 7               THE COURT:  Well, let me ask this.  Since this

 8     would have been -- the detention hearing would have been in

 9     front of Magistrate Judge Bernthal on the first floor of this

10     building downstairs.  Do you recall being there in front of

11     Judge Bernthal at some time?

12               THE WITNESS:  Correct.

13               THE COURT:  Okay.  And the detention hearing would

14     have been on December 15, 2006, the day after this stop.  Is

15     that right?  The day after the stop, you were in Federal Court

16     downstairs?

17               THE WITNESS:  Correct.

18               THE COURT:  And did you give -- did you talk at all

19     at that hearing?

20               THE WITNESS:  I, I remember talking, but I don't

21     remember the specifics of exactly what I talked about.

22               THE COURT:  Did you take the stand and sit down

23     like this in that courtroom?  Did you sit down in a seat next

24     to the judge like this?

25               THE WITNESS:  I, I don't remember getting on the
```

1    stand, but I remember giving a statement at the table.

2              THE COURT:  Okay.  Thank you.

3    BY MR. MILLER:

4        Q    You read from a statement; you remember that?

5        A    I remember giving -- I remember giving Judge

6    Bernthal a statement --

7        Q    Do you remember --

8        A    -- regarding, regarding trying to get, regarding

9    trying to get released.

10       Q    Do you remember me asking you questions following

11   your statement?

12       A    No.  No, I don't.

13       Q    So you don't remember anything -- you wouldn't

14   remember today anything you said at that hearing then?

15       A    What I'm saying is this:  When I was told to get my

16   hands up, it wasn't -- it wasn't as if there was any kind of

17   struggle as if I had to be pulled out of the truck.  I wasn't

18   reaching -- I wasn't gonna reach down because these guys

19   had -- I wasn't resisting getting out of the truck.  I just

20   wasn't gonna reach down with a gun on me and take a seat belt

21   off of me.

22              Once the seat belt was taken off of me, then I was

23   willfully getting out of the truck.  I wasn't gonna reach down

24   and, you know, with -- guys had guns on me.

25       Q    So you -- when you were -- let me step back to the

1    question.  So you don't recall what it was that you stated in

2    front of Judge Bernthal regarding that?

3        A    No.

4        Q    Okay.  And, again, your testimony is that then you

5    had your hands up after the officers approached the truck?

6        A    Correct.

7        Q    And your testimony is they pulled you out of the

8    truck?

9        A    Correct.

10        Q    And I believe you testified on direct examination

11    that you were beaten?

12        A    Correct.

13        Q    Could you be more specific for us.  What do you

14    mean when you say you were beaten?

15        A    After I, after I was handcuffed, I was beaten.

16        Q    Okay.  And how was it that you were handcuffed?

17        A    What I was hand-- when I was handcuffed and I was

18    on the ground face-down, then it was officers -- it was

19    Officer Martin and Officer Powers.  It was Special Agent

20    Powers and Special Agent -- Special Agent Martin and Special

21    Agent Powers.  They started beating; they started beating me

22    and kicking on me.

23        Q    Okay.  Let's step --

24        A    That's how I ended up with these sores in the back

25    of my head, and that's how I ended up with a bloody mouth.

USA v. GENE SUTTON, No. 07-20009

```
1        Q      Now, let me step back.  How did you get on the
2   ground?
3        A      How did I get on the ground?
4        Q      Yes.
5        A      I had, I had to get on the ground to be handcuffed.
6        Q      Did you get on the ground voluntarily?
7        A      Well, if you, if you gonna get handcuffed, you have
8   to be on the ground.
9        Q      Well, what did you do when they pulled you out of
10  the truck?
11       A      When you -- whenever you, whenever you get
12  handcuffed, they gonna tell you to get down on your knees.
13       Q      What -- I'm not asking whenever.  That day,
14  December 14, when you were pulled out of the truck, what did
15  you do?
16       A      When I, when I got out of the truck, I was down on
17  my knees.
18       Q      Okay.  And did -- how did you get down on your
19  knees?  Did you do it voluntarily?
20       A      Yes.  I, I, I -- I didn't, I didn't resist arrest.
21  Whatever happened that day, I was in full compliance with
22  whatever happened.  There was no resisting that day.
23       Q      Okay.  So you got on your knees voluntarily?
24       A      Whatever, whatever happened that day, I was in full
25  compliance with whatever was going on.
```

1          Q    I'm going to ask you again.  Did you get on your

2     knees voluntarily?

3          A    Yes.  If I -- yes.

4          Q    And then how did you get on the ground?

5          A    How did I get on the ground?  If I was on the

6     ground, I was on the ground because I was ordered on the

7     ground.

8          Q    Were you on the ground?

9          A    Yes.

10          Q    So you were ordered to get on the ground?

11          A    Yes.

12          Q    And so you did that voluntarily?

13          A    Yes.

14          Q    And then you stated you were handcuffed?

15          A    Yes.

16          Q    And how was it -- if you could, describe for us how

17     it was that you were handcuffed.

18               MR. HILL:  Your Honor, I'm going to object to this

19     characterization "voluntarily."  That calls for a conclusion.

20     I may have been untimely with that objection.  I would ask it

21     be stricken.  I mean, asking him to -- was it voluntary?  I

22     mean, the men have got guns on him --

23               THE COURT:  Well, --

24               MR. HILL:  -- and telling him to do something.

25               THE COURT:  -- he said he was in compliance.  So

1    I'm going to allow his statement to stand.  Over-- objection

2    overruled.

3    BY MR. MILLER:

4        Q    I'll even clarify.  When you say voluntarily, they

5    didn't -- they didn't force you to get on your knees

6    physically?

7        A    No.  I wasn't, I wasn't, I wasn't -- there wasn't,

8    there wasn't any force involved.  There wasn't any force

9    involved but twice:  when I was pulled out of the truck and

10   until after I was handcuffed.

11       Q    Okay.  So after you get out of the truck, you get

12   on your knees; you lay down on the ground, obeying their

13   instructions, and then you're handcuffed, correct?

14       A    Right.

15       Q    Are you -- are the handcuffs placed behind your

16   back?

17       A    Yes.

18       Q    And then you indicated it was at that time that you

19   were beaten?

20       A    Yes.

21       Q    And could you please describe for us how it was you

22   were beaten?

23       A    They started, they started punching on me, kicking

24   on me; and I was struck in the head.  I was struck in the back

25   of my head with some kind of object.  I don't know what it

1    was, but they were just beating on me and kicking on me.  I

2    don't know what it was.  And one of the times, one of the

3    times -- one of the last times toward the end when they were

4    beating me, I remember lifting my head up.  And I looked up in

5    Hoyt's face, and one of the officers kicked my head down into

6    the dirt.

7         Q    So, so Officer Hoyt was not one of the officers

8    that was beating you?

9         A    No, he wasn't.  But he was standing right there

10   watching.

11        Q    And how many officers were beating you?

12        A    It was two officers.

13        Q    Okay.  And I think you indicated that they kicked

14   you in the head?

15        A    They, they, they -- they were kicking me and

16   punching me all over.

17        Q    And did they make any statements as to why they

18   were doing that?

19        A    They, they didn't have any -- I, I was asking them

20   over and over again once, once they finished, why, why did

21   they do that to me?  Because I, I didn't resist or anything

22   like that.  You know, why did they do it to me?  They were

23   just standing around looking dumfounded when it was all over.

24        Q    And how long did that last?

25        A    They were going through the -- they were going

1    through the episode of punching and kicking on me for at

2    least -- it had to be for a couple of minutes.

3        Q    And did you see or hear your father out there at

4    that time?

5        A    My father, my father probably showed up a few

6    minutes later.

7        Q    Now, how many officers was it that you said gave

8    you this beating?

9        A    It was two officers.  It was, it was Martin and

10   Powers.

11       Q    Did you know them from before?

12       A    No.  I didn't know them from before.

13       Q    Okay.  So how do you -- how are you aware of their

14   names here today?

15       A    Because they were the two officers driving that

16   car.

17       Q    And how are you aware of that?

18       A    Because I'm -- I been going over my discovery over

19   and over again, and that's the only unmarked car -- that's the

20   only unmarked car that was on the scene.

21       Q    That was the only unmarked car that was on the

22   scene?

23       A    That's the only unmarked car besides the Jeep

24   Liberty that Hoyt was in.

25       Q    Okay.  And, of course, your truck, right?

1      A      And my truck.

2      Q      You don't recall another vehicle that was driven by

3    Special Agent Clayt Wolfe?

4      A      Clayt Wolfe -- Clayt Wolfe didn't show up until

5    Hoyt was taking me off.

6      Q      So he did show up at that location at some point?

7             THE COURT:   And was that after your dad left?

8             THE WITNESS:   What that --

9             THE COURT:   Was your dad there, or had your dad

10   left when this other Wolfe comes up in a vehicle?

11            THE WITNESS:   I think my dad was gone.

12   BY MR. MILLER:

13     Q      Now, so it was your testimony that Special Agent

14   Hoyt was at that location before Special Agent Clayt Wolfe was

15   at that location?

16     A      Can you repeat that again?

17     Q      So you indicated that while you were being beaten,

18   Special Agent Hoyt was standing there, right?

19     A      Yes.

20     Q      You indicated that later Special Agent Clayt Wolfe

21   showed up as you were being taken away, correct?

22     A      Right.

23     Q      So your testimony is that Special Agent Hoyt was

24   there at that location before Special Agent Wolfe?

25     A      Correct.

USA v. GENE SUTTON, No. 07-20009

1      Q    Other than Special Agents Powers and Martin, were

2   you beaten by any other officers?

3      A    No.

4           THE COURT:  So Hoyt didn't beat you, and Wolfe

5   didn't beat you?

6           THE WITNESS:  No.

7           THE COURT:  Okay.

8           THE WITNESS:  No.  And, and actually one of -- I

9   don't remember exactly which one of them it was, but they were

10  gonna -- one of those agents that beat me were gonna take me

11  to the police station.  And I asked Hoyt not to let -- I told

12  Hoyt I didn't want to go anywhere with them.  They were gonna

13  take me to the police station.

14          And he grabbed -- my father was there.  And he

15  grabbed me, and he had pulled me back by my arm; and he had

16  told me right in front of my father that he wasn't gonna let

17  me go off with them and that he wasn't gonna let them put

18  their hands on me anymore.

19  BY MR. MILLER:

20     Q    Okay.  Special Agent Hoyt said that?

21     A    Yes.

22     Q    So he wasn't going to let them put their hands on

23  you anymore?

24     A    Yes.

25     Q    Is it possible that he told then, at your father's

1    complaints, that he would take custody of you; and he didn't

2    have to worry that you would be in KAMEG custody?

3        A    No.  He told, he told them he was not gonna let

4    them beat on me anymore.  He was standing right there.

5        Q    And that you went and then you were -- you actually

6    left that location with Special Agent Hoyt; is that right?

7        A    Correct.

8            MR. MILLER:  I don't believe I have any further

9    questions, Your Honor.

10            THE COURT:  Mr. Hill.

11            MR. HILL:  Nothing further, Judge.

12            THE COURT:  You may step down, Mr. Sutton.

13                (Witness Sutton excused, 4:37 p.m.)

14            THE COURT:  Mr. Hill, you may call your next

15    witness.

16            MR. HILL:  Judge, we rest on the motion.

17            THE COURT:  Okay.  Defense rests at this time.

18            The Court believes that a prima facie case has been

19    made for the government to be required to put on evidence.

20            MR. MILLER:  Yes.  We would call Director Bob

21    Bodemer.

22            THE COURT:  Do you want Exhibit 4 in evidence at

23    this time?

24            MR. MILLER:  We'll enter it through the officers,

25    Your Honor.

1              THE COURT:  Okay.

2              MR. HILL:  Which was that?

3              THE COURT:  That was the sirens -- the video.

4              MR. MILLER:  Yes.

5              THE COURT:  You had objected to the video.  I

6      allowed it to be played, but he's not offered it into

7      evidence.

8                   ROBERT BODEMER, sworn, 4:38 p.m.,

9                   DIRECT EXAMINATION BY MR. MILLER:

10         Q     Could you please tell us your name and spell your

11     last name for the court reporter?

12         A     Robert Bodemer, B-o-d-e-m-e-r.

13         Q     And you are the director of the Kankakee Area

14     Metropolitan Enforcement Group?

15         A     Yes.

16         Q     And you're also employed by the Illinois State

17     Police?

18         A     Yes.

19         Q     What is your rank with the Illinois State Police?

20         A     Master sergeant.

21         Q     And how long have you been employed by the Illinois

22     State Police?

23         A     23 years.

24         Q     And how long have you been assigned to KAMEG by the

25     Illinois State Police?

1        A      All together, approximately 11 years.

2        Q      During your 23 years as an officer with the

3    Illinois State Police and in the 11 years with KAMEG, have

4    you received training, various trainings, in the investigation

5    of narcotics trafficking?

6        A      Yes.

7        Q      And have you personally participated in the

8    investigation of numerous cases involving narcotics

9    trafficking?

10       A      Yes.

11       Q      Were you the director of KAMEG in the fall of 2006?

12       A      Yes, I was.

13       Q      And during the fall, did you develop what you

14   referred to as a confidential source who gave information to

15   KAMEG in hopes of receiving favorable treatment in a pending

16   criminal case?

17              MR. HILL:  Excuse me, Your Honor.  Objection,

18   beyond the scope of the activities that occurred on December

19   14, 2006.

20              MR. MILLER:  Your Honor, we're going to go way --

21              MR. HILL:  May I finish?

22              THE COURT:  Yes, you may.

23              MR. HILL:  There was no arrest warrant for my

24   client's arrest, Judge.  To the extent that they claim to have

25   had probable cause in the fall -- in the fall -- of 2006, I

1    think that that's somewhat remote with respect to the

2    activities.

3                THE COURT:   The question, I think, though is:  Did

4    he come in contact with a confidential source in the fall of

5    '06; and he hasn't yet tied it to Mr. Sutton.

6                MR. HILL:   Judge, but in anticipation of -- I'm

7    trying to save time.

8                THE COURT:   No.  We're not going to get done today.

9    That's for sure.

10                MR. HILL:   Okay.  Fine, Judge.

11                But my objection would be that any testimony

12    regarding activities in the fall of 2006 is remote to anything

13    that may have occurred --

14                THE COURT:   Are you just setting up when he met

15    him, or are you going to talk about activities of Mr. Sutton

16    before December 14, '06?

17                MR. MILLER:   We're absolutely going to talk about

18    the activities of November 1, 2006; November 27, 2006, when --

19                THE COURT:   As to why there was the surveillance --

20                MR. MILLER:   Absolutely.

21                THE COURT:   -- on --

22                MR. MILLER:   Two prior controlled buys with drugs

23    from the defendant which established probable cause for his

24    arrest.

25                THE COURT:   Okay.

1          MR. HILL:  Judge, if I may.

2          THE COURT:  Yeah.

3          MR. HILL:  They claim that the basis in the

4    affidavit for his arrest was a traffic stop.

5          MR. MILLER:  The affidavit is irrelevant, --

6          MR. HILL:  Excuse me.

7          MR. MILLER:  -- Your Honor.

8          MR. HILL:  May I finish, Mr. Miller?

9          THE COURT:  Let him finish.

10         MR. HILL:  He claims that the basis for the stop,

11   if you look at the Exhibit 3, the criminal complaint --

12         THE COURT:  Well, now, he's -- I think he's going

13   to paragraph 5.

14         MR. MILLER:  And, Your Honor, the criminal

15   complaint alleges possession of drugs and a gun that were the

16   product after the traffic stop and the search.  They obviously

17   cannot be the basis for the initial stop.

18         We have to present evidence of the basis for the

19   initial stop, which was three controlled buys.

20         MR. HILL:  Judge, they claim that the reason for

21   the stop on December the 14th was a traffic stop.  That's

22   their basis.  Not any activities that may have been occurring

23   allegedly in the fall of 2006.  They claim a traffic stop.

24         MR. MILLER:  I'd like to see that in the affidavit.

25         MR. HILL:  Now, if they --

1          THE COURT:  Well, what he's saying is that you read

2    6 without looking at the other paragraphs and you look at 6

3    solely without respect to 5 or 7 as to tying them together.

4          The Court will overrule that objection and allow

5    the inquiry which I believe is now going into paragraph 5,

6    which is in the fall of 2006.  So objection's overruled.

7          MR. MILLER:  Your Honor, and, again, the affidavit,

8    Your Honor -- just to respond, the affidavit is the basis for

9    the arrest.

10          In a preliminary hearing, evidence regarding the

11    propriety of the stop or constitutional issues regarding that

12    aren't even admissible.  So the basis for the stop wasn't even

13    relevant to the affidavit.

14          Today is the hearing to determine whether there was

15    probable cause, and that's why we're presenting this evidence.

16          THE COURT:  You may go ahead.

17    BY MR. MILLER:

18    Q    Did you develop a confidential source who was

19    cooperating with KAMEG agents in the fall of 2006?

20    A    Yes.

21    Q    And in your line of work, is it common to use

22    confidential sources?

23    A    Yes.

24    Q    And did that confidential source make any

25    statements to you regarding allegations regarding drug

USA v. GENE SUTTON, No. 07-20009

1    trafficking activity of the defendant, Gene Sutton?

2        A    Yes.

3        Q    And what was the general nature of those

4    allegations in the fall of 2006?

5                MR. HILL:  Objection.

6                THE COURT:  Objection -- well, your objection is

7    preserved as to all of the activities before December 14.  So

8    it's a continuing objection to everything before December

9    14th.

10                MR. HILL:  Thank you, Judge.

11                And, additionally, not just in terms of remoteness

12    but also -- and relevancy -- but also in terms of -- I know

13    this is a motion to suppress -- but double hearsay also.

14                THE COURT:  All of the objections you've made to

15    everything before December 14th are preserved.  It's a

16    continuing objection throughout all of the hearing.

17                MR. HILL:  Thank you, Your Honor.

18                THE COURT:  The Court has overruled the objection

19    and will allow the matters from the fall of 2006 continuing to

20    December 14th to be inquiry.  But you can -- you can raise an

21    objection again if you think that the question is improper.

22                MR. MILLER:  Thank you, Your Honor.

23                THE COURT:  But this inquiry is allowed.

24    BY MR. MILLER:

25        Q    What was the nature of the statements the

1    confidential source made regarding drug trafficking activity

2    of the defendant?

3        A    That the confidential source had purchased

4    approximately two and a half ounces of cocaine hydrochloride,

5    or cocaine powder, approximately twice a month for

6    approximately one year from the defendant.

7        Q    And based on those statements, did you begin an

8    investigation of the defendant as, into drug trafficking?

9        A    Yes.

10       Q    On November 1, 2006, did you use that same

11   confidential source to make a controlled purchase of cocaine

12   from the defendant?

13       A    Yes.

14       Q    And were you involved in that operation?

15       A    Yes.

16       Q    What was your involvement in that operation on

17   November 1st of 2006?

18       A    I was the supervisor, but I just generally assisted

19   with the surveillance.

20       Q    And where -- through that investigation, where did

21   that controlled purchase of cocaine from the defendant take

22   place?

23       A    At a trailer on the 4000 South Road in Pembroke

24   Township.

25       Q    And is that in St. Anne, Illinois?

1          A      Yes.   The mailing address is St. Anne.

2                 THE COURT:   It's in the country, though, right?

3                 THE WITNESS:   Yes, sir.

4     BY MR. MILLER:

5          Q      I'm going to show you what's been previously marked

6     as Government Exhibit 1A for identification.   Do you recognize

7     that?

8          A      Yes.

9          Q      And what is Government Exhibit 1A?

10         A      It's a map, a section of Pembroke Township.

11         Q      Does that map include the area where the trailer

12    was located where the controlled buy of cocaine took place?

13         A      Yes.   It would be located at the intersection of

14    Ridge Road and 4000 South Road.

15         Q      And could you -- if you could point at your screen

16    there, we'll see if it works -- and touch the screen to point

17    out where that trailer's located approximately?

18         A      [Indicating on screen.]

19         Q      Is that approximately where it's located?

20         A      Yes.

21                THE COURT:   Show him the Defendant's Exhibit Number

22    2 and ask him if he can identify it on Defendant's Exhibit

23    Number 2, since these are similar, if not identical exhibits.

24         Q      I show you what's been previously marked as

25    Defendant's Exhibit Number 2.   Do you see that same location

1    on Defendant's Exhibit Number 2?

2         A    Yes.

3              THE COURT:  So that's what is shown as an "X" on

4    Defendant's Exhibit Number 2?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  And Defendant's Exhibit Number 2 shows

7    that "X" to be a trailer; is that what you're talking about?

8              THE WITNESS:  Yes.

9              THE COURT:  Okay.

10   BY MR. MILLER:

11        Q    Approximately how much cocaine was purchased from

12   the defendant on that date?

13        A    Approximately two and one-quarter ounces.

14        Q    Okay.  And is that approximately 63 grams?

15        A    Yes, sir.

16        Q    And when you do -- and on this occasion when you

17   did a controlled purchase, did you provide the confidential

18   source with money to make the purchase?

19        A    Yes.

20        Q    Do you recall approximately how much it was on that

21   occasion?

22        A    No, I don't.

23        Q    And is the money that you provide, are those bills

24   marked prior to -- or strike that.

25              Are the serial numbers on those bills recorded

1    prior to giving them to the confidential source?

2        A    Yes.

3        Q    And on this occasion, was the -- was the in-person

4    conversations between the confidential source and the

5    defendant recorded through audio means?

6        A    Yes.

7        Q    And were telephone calls between the confidential

8    source and the defendant to arrange the drug transaction

9    recorded audio, through audio?

10        A    Yes.

11        Q    And, in fact, did -- was that audio recording

12    permitted through what's called a State Court -- a State Court

13    overhear order?

14        A    Yes.

15        Q    And in support of that overhear order, did the

16    confidential source, in fact, sign an affidavit under an

17    assumed name before the judge indicating that he had

18    previously purchased cocaine from the defendant?

19        A    Yes.

20        Q    Following that controlled purchase on November 1,

21    2006, did agents of KAMEG also engage in a controlled purchase

22    of cocaine from the defendant on November 27, 2006?

23        A    Yes.

24        Q    And were you involved in that purchase?

25        A    Yes.

USA v. GENE SUTTON, No. 07-20009

1     Q     And, again, what was your --

2           THE COURT:   That's November twenty--

3           MR. MILLER:   Seventh.

4           THE COURT:   --seventh.   Thank you.

5     BY MR. MILLER:

6     Q     And what was your role on that date?

7     A     I was the supervisor and also assigned to

8     surveillance duties.

9     Q     Okay.  Do you recall where that controlled purchase

10    took place?

11    A     In a parking lot of an electronics shop on Mulligan

12    Drive in Bradley, Illinois.

13    Q     And do you recall approximately how much cocaine

14    was purchased on that date?

15    A     Approximately one ounce.

16    Q     Is that approximately 28 grams?

17    A     Yes, sir.

18    Q     And what was the form of that cocaine, if you

19    recall?

20    A     Crack cocaine, or cocaine base.

21    Q     And was that meeting recorded through audio,

22    through an audio wire?

23    A     Yes.

24          MR. HILL:   Excuse me.   What date?

25          MR. MILLER:   November 27, 2006.

1              MR. HILL:   Thank you.

2     BY MR. MILLER:

3         Q     And were telephone calls between the confidential

4     source and the defendant recorded on that date as well?

5         A     Yes.

6         Q     Now, let me turn your attention to December 14th of

7     2006.   On that date, were you aware of the two previous

8     controlled purchases of cocaine from the defendant on November

9     1, 2006, and November 27, 2006?

10        A     Yes.

11        Q     And on that date, did you participate in arranging

12    another controlled purchase of cocaine from the defendant?

13        A     Yes.

14        Q     And where was it that that controlled purchase was

15    to take place?

16        A     At the same trailer in Pembroke Township, Illinois.

17        Q     The one previously identified on Government Exhibit

18    1A?

19        A     Yes, sir.

20        Q     And what was to be purchased on the December 14th

21    date?

22        A     Approximately four and a half ounces of cocaine.

23        Q     And what was the form of that cocaine?

24        A     Cocaine base.

25        Q     And do you recall what the purchase price was to be

1    for the cocaine that day?

2         A    No, I don't.

3         Q    Now, did you use the same confidential source to

4    make that purchase?

5         A    Yes.

6         Q    Was he fitted with an audio recording device?

7         A    Yes.

8         Q    Was he also fitted with a video recording device?

9         A    I believe he was.

10        Q    And let me just ask you about the plan that day.

11   Did you have a plan on what was to occur if the controlled

12   purchase took place?

13        A    Yes.

14        Q    And what was that plan?

15        A    We had acquired the previous day two search

16   warrants:  one to search the trailer marked in Exhibit 1A and

17   one to search the residence to the west of the trailer.

18             After the controlled purchase was made, the search

19   warrants would be executed; and the defendant, Mr. Sutton,

20   would be taken into custody for the delivery of that day and

21   also the two previous deliveries.

22        Q    And you referred to a search warrant besides that

23   trailer to a location west of there?

24        A    Yes, sir.

25        Q    And was that location 10748 East 4000 South Road in

1    St. Anne?

2        A    Yes.

3        Q    And is that the residence of both -- at that time,

4    was that the residence of the Defendant Gene Sutton and his

5    father, Gene Sutton?

6        A    Yes.

7        Q    And just to be clear, you obtained those search

8    warrants on December 13, 2006?

9        A    Correct.

10       Q    And were those signed by a State Court judge?

11       A    Yes, they were.

12       Q    So on December 13, 2006, a State Court judge found

13   you had probable cause to search both that trailer where the

14   purchase had taken place and the trailer where the defendant

15   and his father lived?

16       A    Physical residence, not a trailer where the

17   defendant and the father lived.  Yes.

18       Q    Okay.  I'm sorry.

19            MR. HILL:  Excuse me, Your Honor.  Again, objection

20   as to the relevancy of search warrants to search a trailer and

21   a residence when the stop of Gene Sutton is predicated upon a

22   traffic stop.

23            THE COURT:  Same objection.  The Court -- again,

24   overruled.

25            You may continue, Mr. Miller.

USA v. GENE SUTTON, No. 07-20009

1   BY MR. MILLER:

2       Q    And following the controlled -- oh, you indicated a

3   search warrant was to take place.

4            What was your specific role in the surveillance?

5       A    That day I was also the supervisor, and I was

6   assigned to surveillance duties.

7       Q    And do you recall:  What was -- was KAMEG Special

8   Agent Joe Powers involved in that operation?

9       A    Yes, he was.

10      Q    And what was his assignment?

11      A    He was the driver of the two-man KAMEG marked

12  police car.  His partner was Jeff Martin.  And their duties

13  were to be in the area in the event that we needed to have a

14  uniform presence or a vehicle stopped in another location

15  other than the two search warrants.

16      Q    Okay.  And I want to show you what's been

17  previously marked as Defendant Exhibit Number 1.

18           THE COURT:  And make sure when we leave today that

19  the clerk gets all of these exhibits and that counsel doesn't

20  leave with them.

21  BY MR. MILLER:

22      Q    Is that -- does that appear to be the, what you

23  referred to as the marked squad car that Special Agent Martin

24  and Powers are, were assigned to?

25      A    Yes.

USA v. GENE SUTTON, No. 07-20009

1    Q    And now you refer to that as a marked squad car.

2    Explain to us about why you refer to that as a marked squad

3    car.

4    A    We have two types of vehicles within inventory at

5    KAMEG.  They're all government official vehicles, and they're

6    either covert car, stock vehicles from dealership parking

7    lots, or vehicles that have been seized from persons driving

8    them, regular citizens, or what we refer to as a marked squad

9    car, a police car type package vehicle with spotlights, red

10   and blue flashing emergency lights, flashing headlights,

11   flashing rear lights, a siren, police radios mounted inside.

12   Q    Okay.  And --

13        THE COURT:  Let me ask you this.  In Defendant's

14   Exhibit Number 1, is the front license plate obliterated for

15   purposes of the picture to obscure the numbers, or was that

16   the way the license plate looked when the officers would have

17   driven it?

18        THE WITNESS:  It appears to be obliterated.  The

19   front license plate would be a standard Illinois passenger car

20   plate.

21        THE COURT:  Okay.

22   BY MR. MILLER:

23   Q    And to your knowledge, on December 14, 2006, was

24   the vehicle that Special Agents Martin and Powers were in

25   equipped with the take-down lights, the siren, and the

1    spotlight?

2        A    Yes.

3        Q    And, and the vehicles from KAMEG that we refer to

4    as unmarked vehicles, are they equipped with any of those

5    things?

6        A    No.

7        Q    So your reference to marked versus unmarked is

8    distinguished between those two types of vehicles?

9        A    Yes.

10       Q    If you intend to pull someone over and arrest them,

11   do you use a specific type of vehicle?

12       A    Yes.  If we can pre-plan the event, we use the

13   police squad cars that are marked with the emergency lights

14   and spotlight.

15       Q    Let me turn your attention then to the, to the

16   events of December 14, 2006.

17            THE COURT:  Why don't we stop here because I know

18   we're not going to get done; and while I said that I've got my

19   wife's birthday to go to, I know the court reporter indicated

20   to me during the break -- Lisa, is that right --

21            THE REPORTER:  Yes.

22            THE COURT:  -- that you have to leave at 5:00?

23            THE REPORTER:  Thank you.

24            THE COURT:  So before we go into a new area of

25   December 14 with Mr. Bodemer, let's talk about when we can

USA v. GENE SUTTON, No. 07-20009

1    continue the evidentiary hearing because I had a trial come

2    off at the last minute that was going to be this week and

3    next.  That's how we were able to get this in.  So I actually

4    have time, but I don't know what Mr. Hill's schedule is or the

5    witness's.  So let's go off the record so we can establish a

6    new date, and then we can get the court reporter out by 5:00.

7                       (Discussion off the record regarding

8                        further scheduling of this matter.)

9              THE COURT:  For the record, the evidentiary hearing

10   in this case -- and I haven't heard anything to the contrary.

11   Mr. Bodemer, you would need to be sitting here ready to go at

12   1:30 on Monday, November 5th, as the first government witness.

13   Can you be here?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  And the other witnesses that you intend

16   to call, Mr. Miller, they can be here?

17             MR. MILLER:  Yes, Your Honor.

18             THE COURT:  Okay.  And so we will continue the

19   evidentiary hearing in this matter to 1:30 on Monday, November

20   5th; and we will go until 5:00 on that date.  Hopefully, we'll

21   complete before then.

22             Anything further from the government?

23             MR. MILLER:  No, Your Honor.  Thank you.

24             THE COURT:  Anything further, Mr. Hill?

25             MR. HILL:  No, Your Honor.

1          THE COURT:  Now, while Mr. Bodemer is a witness and

2    on the stand, the government is to have no communication with

3    him between now and Monday, November 5th, since he is on the

4    stand.

5          MR. MILLER:  Concerning his testimony, correct?

6          THE COURT:  Concerning his testimony.

7          MR. MILLER:  If some reason the trial --

8          THE COURT:  Right.  If you've got to tell him that

9    Judge McCuskey died following eating cake tonight, you can

10   have that contact.

11         Okay.  Anything further from the government?

12         MR. MILLER:  No, Your Honor.  I believe, if you

13   haven't already, you would make the ends-of-justice finding --

14         THE COURT:  I will.

15         And anything further, other than the

16   ends-of-justice finding, Mr. Hill?

17         MR. HILL:  No, Your Honor.

18         THE COURT:  The Court makes the ends-of-justice

19   finding again that from the date of filing the motion to

20   suppress evidence in this case and to quash the arrest and

21   suppress evidence, docket number 14, on June 4th, to and

22   including Monday, November 5th, which is the hearing date on

23   this, the -- that period of delay is excluded from the time

24   limits for filing, for commencing trial.

25         The Court finds the ends of justice served by

2:07-cr-20009-MPM-DGB    # 38    Page 129 of 129

USA v. GENE SUTTON, No. 07-20009

1   taking this action which outweighs the best interests of the

2   public and the defendant in a speedy trial.  The Court makes

3   the ends-of-justice finding pursuant to 18 United States Code

4   Section 3161(h)(8)(A).

5            And we'll see everybody here at 1:30 on Monday,

6   November 5th.  Thank you all.

7                 (Hearing adjourned, 5:04 p.m.)

8

9                 *  *  *  *  *  *  *  *  *  *  *  *

10

11                   REPORTER'S CERTIFICATE

12          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

13   that the foregoing is a correct transcript from the record of

14   proceedings in the above-entitled matter.

15          Dated this 8th day of January, 2008.

16

17                    S/Lisa Knight Cosimini
                      _____
                      Lisa Knight Cosimini, RMR-CRR
18                    Illinois License # 084-002998

19

20

21

22

23

24

25

LISA KNIGHT COSIMINI, RMR-CRR
Official Court Reporter -- U.S. District Court
(217) 384-2290