1           UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF ILLINOIS
2

3   UNITED STATES OF AMERICA,
                                Docket No. 07-20009
4           Plaintiff,

5       vs.                     Urbana, Illinois
                                November 5, 2007
6   GENE SUTTON,                1:35 p.m.

7           Defendant.

8

9                   MOTION TO SUPPRESS
            (Continuation from October 18, 2007)
10

11      BEFORE THE HONORABLE MICHAEL P. McCUSKEY
            CHIEF UNITED STATES DISTRICT JUDGE

12

13  A P P E A R A N C E S :

14  For the Plaintiff:     EUGENE L. MILLER, ESQUIRE
                           Assistant United States Attorney
15                         201 South Vine Street
                           Urbana, Illinois  61802
16                         (217) 373-5875

17  For the Defendant:     STANLEY L. HILL, ESQUIRE
                           Stanley L. Hill & Associates, P.C.
18                         651 West Washington Blvd., Suite 205
                           Chicago, Illinois  60661
19                         (312) 917-8888

20

21

22  Court Reporter:        LISA KNIGHT COSIMINI, RMR-CRR
                           Official Court Reporter
23                         201 South Vine Street, Suite 344
                           Urbana, Illinois  61802
24                         (217) 384-2290

25  Proceedings recorded by mechanical stenography; transcript
    produced by computer.

1          THE COURT:  This is United States of America versus

2    Gene Sutton, Case Number 07-20009.

3          Present in open court is the defendant, Gene

4    Sutton, accompanied by his attorney, Stanley L. Hill; the

5    United States of America represented by its assistant U.S.

6    attorney, Eugene Miller.

7          The parties were last before the Court for an

8    evidentiary hearing on October 18, 2007.

9          Shannon, do you have the exhibits out of the vault

10   in this case?

11         DEPUTY CLERK:  I don't have them, but we can get

12   them.

13         THE COURT:  You'll need to bring them from the

14   vault.

15         The defendant's admitted exhibits were stored in

16   the vault on October 18.  There were no admitted exhibits from

17   the plaintiff.  Of course, the testimony in this case has not

18   completed.  An evidentiary hearing was held on October 18.

19   The Court entered an order excusing witnesses from the

20   courtroom in advance of their testimony.

21         The testimony that took place on the 18th had the

22   defendant's father testify, Gene Sutton Sr.  Next was DEA

23   Agent Christopher Hoyt, and the defendant Gene Sutton took the

24   stand.  Following that, the defense rested.  Their exhibits

25   were admitted.

1    And the government began its testimony with Robert

2    Bodemer, master sergeant of Illinois State Police assigned to

3    Kankakee Area Metropolitan Enforcement Group.  The Government

4    Exhibit 1A was used.  However, the government did not offer to

5    admit it.  There had been Government Exhibit Number 4 also

6    which was a video that had been used during Gene Sutton's

7    testimony.  We did have -- and then Government's Exhibit

8    Number 2 had been used during the testimony of Gene Sutton Sr.

9    But am I correct, Mr. Miller; none of the

10   government's exhibits were offered in evidence on October

11   18th?

12   MR. MILLER:  That's correct, Your Honor.  We're

13   waiting until our portion of the case.

14   THE COURT:  That's what I thought you said.

15   Also accompanying you at counsel table is the case

16   agent; is that right?

17   MR. MILLER:  Yes, Your Honor.

18   THE COURT:  That's Christopher Hoyt?

19   MR. MILLER:  Yes, Your Honor.

20   THE COURT:  And the Court previously on October

21   18th overruled a motion to have Mr. Hoyt excused.

22   I do see Sergeant Bodemer's in the courtroom and

23   will be soon retaking the stand in this case.

24   And, Mr. Hill, the family members that are present,

25   Mr. Sutton, of course -- Sr. -- is able to be present; and I

1    don't expect -- you've rested -- that you have any additional

2    witnesses that would be in the courtroom; is that correct?

3              MR. HILL:  That's correct, Your Honor.

4              THE COURT:  Okay.  And that would include rebuttal

5    witnesses?

6              MR. HILL:  That is correct.

7              THE COURT:  Okay.  Mr. Bodemer, you may come

8    forward; and since it was some time since October 18, you may

9    be resworn at this time.

10             ROBERT BODEMER, sworn, 1:40 p.m.,

11         CONTINUED DIRECT EXAMINATION BY MR. MILLER:

12        Q    And just for the record, could you tell us your

13   name again?

14        A    Robert Bodemer.

15             MR. MILLER:  And, Your Honor, if I may, just to set

16   the stage, I believe Mr. Bodemer testified -- oh, I don't

17   know, 20 minutes or a half hour -- and during that time he

18   gave his background already.  He discussed a controlled

19   purchase of cocaine from the defendant on November 1st and on

20   November 27th had began to discuss the events of December 14,

21   2006.

22             And according to my notes, his testimony ended at

23   about the time he was discussing a confidential source going

24   to a trailer located at 3973 South Ridge Road in Kankakee

25   County, Illinois.  And so that's where I would intend to pick

USA v. GENE SUTTON, No. 07-20009

1    up.

2              THE COURT:  That's December 14?  Was that December

3    14, '06?

4              MR. MILLER:  Yes, Your Honor.

5              THE COURT:  Yeah, that's what my notes -- and there

6    was a December 13 search warrant issued to two locations; and

7    then I think you had Defendant's Exhibit 1 showed to Mr.

8    Bodemer, and that was the car that Martin and Powers had used.

9    And that's pretty much about where my notes end.

10             MR. MILLER:  Okay.  Thank you, Your Honor.

11   BY MR. MILLER:

12       Q    Let me turn your attention to that controlled

13   purchase on December 14, 2006.  Again, to set the scene, that

14   was to take place at 3973 South Ridge Road in St. Anne,

15   Kankakee County, in the Central District of Illinois?

16       A    Yes.

17       Q    And what type of residence was that to take place

18   at?

19       A    A mobile home trailer.

20       Q    And as part of the controlled purchase, was the

21   confidential source to go to that location?

22       A    Yes.

23       Q    And did that occur?

24       A    Yes.

25       Q    And, in fact, were you able to -- and just to step

USA v. GENE SUTTON, No. 07-20009

1    back, what was your role during this controlled purchase?

2         A    I was the --

3         MR. HILL:  Excuse me, Your Honor.  Objection as to

4    the relevancy of an intent to conduct a controlled purchase at

5    a trailer when we're talking about an arrest of my client not

6    at that trailer several miles away.  There was no arrest

7    warrant for my client.  Had he been in the trailer, we

8    might -- that might well be relevant.

9              But we're not talking about, respectfully, a

10   search -- an arrest incident to a search, nor are we talking

11   about my client being present at the time of a search.  We're

12   talking about my client being arrested two miles from a

13   trailer without an arrest warrant; and I would respectfully

14   submit that anything that happened at that trailer would be

15   irrelevant to the Court's determination of that issue.

16        THE COURT:  Mr. Miller, you may respond.

17        MR. MILLER:  Well, since one of the bases, if not

18   the main basis of the defendant's arrest was the controlled

19   purchase of cocaine from the defendant at that trailer, we

20   believe it's not only highly relevant but ultimately will be

21   dispositive of the defense motion to suppress evidence because

22   the defendant's sale of cocaine provides the agents, with or

23   without a warrant, with probable cause to arrest the

24   defendant.

25        MR. HILL:  Your Honor, if I may.

1          THE COURT:  Yes.

2          MR. HILL:  The allegation regarding the basis for

3     the arrest was that of the traffic stop.  That was the

4     information that was brought to our attention, that it was

5     predicated upon a traffic stop, that my client was allegedly

6     speeding down the road; and that's the basis upon which the

7     government has indicated, at least thus far with respect to

8     the affidavit of Special Agent Hoyt, that that was the basis.

9          Now, what happened inside that trailer and for them

10    to try to bootstrap probable cause based upon events that they

11    subsequently find out about, I would respectfully submit, does

12    not justify probable cause for stopping my client two and a

13    half -- almost two and a half miles away from that, that, that

14    trailer.

15         MR. MILLER:  Your Honor, if I may.

16         THE COURT:  Mr. Miller.

17         MR. MILLER:  First of all, Defendant has, at the

18    last hearing and this hearing, consistently referred to the

19    basis for the stop and the arrest of the -- and the arrest of

20    the defendant being speeding.

21         I've reviewed the affidavit.  I see nowhere where

22    it says he was arrested for speeding.  It says that he

23    continued to drive quickly, attempted to flee from officers,

24    which the evidence will show.  He finally came to a stop when

25    he was unable to negotiate a turn and drove the truck into a

1    sandy area.  They approached the truck and arrested Sutton.

2                So this claim that he's, he's made consistently

3    throughout these proceedings that the defendant was arrested

4    for speeding is nowhere contained within the affidavit, nor

5    has it ever been claimed.

6                And the facts of the defendant's sale of controlled

7    substance were not known subsequently to the officers -- they

8    were known before the officers made the arrest; and, in fact,

9    we'll establish that through this hearing through the

10   testimony of these witnesses, as we've already established

11   through the testimony of Agent Bodemer that they had a search

12   warrant for that trailer based on two prior controlled

13   purchases of drugs from the defendant that they'd obtained the

14   day before the defendant was arrested.

15               So this information is not subsequent to the

16   defendant's arrest.  It is prior to the defendant's arrest,

17   and it is the basis for the defendant's arrest.

18               MR. HILL:  Judge, just briefly, I have an arrest

19   report that, of arresting Officer Lockwood as well as

20   assisting Officer Wolfe, right here.  It was tendered to us

21   during discovery by the government.  It indicates that my

22   client was arrested after a traffic stop and found to be in

23   possession of a controlled substance and a handgun.

24               That was what -- now, I don't know -- this document

25   was tendered to me by the government in discovery.  They very

1    specifically states that it was a traffic stop that was the

2    predicate upon which the, the stop was based.  That's here and

3    it comes from Lockwood, as well as Wolfe who are here.  Now, I

4    think counsel may have misspoke.

5            Additionally, Your Honor, to the extent that

6    they're saying -- to the extent that they're saying that there

7    were these controlled buys that occurred, if they had enough

8    time to go get a search warrant, they certainly had enough

9    time to go and get an arrest warrant.  And if they had had an

10   arrest warrant, we wouldn't be here talking about this.

11           It's our contention that in order to have stopped

12   Gene Sutton two and a half -- almost two and a half miles away

13   from that trailer that they needed an arrest warrant. They

14   had enough time to go get a search warrant, and they're

15   talking about these controlled buys that happened in the, in

16   the fall -- in November, they claim.  They -- in November of

17   2006.

18           I mean, you can't say that, you know, we've been

19   watching a particular suspect for a period of two months; and

20   then all of a sudden on December 14th say, "Well, based upon

21   these observations we've been making, we're going to go out

22   and say that we've got probable cause to make an arrest."  If

23   they had time to go get a search warrant, they certainly,

24   based upon all of these allegations regarding my client's

25   alleged conduct, they certainly would have had enough time to

1    get an arrest warrant.  Then we wouldn't be here challenging

2    or having a basis to challenge.

3                There was no arrest warrant, and now they are

4    attempting to slide away from what the arrest report says.  It

5    is right here.  This is my good faith basis.  I don't know

6    what counsel's good faith basis is for saying that it wasn't

7    an arrest incident to a traffic stop.  Lockwood and Wolfe were

8    the arresting officers.  They say it was a traffic stop.  It

9    was not based upon a controlled buy.

10               THE COURT:  Let's mark that as an exhibit in

11   support of your objection.

12               MR. HILL:  This would be --

13               THE COURT:  We can make a copy.

14               MR. HILL:  Thank you, Judge.

15               This would be, I guess, Defendant's Exhibit 4.

16               THE COURT:  Numerical, what do we have, Madam

17   Clerk, as far as Defendant's exhibits?

18               DEPUTY CLERK:  Number 4.

19               MR. HILL:  This is 4.

20               THE COURT:  It will be marked as Defendant's

21   Exhibit 4.

22               Do you need a copy?  We can make a copy.

23               MR. HILL:  Thank you, Judge.  I -- sure.  I'd

24   rather the Court take a look at it, and then I can --

25               THE COURT:  Right.  I want to do that, too.

1          MR. HILL:  Absolutely.

2          THE COURT:  I want to make sure that you have a

3     copy.

4                    (Brief pause in proceedings.)

5          THE COURT:  As I look at this, --

6          MR. HILL:  Judge, and I'm sorry --

7          THE COURT:  I'm looking at it where it talks about

8     the offense.  It's, the box states "possession of controlled

9     substance with intent (over 15 grams)," it looks like, "UUW,"

10    which would be unlawful use of a weapon, and then "narrative,"

11    there's just a one sentence:  "Arrested after traffic stop and

12    found to be in possession of controlled substance (over" --

13    looks like "15 grams) and handgun."

14         It doesn't seem to say "arrested for traffic stop."

15    It says "after."

16         MR. HILL:  Judge, if I may.

17         THE COURT:  Yes.

18         MR. HILL:  In addition to that, another exhibit

19    that was tendered in discovery, --

20         MR. MILLER:  And if I could just object at this

21    point that the defendant has rested and is now attempting to

22    introduce exhibits, I guess.

23         MR. HILL:  Judge, no.  I --

24         THE COURT:  No.  It's in support of his objection.

25         MR. HILL:  I'm objecting to them now trying to

1    change what the focus is of this motion.

2              THE COURT:  That's what his argument is.

3              MR. HILL:  And, essentially, we've got discovery at

4    page 46 and 47 that was tendered to us.

5              THE COURT:  He's saying this is a traffic case, and

6    now you're turning it into something else.  That's his

7    argument.

8              MR. HILL:  Judge, at 12:14 p.m. -- this is Special

9    Agent Martin and Special Agent Powers -- 12:14 p.m. on

10   December 14, 2006, "agents attempt to conduct traffic stop on

11   Sutton in the area of ....   Sutton fails to stop and drives

12   west." That's -- I would ask -- that's at page 47 of a

13   two-page report marked page 46 and 47.  I would also offer

14   this as Defendant's Exhibit 5 in support of my objection to

15   the government's attempt now to recharacterize the nature of

16   this detention.

17             THE COURT:  I'll allow 4 and 5 in over -- you want

18   to object, Mr. Miller?

19             MR. MILLER:  I will, Your Honor, as to --

20             THE COURT:  Okay.

21             MR. MILLER:  -- Defendant having rested.

22             THE COURT:  So we'll allow 4 and 5 in.  I want to

23   look at 5.

24             MR. HILL:  It's at 12:14 on page --

25             THE COURT:  Uh-huh.

1          MR. HILL:  12:14 p.m. --

2          THE COURT:  On the second page.

3          MR. HILL:  -- on page 47, Your Honor.

4          THE COURT:  On page 47 of Defendant's Exhibit 5.

5    But I want to take the time to look at it here.

6                    (Brief pause in proceedings.)

7          THE COURT:  "The following will document

8    surveillance conducted during a drug investigation which took

9    place in Kankakee County on December 14, 2006, at which time

10   KAMEG confidential source purchased approximately 126 grams of

11   purported crack cocaine for $2,500 U.S. currency, official

12   advance funds, from Gene Sutton Jr. who was subsequently

13   arrested for delivery of a controlled substance.

14          "This controlled purchase took place at a trailer

15   located at 3973 South Ridge Road, St. Anne.  Agents

16   participating in this investigation were Director Bodemer" --

17   and then it goes on and names numerous other people.

18          "The following were -- approximate times and

19   observations were noted."  Surveillance started then on

20   December 14 at 10:00 a.m.

21                    (Brief pause in proceedings.)

22          THE COURT:  It doesn't say on this, Mr. Hill, who

23   prepared this Defendant's Exhibit 5.

24          MR. HILL:  It's -- I believe at the bottom, Judge.

25   I think it says Lock and Wolfe, I believe.  I don't have it in

1    front of me.

2              THE COURT:  I'm going to -- okay.  And -- okay.  I

3    see how it's done.  "Agents participating in this

4    investigation were Director Bodemer, Deputy Director Kidwell,

5    Mallindine, Sneed, Martin, Brown, Powers, and I (S/A Clayt

6    Wolfe)" number, "from KAMEG."

7              So the way it reads to me, it would have been

8    Wolfe's report, which ends with:  "12:14 p.m. agents attempt

9    to conduct traffic stop on Sutton in the area of 4000 South

10   and 13000 East Road, Hopkins Park."

11             Mr. Miller, is it your -- the reason you believe 4

12   and 5, which you objected to, is that the stop is as a result

13   of a drug transaction that he was under surveillance for that

14   day?

15             MR. MILLER:  That's correct, Your Honor.  He said I

16   misspoke, but the defense counsel keeps saying speeding,

17   speeding, speeding.  There was nothing in any of the two

18   exhibits that that Court read that said speeding.  He must

19   equate "traffic stop" with "speeding."  There are numerous

20   reasons for a traffic stop.

21             In this case, the reason was that the defendant had

22   just completed a drug transaction; and that's the basis for

23   this stop in this case and the arrest of the defendant.

24             MR. HILL:  Judge, --

25             THE COURT:  I'll -- I think I've heard enough.  I'm

USA v. GENE SUTTON, No. 07-20009

1  going to overrule the objection at this point, giving Mr.

2  Miller an opportunity to tie that up.

3          Defendant's 4 and 5 that I just looked at would not

4  necessarily contradict the theory that Mr. Miller is talking

5  about.  In fact, it looks like it may even somewhat support

6  it, but I haven't heard that.  So I'm going to give Mr. Miller

7  a chance to tie it up.

8          So the objection at this point is overruled.  You

9  may restate the question and proceed.

10          MR. MILLER:  Thank you, Your Honor.

11  BY MR. MILLER:

12      Q    And just, again, to set the scene, why was it that

13  you and other KAMEG agents were in the area of 3973 South

14  Ridge Road on, around noon on December 14, 2006?

15      A    To conduct a controlled purchase of crack cocaine

16  from Mr. Sutton, to take him into custody after the delivery

17  of the crack cocaine, and then to execute two search warrants

18  in the general area.

19      Q    And did you observe the confidential source go to

20  the trailer at 3973 South Ridge Road?

21      A    Yes.

22      Q    Approximately how long -- and I think we went over

23  this before, but was the confidential source equipped with a

24  video and audio recording device?

25      A    Yes.

1    Q    Approximately how long was the confidential source

2    inside the trailer?

3    A    Four minutes.

4    Q    And after, sometime after the confidential source

5    left the trailer, did you learn that the confidential source

6    had purchased --

7         MR. HILL:  Excuse me.  Objection as to foundation,

8    Judge.  I mean, when did they find out?  It certainly wasn't

9    before my client was arrested.

10        THE COURT:  Sustained.

11        You may rephrase the question.

12   BY MR. MILLER:

13   Q    Before Mr. Sutton was arrested, did, had -- did you

14   receive information that the confidential source had purchased

15   four and a half ounces of crack cocaine from the defendant?

16   A    Yes.

17   Q    And approximately -- you stated this.

18   Approximately how long was it that the confidential source was

19   inside the trailer?

20   A    Four minutes.

21   Q    Approximately how long after the confidential

22   source left the trailer -- let me step back.

23        Did you have an opportunity to observe the

24   confidential source leave the trailer?

25   A    Yes.

1      Q      Did you observe the defendant at any time after

2   that leave the trailer?

3      A      Yes.

4      Q      And approximately how long was it after the

5   confidential source left the trailer that the defendant, Gene

6   Sutton, left the trailer?

7      A      Three to five seconds.

8      Q      And, now, where were you that you were able to

9   observe the defendant and the confidential source leave the

10  trailer?

11     A      I was riding in an airplane.

12     Q      And were you using any devices to aid your

13  observation?

14     A      Yes.

15     Q      And what were you using?

16     A      Binoculars.

17     Q      After the defendant left the trailer, did that

18  cause somewhat of a change in the KAMEG plans?

19     A      Yes.

20     Q      And how so?

21     A      The plan was for the confidential informant to

22  depart the area.  We had agents already in place to execute

23  the search warrant, one of the two search warrants at the 3973

24  South Ridge address.

25             When Mr. Sutton, the target of the investigation,

1    departed right after the confidential informant, he entered

2    into a black pickup truck and departed the area.  So we had to

3    have one of the squad cars that we had available to us try to

4    attempt to catch up to the pickup truck in order to stop and

5    arrest Mr. Sutton at the same time that the other officers

6    were en route to the trailer to execute the search warrant.

7         Q    I'm going to show you what's been previously marked

8    as Government Exhibit 1A for identification.  Do you recognize

9    that?

10        A    Yes.

11        Q    And what is Government Exhibit 1A?

12        A    It's a map of the, one section of Pembroke

13   Township.

14        Q    And does this, what you're viewing on Government

15   Exhibit 1A, include the trailer where the controlled purchase

16   of crack cocaine took place?

17             MR. HILL:  You know, I'm going to object to this

18   characterization of "crack," Your Honor.

19             THE COURT:  We don't have any foundation yet, I

20   don't think, for that.  So that objection's sustained.

21   BY MR. MILLER:

22        Q    Well, after the purchase was made, was the

23   substance that was purchased from the defendant sent to the

24   Illinois State Police Crime Lab?

25        A    No.  I believe it was sent to the DEA lab.

1    Q    And what was the -- and was it determined to be

2    cocaine base, crack?

3    A    Cocaine base, yes.

4    MR. HILL:  Your Honor, I'm going to again object as

5    to the characterization of "crack."  "Controlled substance"

6    maybe.  "Crack," objection.

7    THE COURT:  Objection to crack at this point, I

8    think, is irrelevant, whatever controlled substance it was.

9    BY MR. MILLER:

10    Q    I believe we discussed -- what was it that the

11    confidential source believed he was going to be purchasing

12    from the defendant?

13    MR. HILL:  Objection as to what the confidential

14    source believed.

15    THE COURT:  No.  I think the Seventh Circuit talks

16    about that, that you don't need a drug test.  Judge

17    Easterbrook talks about people who are involved in drug

18    transactions are the best to know what they wish to purchase

19    and what they have purchased since it's a retail and wholesale

20    transaction.  It's a business.

21    So objection overruled as to that.

22    A    The confidential source believed that the purchase

23    was going to be crack cocaine.

24    Q    And after, after the controlled purchase of crack

25    cocaine from the defendant took place, where was it -- let me

1    ask you.  Where did that controlled purchase take place on

2    Government Exhibit 1A?

3        A    In a mobile home trailer at 3973 South Ridge Road,

4    which would be just north of the East 4000 South Road on the

5    east side of the South Ridge Road.

6        MR. HILL:  Excuse me, Your Honor.  Objection.  I

7    would move to strike.  Special Agent Bodemer is in an airplane

8    flying around, and for him to talk about something that

9    allegedly happened in a trailer without there being any

10   foundation for how he knows is improper.

11       THE COURT:  Sustained.  Lay the foundation for how

12   he knew --

13       MR. HILL:  He's in an airplane.

14       THE COURT:  -- where the locations were.

15   BY MR. MILLER:

16       Q    And how do you know where the location of the

17   trailer is?

18       MR. HILL:  Objection, Your Honor.  That's not my

19   objection.  My objection is to the alleged transfer of a

20   controlled substance allegedly from my client to a

21   confidential source.

22       MR. MILLER:  That was --

23       MR. HILL:  This man has indicated he's up in an

24   airplane with binoculars.  He certainly can't use binoculars

25   to look through a trailer.

1            THE COURT:  Sustained.  Rephrase and lay the

2    foundation.

3            MR. MILLER:  Where was, where was the trailer --

4    Your Honor, we've already had testimony as to the controlled

5    purchase.  The basis here is:  What did the officers know and

6    believe to establish probable cause here.

7            THE COURT:  But you haven't had how he knows.

8            MR. MILLER:  Okay.

9            THE COURT:  I mean, it's only, it's only going to

10   take a simple question of who told him what.

11   BY MR. MILLER:

12       Q    How did you learn that the controlled purchase of

13   crack cocaine had taken place?

14       A    After the confidential informant departed the

15   residence, the informant was instructed to meet with two

16   agents.  After meeting with the two agents, he produced the

17   crack cocaine.  The confidential informant was searched prior

18   to and then after producing the crack cocaine.  There were no

19   other contraband items found.  And then the statement from the

20   confidential informant to the agents -- the agents relayed the

21   statement to us that they, in fact, had received approximately

22   four and half ounces of crack cocaine.

23           THE COURT:  Who told you that?

24           THE WITNESS:  Trooper Lockwood.

25           THE COURT:  There you go.  That's easy.  It's just

1   a matter of who said what.

2            Mr. Hill's objections are good objections because

3   until you say who said what it's pretty hard for you to know

4   what you knew; but as soon as you say that Lockwood told you

5   this, then it makes sense.

6   BY MR. MILLER:

7        Q    And could you point out for us on Government

8   Exhibit 1A the trailer where the controlled purchase took

9   place?

10            And you can touch with your finger.

11            THE COURT:  And Mr. Hill's objection is:  How do

12   you know that's the trailer where the controlled purchase took

13   place.  Who told you that since you weren't there?

14            That's my question to you.  I get to ask questions,

15   too.

16            THE WITNESS:  Oh, excuse me.

17            THE COURT:  Maybe not in Kankakee; but here in

18   Federal Court, I get to ask questions.

19            Who told you that's where the transaction took

20   place?

21            THE WITNESS:  Trooper Lockwood.

22            THE COURT:  Thank you.

23   BY MR. MILLER:

24        Q    To be clear, did you see the confidential source

25   enter into that trailer?

1          A       Yes.

2          Q       And you saw the confidential source leave the

3    trailer?

4          A       Yes.

5          Q       And you saw the defendant leave that trailer?

6          A       Yes.

7          Q       What type of vehicle did you observe the defendant

8    get in after he left the trailer?

9          A       Black-colored, full-size pickup truck.

10         Q       And where did the trailer go -- I'm sorry.  Where

11   did the defendant drive after he left the trailer?

12         A       After departing the trailer, he turned eastbound on

13   East 4000 South Road.

14         Q       And did you continue to maintain visual

15   surveillance?

16         A       Yes.

17         Q       And please just describe for us where the, where --

18   can you give us just where the black truck went from the time

19   it left the trailer up until the time you observed the

20   trailer -- I'm sorry -- the truck to come to its first stop?

21         A       The first stop was at the intersection of Main

22   Street and Central Street.

23         Q       And did the truck stop at that point?

24         A       Yes.

25         Q       And where did it go from there?

1      A      It turned left, which is northbound, on Main

2   Street.

3      Q      And where did it go after it was on Main Street?

4      A      Turned east on East Spinning Wheel Road.

5      Q      Now, during this time that you were observing the

6   defendant's vehicle, are you providing that information to any

7   other agents?

8      A      Yes.

9      Q      And how are you doing that?

10     A      By radio.

11     Q      And after the truck turns on East Spinning Wheel

12   Road, what do you observe?

13     A      Approximately a quarter mile east of Main Street on

14   Spinning Wheel Road, the black pickup truck pulled into a

15   driveway on the north side of Spinning Wheel Road.  The

16   driver's door opened.  Mr. Sutton exited the pickup truck and

17   stood in the general area of the driver's door of the pickup

18   truck.

19     Q      And can you point out for us on Government

20   Exhibit -- and I would move to admit Government Exhibit 1A at

21   this time, Your Honor.

22            THE COURT:  Any objection, Mr. Hill?

23            MR. HILL:  No objection.

24            THE COURT:  Admitted without objection.

25

BY MR. MILLER:

Q    And can you point out for us on Government Exhibit 1A where you observed the defendant's vehicle to stop off of Spinning Wheel Road?

A    About that area.

Q    And what did you observe the defendant do at that point?

A    He just stood in the general area of the driver's door.

Q    Now, were there other persons involved in the operation in the area in vehicles?

A    Yes.

Q    And could you observe them as well?

A    Yes.

Q    And who if anybody else's vehicle did you observe in the area of Spinning Wheel Road at the time the defendant's vehicle was there?

A    Agent Hoyt's.

Q    And what did you observe Agent Hoyt's vehicle to do?

A    After the, Mr. Sutton turned eastbound on Spinning Wheel Road, started traveling eastbound.  Agent Hoyt turned eastbound also.  And when Mr. Sutton parked the pickup truck on the north side of Spinning Wheel Road, Agent Hoyt proceeded eastbound past that location.

1    Q    And where did Agent Hoyt's vehicle go?

2    A    East of the black pickup truck Mr. Sutton was

3    driving towards the, what we would call the east end of East

4    Spinning Wheel Road.

5    Q    And is that a dead-end road?

6    A    Yes.  There's, I guess, an unimproved access you

7    could take at the end of the, the east end of the dead-end

8    road.  There's two tire tracks that run through the field that

9    take you back out to another end; but for practical purposes,

10   the road itself would be considered a dead-end road.

11   Q    Did you observe the defendant's vehicle to leave

12   where it was parked on Spinning Wheel Road?

13   A    Yes.

14   Q    And approximately how long was it, was the vehicle

15   parked there?

16   A    Maybe a minute or less.

17   Q    And where did you observe the defendant's vehicle

18   to go then?

19   A    The black pickup truck backed out of the driveway

20   and proceeded westbound on East Spinning Wheel Road.

21   Q    And did it come to the intersection of what's

22   labeled here on Main Street and East Spinning Wheel Road?

23   A    Yes.

24   Q    And where did it go from there?

25   A    It turned right which is northbound on Main Street.

USA v. GENE SUTTON, No. 07-20009

1    Q    How far did it go north on Main Street?

2    A    Approximately a quarter of a mile.

3    Q    And what happened then?

4    A    The pickup truck pulled off to the right shoulder

5    area of the roadway, made a U-turn onto Main Street, and then

6    continued southbound on Main Street.

7    Q    And where did the vehicle go after it was

8    southbound on Main Street?

9    A    It continued southbound to the intersection with

10   East Central Street.

11   Q    Now, are you familiar with the intersection of Main

12   Street and East Central Street?

13   A    Yes.

14   Q    Are there stop signs there?

15   A    It's a four-way stop.  Yes.

16   Q    And what, if anything, did you observe the

17   defendant's vehicle do as it approached Main Street?  I'm

18   sorry, as it approached Central Street on Main Street?

19   A    The black pickup truck turned right, which would be

20   going westbound on East Central Street, without stopping at

21   the intersection.

22   Q    Now, at this time, are you aware -- did you observe

23   another KAMEG vehicle in the area of the defendant's black

24   pickup truck?

25   A    Yes.

1          Q      And what vehicle was that?

2          A      It was a maroon-colored Chevrolet Impala squad car.

3          Q      And are you -- from your radio contact, are you

4    aware of who was in that squad car?

5          A      Yes.

6          Q      And who was that?

7          A      Agent Joe Powers was the driver, and Agent Jeff

8    Martin was the front passenger.

9          Q      And, again, were you in radio contact with them

10   calling out the locations of the defendant's black pickup

11   truck?

12         A      Yes.

13         Q      After the black pickup truck began heading west on

14   4000 South Road, where did it go?

15         A      It continued eastbound until approximately the

16   11000 Road, East 11000 Road.

17         Q      And is that on this map?

18         A      Yes.  It's, it's the South 11000 East Road.

19         Q      I'm going to show you what's been previously marked

20   as Government Exhibit 1B.  Do you recognize that?

21         A      Yes.

22         Q      And what is that?

23         A      It's a larger area map of the Pembroke Township.

24         Q      And is this a fair and accurate representation of

25   the streets in that area?

1      A     Yes.

2            MR. MILLER:  Your Honor, we'd ask for Government

3      Exhibit 1B to be admitted at this time.

4            THE COURT:  Any objection, Mr. Hill?

5            MR. HILL:  No objection.

6            THE COURT:  Be admitted without objection.

7      That's -- and that was Government?

8            MR. MILLER:  Exhibit 1B.

9            THE COURT:  1B, right.  We had 1A.  Now we have 1B.

10     BY MR. MILLER:

11     Q     So I'm correct, then, the, the defendant's pickup

12     truck traveled back past, or near the trailer where the

13     controlled purchase had taken place?

14     A     Yes.

15     Q     And approximately how far did it go down 4000 East

16     Road -- or I'm sorry, 4000 South Road?

17     A     From the intersection of Main Street and the East

18     4000 South Road, it traveled approximately three miles to the

19     west.

20     Q     And what happened at three miles to the west?

21     A     As the pickup truck was westbound and crossed the

22     intersection of the South 11000 Road, it continued to the

23     10000 Road.  There's a slight jog or an S-curve in the 4000

24     Road.  The black pickup truck then turned left, or southbound,

25     and became stuck just off of the road in a ditch or small

1    drive area.

2                 THE COURT:  Now, Mr. Sutton had testified back on

3    October 18th that he was run off of the road.  Did you observe

4    that?

5                 THE WITNESS:  No, sir.

6    BY MR. MILLER:

7         Q    At the time the black truck left 4000 South Road,

8    could you observe approximately where the maroon car with

9    Agents Powers and Martin was?

10        A    Several car lengths to the east of or behind the

11   pickup truck.

12        Q    And after the black truck became stopped, did you

13   observe what the maroon car did?

14        A    Yes.  The maroon car stopped behind the rear bumper

15   area of the pickup truck.  The maroon car was still up on the

16   roadway.

17        Q    Now, did you -- were you still in radio contact

18   with the officers?

19        A    Yes.

20        Q    And then did you learn that the defendant had been

21   placed under arrest?

22        A    Yes.

23        Q    After you learned that, what did you do?

24        A    I departed the area in the airplane.

25        Q    Now, at some point later, did you have contact with

USA v. GENE SUTTON, No. 07-20009

1      the defendant?

2          A      Yes.

3          Q      And where was that?

4          A      I met with Agent Hoyt in the Village of Aroma Park.

5      Agent Hoyt was transporting Mr. Sutton from Pembroke Township

6      en route to the Bourbonnais Police Department.  And after I

7      landed from the airplane, I entered my squad car, met him in

8      the Village of Aroma Park to follow him in to Bourbonnais

9      Police Department, and that's where I first came in contact

10     with him.

11         Q      At the Bourbonnais Police Department?

12         A      Well, in the parking lot --

13         Q      Okay.

14         A      -- at Aroma Park and then subsequently at the

15     Bourbonnais Police Department.

16         Q      And approximately how long -- approximately how

17     long was that after the, when you were informed of the

18     defendant's arrest until the time that you saw him?

19         A      It -- the time I saw him at the police department?

20         Q      At the Aroma Park, if you know.

21         A      At Aroma Park?  Approximately 45 minutes, I

22     believe.

23         Q      At the time you saw him at Aroma Park, did you

24     notice any blood on the defendant's clothing?

25         A      No.

1    Q    Did you notice any blood on the defendant's face?

2    A    No.

3    Q    Now, you stated after that you went with Agent Hoyt

4    to the Bourbonnais Police Department?

5    A    Yes.  I followed in my squad car.

6    Q    And what occurred at the Bourbonnais Police

7    Department?

8    A    Mr. Sutton was escorted into an interview room.  He

9    was unhandcuffed, and he was advised of his constitutional

10   rights.

11   Q    I'm going to show you what's been previously marked

12   as Government Exhibit 3.  Do you recognize Government Exhibit

13   3?

14   A    Yes.

15   Q    And what is Government Exhibit 3?

16   A    It's a, appears to be a copy of the written

17   <u>Miranda</u> advisement of constitutional rights, which Agent Hoyt

18   read verbatim to Mr. Sutton in my presence.

19   Q    And it appears that there are initials, or at least

20   the letters "GS" next to the bullet points on rights.  Do you

21   know how those got to that form?

22   A    Yes.  After Agent Hoyt read each of the bullet

23   points to Mr. Sutton, at the completion of the waiver of

24   rights, he was asked if he understood those rights; and he was

25   requested to initial beside each of the bullet points as he

USA v. GENE SUTTON, No. 07-20009

1    understood them.

2                MR. HILL:  Objection, foundation, Judge.  Was

3    Special Agent Bodemer present?

4                THE COURT:  That's the objection.  How does he

5    know?  So sustained without foundation.

6                MR. MILLER:  He testified that he was there.

7    BY MR. MILLER:

8        Q    Were you there when these rights were read to Mr.

9    Sutton?

10       A    Yes.

11       Q    Did you --

12               THE COURT:  Did you observe Mr. Sutton put the "GS"

13   next to those points?

14               THE WITNESS:  Yes.

15               THE COURT:  Okay.  Objection overruled.

16   BY MR. MILLER:

17       Q    And, in fact, at the bottom of this form, there is

18   also -- I'm going to show you Government Exhibit 3.  It's hard

19   to see on there.

20               At the bottom of this form, there is a signature

21   that purports to be the signature of Gene Sutton.  Did you

22   observe that signature to be made?

23       A    Yes.

24       Q    And who made that signature?

25       A    The defendant in the orange.

1          Q     And you see Gene Sutton in the courtroom here

2     today?

3          A     Yes.

4          Q     And could you please point him out for the Court?

5          A     Sitting at the counsel table with the orange.

6                MR. MILLER:  Your Honor, we'd request that the

7     record reflect that the witness has identified the defendant,

8     Gene Sutton.

9                THE COURT:  The record will so reflect the

10    identification of Mr. Sutton.

11    BY MR. MILLER:

12         Q     There are two other signatures on that page.  Do

13    you recognize those?

14         A     Yes.

15         Q     And who are the other two signatures?

16         A     The top signature on the witness line is Agent

17    Christopher Hoyt's, and the second one is my signature.

18         Q     And you made that second signature?

19         A     Yes.

20         Q     And as you said, Officer Hoyt was the one who read

21    those rights to Mr. Sutton?

22         A     Yes.

23         Q     Now, at the time that those rights were read to Mr.

24    Sutton, I think you indicated this, but was he handcuffed?

25         A     No.

1        Q    At that time, was anyone's guns drawn?

2        A    No.

3        Q    Was any physical force used against Mr. Sutton at

4    any time at the Bourbonnais Police Department?

5        A    No.

6        Q    How would you describe -- following reading him his

7    rights, did he make any statements?

8        A    Yes.

9        Q    And how would you describe the nature of the

10   conversations between you and the defendant, Gene Sutton, at

11   that time?

12       A    They were cordial, businesslike, regular tone of

13   voice, cooperative.

14       Q    Was he permitted to go to the bathroom during

15   those, that interview?

16       A    Yes.

17       Q    And, in fact, did he indicate at some point during

18   the interview whether he was hungry?

19       A    Yes.

20       Q    And what, if anything, did you do in response to

21   that?

22       A    I went to the squad room of the police department,

23   and there was some -- there's vending machines in there, and

24   there was some cookies and a Christmas box.  I asked him what

25   his preference was.  He preferred not to have chips from the

USA v. GENE SUTTON, No. 07-20009

Thursday, 24 January, 2008  10:12:59 AM
Clerk, U.S. District Court, ILCD

1   vending machine.  So we brought him in some cookies.  He'd

2   asked for -- we offered him something to drink.  He did not

3   want any soda; so we brought him water.

4        Q    Now, following the waiver of his <u>Miranda</u> rights,

5   did the defendant make any admissions regarding crack cocaine?

6        A    Yes.

7        Q    And what admissions did he make?

8        A    He'd stated that prior to his arrest he had been in

9   the trailer and had delivered crack cocaine -- he didn't

10  specify the amounts -- to an individual.  He'd also stated

11  that there was approximately one ounce of cocaine powder and

12  crack cocaine that was in his truck at the time of his arrest,

13  and that was the remainder of a thirteen and a half ounce

14  cocaine purchase he had previously made, turned into crack,

15  and then had delivered some at this trailer; and this was what

16  was left of that.

17       Q    And without going into details, did the defendant

18  make other admissions regarding the distribution of cocaine at

19  that time?

20       A    Yes.

21       Q    I'm going to show you what's been previously marked

22  as Government Exhibit 2.  Do you recognize Government Exhibit

23  2?

24       A    Yes.

25       Q    And what is that?

1     A     A booking photo from the Jerome Combs Detention

2  Center, Kankakee County, the evening of Mr. Sutton's

3  incarceration.

4     Q     Is that a fair and accurate representation of the

5  way he appeared to you when you met with him on December 14,

6  2007 -- I'm sorry, 2006?

7     A     Yes.  When we were in person at the police

8  department, he had a small laceration, I believe, under his

9  right eye on the cheek.  It was red.  You could tell that the

10  skin had been broke, but there was no blood dripping out of

11  that.  You can't identify that in this photo; but other than

12  that, yes.

13            THE COURT:  And that was taken December 14, 2006?

14            THE WITNESS:  Yes, sir.

15            MR. MILLER:  I don't have any other questions for

16  the witness, Your Honor.

17            THE COURT:  You may examine, Mr. Hill.

18                CROSS-EXAMINATION BY MR. HILL:

19     Q     Is that Special Agent Bodemer?

20     A     That's fine.  Yes.

21     Q     Special Agent Bodemer, you previously testified on

22  October the 18th, 2007, that there was a controlled buy of,

23  allegedly participated in with a confidential source and my

24  client on November 1, 2006; is that correct?

25     A     That I participated in or that one had occurred,

1    sir?

2        Q    You claimed that my client participated in a

3    controlled sale with your confidential source on November 1,

4    2006.

5            MR. MILLER:  I guess I'm going to object for

6    foundation, "you claimed."  I don't know when or what --

7            THE COURT:  Well, no.  In fact, I'm looking at my

8    notes, and that was one of the first questions --

9            MR. HILL:  That was the first question.

10           THE COURT:  -- at 4:40 on October 18 was whether

11   the confidential source in the fall of 2006 had purchased two

12   and a half ounces of cocaine from Mr. Sutton on a regular

13   basis.  And Mr. Bodemer talked about a November 1, 2006,

14   controlled buy.  So that's my notes that Mr. Hill is referring

15   to, and you may --

16           MR. HILL:  That's correct.

17           THE COURT:  Objection overruled.  You may follow

18   up, Mr. Hill.

19   BY MR. HILL:

20       Q    You get the question?

21       A    Yes, sir.

22       Q    You claim that my client participated in a

23   controlled sale on November 1, 2006, correct?

24       A    Yes, sir.

25       Q    Did you obtain an arrest warrant for my client for

USA v. GENE SUTTON, No. 07-20009

1      the allegations alleged that he participated in on November 1,

2      2006?

3              A     No, sir.

4              Q     You know how to get an arrest warrant, correct?

5              A     Yes, sir.

6              Q     You didn't get one, did you?

7              A     That's correct.

8              Q     All right.  Now, again, on November the 27th, you

9      claim -- 2006, you claim that my client participated in

10     another controlled sale involving your confidential source; is

11     that correct?

12             A     Yes, sir.

13             Q     And, of course, did you get an arrest warrant for

14     my client?

15             A     No, sir.

16             Q     You know how to get an arrest warrant, correct?

17             A     Yes, sir.

18             Q     You didn't get an arrest warrant, though, did you?

19             A     Correct.

20             Q     You indicate that, again, on -- was there another

21     time, other than November 1st or November 27th, sir, that my

22     client allegedly participated in some transaction with your

23     confidential source?

24             A     December 14, 2006.

25             Q     Other than the 14th, --

1      A      No, sir.

2      Q      -- allegedly.

3      A      No, sir.

4      Q      All right.  Now, with respect to both of those

5  transactions on, alleged transactions on November 1st and

6  November 27th, you did have an opportunity to get a search

7  warrant based upon those activities, correct?

8      A      Yes, sir.

9      Q      And you prepared an affidavit to get a warrant

10  based upon those activities, correct?

11      A      I did not personally; but my group did, yes.

12      Q      And that warrant was a search warrant which would

13  have permitted you to execute a search at the trailer on

14  Ridge, correct?

15      A      Yes, sir.

16      Q      Of course, there was no arrest warrant for my

17  client, Gene Sutton, correct?

18      A      That's correct.

19      Q      Notwithstanding what you claim your confidential

20  source told you he had done, correct?

21      A      Correct, sir.

22      Q      Now, let's talk about 12/14/07 -- I'm sorry, '06.

23      A      Yes, sir.

24      Q      At that time, you had a search warrant to conduct

25  the search at the trailer on Ridge, correct?

1        A      Yes, sir.

2        Q      And on that day, your confidential source went into

3    the trailer; isn't that correct?

4        A      Yes.

5        Q      And your confidential source was wearing audio and

6    video recording devices, correct?

7        A      Yes.

8        Q      And there was a problem with the audio and video

9    recording devices; isn't that correct?

10       A      Yes.

11       Q      And as a result of the problem with the audio and

12   video recording devices, you were unable to determine what, if

13   anything, transpired inside the trailer with the confidential

14   informant inside the trailer in real time; is that correct?

15       A      Yes, sir.

16       Q      Because you had no idea what this confidential

17   source was doing inside that trailer because the audio and

18   video was not working, correct?

19       A      Correct.

20       Q      Now, there were other individuals who were inside

21   that trailer, correct?

22       A      Yes, sir.

23       Q      You've indicated that my client, Gene Sutton, was

24   inside the trailer; but that wasn't his trailer, was it?

25       A      [No response.]

1      Q     It wasn't his trailer; he wasn't the owner of it,

2   right?

3      A     You are correct.

4      Q     And you didn't have -- I mean, he had no possessory

5   interest in that trailer, correct?

6      A     Correct.

7      Q     There were at least three other individuals that

8   were in that trailer; isn't that correct?

9      A     Yes.

10     Q     There was a woman who was an amputee who was in

11  that trailer?  By that, she had one arm, correct?

12     A     Yes.

13           MR. MILLER:  I guess I want to go with the same

14  foundation objection, Judge, since -- I'd just like him to ask

15  what the foundation is for asking the questions.

16           THE COURT:  So your objection is relevancy?

17           MR. MILLER:  No, just foundation.

18           MR. HILL:  Judge, I'll withdraw it --

19           THE COURT:  Okay.

20           MR. HILL:  -- at this point.

21  BY MR. HILL:

22     Q     In real time, you had no knowledge of what was

23  transpiring inside that trailer, correct?

24     A     Yes, sir.

25     Q     Yes, sir; you did not know?

1        A       You are correct.  You are correct.

2        Q       All right.  Now, because you had no knowledge in

3    real time of what was happening inside that trailer, you had

4    no personal facts or fact -- strike that.

5                You had no facts upon which to base probable cause

6    based upon your own personal knowledge; isn't that correct?

7        A       Correct.

8        Q       In fact, none of the off-- other officers had any

9    basis upon which to base probable cause because they had no

10   real-time knowledge of what had transpired inside that

11   trailer, correct?

12       A       Correct.

13       Q       Now, Gene Sutton leaves the trailer; does he not?

14       A       Yes, he does.

15       Q       At the time that Gene Sutton leaves the trailer,

16   you do not know whether or not an alleged transaction

17   involving alleged crack cocaine had occurred, isn't that

18   correct?

19       A       Correct.

20       Q       In fact, you're up in your plane looking out; you

21   observe Sutton get out of the trailer, get into his pickup

22   truck and drive away.  Isn't that correct?

23       A       Yes, sir.

24       Q       At the time he drove away, you did not have

25   probable cause to believe that he had committed a crime

1    because you had no real-time knowledge of what had occurred;

2    isn't that correct?

3         A    I didn't have probable cause for incidents on the

4    date of the 14th at that time.

5         Q    Yes, sir.  Is that true?

6         A    For the date of the 14th, correct.

7         Q    He walks out the trailer; he gets in this truck; he

8    drives away.  And at the time you see him walk out of the

9    trailer, get into his truck, and drive away, you don't know

10   what's happened inside that trailer, do you?

11        A    Correct.

12        Q    Nor what, if any, transaction may have occurred

13   with this source, correct?

14        A    Correct.

15        Q    Now, when he comes out of the trailer, gets into

16   his car, and drives away, you have occasion to see Special

17   Agent Hoyt following him; isn't that correct?

18        A    Yes, sir.

19        Q    And, of course, at the time that he comes out and

20   drives away -- that, by the way, was before this confidential

21   source had come out of the trailer; isn't that correct?

22        A    No.  Mr. Sutton had come out within three to five

23   seconds behind the confidential informant.

24        Q    Okay.  But at the point that Sutton gets in the

25   truck, or his black pickup, and drives away, there had been no

1    conversation with the confidential source, had there?

2         A    You're correct.

3         Q    In fact, the video wasn't working, correct?

4         A    Yes.

5         Q    The audio wasn't working, correct?

6         A    Correct.

7         Q    Sutton drives away; and you don't know what, if

8    anything, has happened inside the trailer, if anything at all,

9    correct?

10        A    You're correct.

11        Q    But, Hoyt begins to follow him; isn't that correct,

12   you've testified?

13        A    Yes, sir.

14        Q    At the time that Hoyt began to follow him, Hoyt had

15   no basis to follow him because he didn't know if anything had

16   happened inside the trailer; isn't that correct, sir?

17        A    I disagree.

18        Q    Well, Hoyt didn't know what had happened in the

19   trailer, right?

20        A    On December 14th, you are correct.

21        Q    Notwithstanding, he starts following my client;

22   isn't that correct?

23        A    You're correct.

24        Q    You start conducting surveillance of my client,

25   correct?

1    A    Yes, sir.

2    Q    And at that time, you didn't know anything that had

3    allegedly transpired inside that trailer, correct?

4    A    On December 14, 2006, you're correct.

5    Q    Yeah.  And, of course, with respect to the previous

6    dates, November 1st and November 27th, you didn't have an

7    arrest warrant for my client based upon those allegations, did

8    you?

9    A    We did not.

10    Q    And, of course, you could not have arrested him

11    based upon these allegations on the 1st and the 27th -- you

12    couldn't have done it on the 14th; you didn't have an arrest

13    warrant?

14    A    I disagree.

15    Q    Well, you ever hear of remoteness, sir?

16    A    Remoteness?

17    Q    Remoteness.

18    A    In what context?

19    Q    Well, if these allegations, as you claim, had

20    occurred on November 1st and on November 27th, you had ample

21    opportunity to get a search warrant; you certainly could have

22    gotten an arrest warrant, correct?

23    A    Could have, yes.

24    Q    Assuming you had the basis for it, correct?

25    A    [No response.]

1       Q       Assuming you had the basis for it, right?

2       A       For the arrest warrant?

3       Q       Yes.

4       A       Yes.

5       Q       But you didn't get one, did you?

6       A       We chose not to get one.

7       Q       You didn't get one, did you?

8       A       We chose not to.

9       Q       You got a search warrant, right?

10      A       Two of them, sir.

11      Q       But never got an arrest warrant to arrest my

12  client?

13      A       You're correct.

14      Q       Now, Sutton drives away.  He drives down Central --

15  he drives down 4000, which would be the -- Central, correct?

16      A       Yes, sir.  Yes, sir.

17      Q       And then he turns and goes north on Main, correct?

18      A       Yes, sir.

19      Q       And while he's doing this, he's being followed by

20  Hoyt, correct?

21      A       Yes.

22      Q       And he's being surveiled by you, correct?

23      A       Yes.

24      Q       And at this time, you still hadn't talked to any

25  confidential informant, had you?

1          A       Correct.

2          Q       So you don't know what had happened inside that

3     trailer at that point, correct?

4          A       You're correct.

5          Q       He turns onto Spinning Wheel Drive, correct?

6          A       Spinning Wheel Road, right, yes.

7          Q       You still hadn't talked to anybody regarding what

8     allegedly happened in the trailer, right?

9          A       Correct.

10         Q       He pulls out of Spinning Wheel and goes north on,

11    on Main Street, correct?  I'm sorry, on -- what would be --

12    Main Street?

13         A       Yes, sir.

14         Q       And he goes north and he stops at about Gamble

15    Road?

16         A       Approximately that area, yes, sir.

17         Q       Where Moody's or Mondy's Garage is located?

18         A       In the general area, yes, sir.

19         Q       And he then pulls out and goes back south, correct?

20         A       Yes.

21         Q       And, of course, still you don't know what, if

22    anything, had happened in that trailer, correct?

23         A       Yes, I did.

24         Q       Well, you claim that you talked to Lockwood,

25    correct?

1        A      Yes, sir.

2        Q      Lockwood was the person who you allegedly talked

3    to, correct?

4        A      Yes, sir.

5        Q      And Lockwood had allegedly talked to this

6    confidential source, correct?

7        A      Correct.

8        Q      No one had observed the confidential source,

9    though, do anything, correct, inside that trailer, correct?

10       A      Inside the trailer, correct.

11       Q      And, of course, there were other people inside that

12   trailer, correct, besides my client, correct?

13       A      Yes, sir.

14       Q      You've indicated the amputee was in there, correct?

15       A      I acknowledged that you indicated the amputee was

16   in there.  Yes.

17       Q      And, of course, you found that out subsequently

18   when the search warrant was executed, correct?

19       A      Yes.  You're correct.

20       Q      And there was also another male, black, inside the

21   trailer, correct?

22       A      Yes, sir.

23       Q      There were at least two other male, blacks, weren't

24   there?

25       A      The individual you speak of and then the

1    confidential informant and the amputee, female.  Yes.

2        Q    There were a total of three?

3        A    Yes, sir.

4        Q    In fact, when the search warrant was executed, the

5    male, black, who was in the trailer ran to the bathroom and

6    attempted to flush what he had; isn't that correct?

7        A    Yes, sir.

8        Q    And acknowledged that the stuff was his, correct?

9        A    The stuff he attempted to flush, yes.

10       Q    What time did the confidential source allegedly

11   talk to Lockwood?  What time was it?

12       A    I was notified approximately a minute, maybe a

13   minute and a half, in that time period, before the black

14   pickup truck came to a final stop.

15       Q    Okay.  So the pickup truck stops at about 12:14,

16   according to a report that we've got, regarding -- agents

17   attempt to conduct a traffic stop at about 12:14 p.m.  Would

18   that refresh your recollection regarding the time?  You say

19   about a minute before then, correct?

20       A    I'm going to guess, yes, approximately.

21       Q    All right.  So a minute before then would have been

22   12:13, correct?

23       A    Approximately.

24       Q    About?

25       A    Approximately, yes, sir.

1       Q     So any time prior to 12:13, you had no knowledge of

2    what my client had allegedly done inside that trailer,

3    correct?

4       A     With the times being approximately, yes.

5       Q     In fact, your officers proceeded to follow my

6    client, chasing him with Mars lights and -- not with Mars

7    lights, with a -- what kind of lights are they that you

8    described as being a marked car?

9       A     Flashing headlights, --

10      Q     Flashing headlights --

11      A     -- flashing red and blue lights, --

12      Q     Uh-huh.

13      A     -- a spotlight.

14      Q     Okay.  And that's as they drove down 14-- or 4000

15   South Road, correct?

16      A     They actually attempted -- they were notified --

17      Q     My question, sir, is that the lights were on on

18   4000 South Road, correct?

19      A     Yes, they were.

20      Q     And they proceeded to try to stop him for about 2.3

21   miles; isn't that correct?

22      A     I believe it was a little further than that, but

23   approximately that, yes.

24      Q     That they were trying to stop him with those

25   headlights -- I mean, with those lights on, correct?

1      A     Yes, sir.

2      Q     And when those lights were on, when they were first

3    turned on and they were trying to stop my client, they had no

4    knowledge regarding what had transpired inside that trailer

5    because you didn't find out until about a minute before he was

6    pulled over?  Yes or no.

7      A     No.  You're wrong.

8      Q     Well, you've just testified that you didn't know

9    what was going on until about a minute, or what had allegedly

10   occurred inside that trailer, until about a minute before my

11   client was stopped.

12     A     I --

13     Q     Isn't that correct?

14     A     I gave approximately a minute, a minute and a half

15   approximately.

16     Q     No.  You said a minute.

17     A     And a minute and a half.

18     Q     Now it's a minute and half?

19           MR. MILLER:  Judge, I'm going to object to being

20   argumentative with him.

21           MR. HILL:  Judge, he said a minute before.  Now

22   it's a minute and a half now that he knows where I'm going

23   with this.

24           THE COURT:  Well, you'll have to tie it up.  I

25   don't know right now the significance of the 30-second

1    variance.

2    BY MR. HILL:

3        Q    Sir, at the time that the Mars lights, or at the

4    time that the lights were placed on my client, the

5    confidential source had not told anybody what had transpired

6    in that trailer, correct?

7        A    No.  You're wrong.

8        Q    Is Lockwood here today?

9        A    No.

10        MR. HILL:  Judge, I'd asked for all of the agents

11    to be made available for this hearing.

12        THE COURT:  When we started on October 18th, Mr.

13    Miller said that Christopher Hoyt, Robert Bodemer, Jeffrey

14    Martin, Joseph Powers, and Clayt Wolfe were available.  There

15    was no discussion about Mr. Lockwood. If you wish --

16        MR. HILL:  Judge, --

17        THE COURT:  -- to have Mr. Lockwood subpoenaed, we

18    will continue it to a date that you subpoena him.

19        But my understanding, he was not here.  He was not

20    subpoenaed.  Is that correct, Mr. Miller?

21        MR. MILLER:  That's correct, Your Honor.  He was

22    not involved in the arrest of the defendant; and until right

23    now, I had no idea that Mr. Hill would want Mr. Lockwood here.

24    This was never raised in any of his pretrial motions, and

25    we've brought five officers here to respond to the allegations

1      that were raised in the pretrial motion.

2              MR. HILL:  Judge, it's pretty clear that they did

3      not know what had transpired inside of this trailer until

4      Lockwood allegedly tells them after his conversation allegedly

5      with the confidential source.

6              Prior to that, there would have been no probable

7      cause to stop my client, to turn on Mars lights --

8              MR. MILLER:  Judge, I object.  Is this argument or

9      do -- we have a witness on the stand.  We've been here for

10     several hours, last hearing and this hearing; it seems like he

11     could ask questions and save his argument for --

12             MR. HILL:  Judge, this is more than asking

13     questions.  I'm trying to find out what the facts are.

14     Lockwood apparently is the guy, and the government doesn't

15     have him here.

16             THE COURT:  No.  But you can get him here.  They

17     didn't have him here on the 18th, and nobody promised he'd be

18     here today.

19             MR. HILL:  Judge, if I -- respectfully, I didn't

20     know that they were going to say Lockwood was the guy.

21             THE COURT:  It's apparently --

22             MR. HILL:  There's nothing in here that says that

23     Lockwood is the guy.

24             THE COURT:  Apparently, Mr. Miller didn't think he

25     was important either.  I'm just clearing the record that I

1    asked him to tell me on the 18th who was here.  He said five

2    people.  He didn't say Lockwood.  The Court did not ask

3    Lockwood to be here.  You did not subpoena Lockwood, but I'll

4    reopen your case if you want Mr. Lockwood called.

5                    MR. HILL:  Yeah, I do, Judge.  And I would ask that

6    he not be talked with in light of what's just come out by the

7    government.

8                    THE COURT:  Let's finish today before we get to

9    Lockwood.  There's no way he can talk to Lockwood now.  He's

10   on the stand.  There's no way he can talk to him when he

11   leaves the room unless he calls him, but -- we'll take care of

12   that, but let's do one thing at a time.

13                   MR. HILL:  All right.

14                   THE COURT:  Let's complete the witness.

15   BY MR. HILL:

16       Q    Special Agent Bodemer, it's your testimony, then,

17   that it's not until after Lockwood talks to the confidential

18   source that you know what allegedly -- that any agents know

19   what allegedly happened inside the trailer, correct?

20       A    Yes, sir.  Correct.

21       Q    Because before then, you didn't know what had

22   allegedly occurred inside that trailer, correct?

23       A    On December 14, 2006, correct.

24       Q    And, of course, you did not have an arrest warrant

25   to stop my client at that time, correct?

1        A       We did not have an arrest warrant.  Correct.

2        Q       Now, you throughout the -- you were the supervising

3    agent on this report, on this matter?

4        A       Yes, sir.

5        Q       Okay.  You were the supervising case agent,

6    correct?

7        A       I was not the case agent.  I was the supervisor.

8        Q       All right.  And these gentlemen who assisted in

9    this arrest were working essentially under your supervision

10   and control?

11       A       Yes, sir.

12       Q       You are aware of the fact that throughout their

13   reports they indicate that they tried to make a traffic stop

14   on my client; isn't that correct?

15       A       Yes, sir.

16       Q       You never once corrected Martin or Powers or Wolfe

17   or Lockwood with respect to the stat-- or the nature of the

18   stop that they claim they were attempting to make, correct?

19       A       I -- I'm trying to understand your question.  I did

20   not correct them --

21       Q       You never recharacterized it as anything other than

22   a traffic stop in the reports, correct?

23       A       You're correct.

24       Q       And, of course, these were all narcotics agents,

25   KAMEG agents, correct?

1       A       Yes, sir.

2       Q       And not one of them had a ticket book, correct?

3       A       That is incorrect.

4       Q       Who had a ticket book?

5       A       The agents that are assigned to the narcotics group

6    which drive the squad cars have citation books and written

7    warning books.

8       Q       Who had one?

9       A       Every agent in that group, which would include

10   Powers and Martin, have citation books and warning -- written

11   warning books.

12      Q       So, obviously, if they were conducting a traffic

13   stop, they issued a citation to my client?

14      A       It's discretionary.

15      Q       Did anybody issue my client a traffic citation?

16      A       No.

17      Q       Now, we heard from Mr. Hoyt that he allegedly made

18   an illegal U-turn.  Did you see an illegal U-turn while you

19   were in your plane looking at my client?

20      A       I don't know if I'd characterize it as an illegal

21   U-turn, but he made a U-turn.  Yes.

22      Q       Where was the U-turn?

23      A       North of East Spinning Wheel Road.  Approximately a

24   quarter mile north -- as Mr. Sutton traveled north he pulled

25   off to the right shoulder area and turned left, came back

1    around, which would be commonly known as a U-turn, and

2    continued southbound on Main Street.

3         Q    Okay.  But you indicated that you wouldn't

4    characterize it as an illegal U; that was your testimony,

5    correct?

6         A    Correct.

7         Q    Thus, it wouldn't be citationable, correct?

8         A    I would think not.  No.

9         Q    All right.  Now, he then goes south on that street,

10   which would be -- is that Central?  I'm sorry, south on --

11   south on Main Street.  He goes south on Main Street from

12   Gamble, correct?

13        A    Yes, sir.

14        Q    And then he makes a right turn onto East 4000 South

15   Road, correct?

16        A    Yes.

17        Q    There's a stop sign at the intersection of East

18   4000 South Road and South 13000 East Road, correct?

19        A    Yes, a four-way stop sign.

20        Q    Now, Mr. Hoyt indicated that my client blew that

21   stop sign and made a right turn without stopping for the stop

22   sign at that intersection.

23             MR. MILLER:  I'm going to object to the

24   characterization of Agent Hoyt's testimony.  First, he wanted

25   all the witnesses excluded.  Now he's asking the witness to

1    comment on another witness's testimony.  That's not

2    appropriate.  He can just ask questions, Your Honor.  That's

3    the basis for the objection.

4           MR. HILL:  Judge, this is obviously going to the

5    predicate of no citation even though they allege that this was

6    a traffic stop.

7           THE COURT:  Well, I've now forgot what the question

8    is.

9           MR. HILL:  I'll re-ask it again.

10          THE COURT:  So I'll let you --

11          MR. HILL:  I'll ask it again.

12          THE COURT:  Please.

13   BY MR. HILL:

14       Q    Was there a right turn made at the intersection of

15   13th -- of 13000 East and 4000 South Road by the truck that my

16   client was driving?  Did you see that?

17       A    Yes, sir.

18       Q    Did he stop for the stop sign?

19       A    No.  He did not.

20       Q    All right.  Was that an illegal -- so did he run a

21   stop sign?

22       A    A violation of the Illinois Vehicle Code, yes.

23       Q    Was that citationable?

24       A    It's discretionary.  It could be.  Yes.

25       Q    Was my client issued a ticket, a citation, for

1    running a stop sign?

2        A    No.

3        Q    Now, in the report --

4             THE COURT:  Let me stop you here.

5             Mr. Bodemer, did you see that pickup truck go

6    through the stop sign at East 4000 South Road, which is also

7    known as Main, and South 1300 East Road, which is also known

8    as Doney, as that pickup truck turned right to go west?  Did

9    you see that?

10            THE WITNESS:  Yes, I did.

11            THE COURT:  Okay.

12            THE WITNESS:  From the 13000 Road to the 4000 Road.

13            THE COURT:  So you could have written a ticket also

14   if you wished?

15            THE WITNESS:  Yes.

16            THE COURT:  Okay.

17   BY MR. HILL:

18       Q    But was one written?

19       A    None.

20       Q    All right.  And, again, you indicate that my

21   client -- or at least in your reports you indicate that he was

22   arrested after a traffic stop.  What was the traffic stop,

23   sir?

24       A    His vehicle was stopped.  The characterization of a

25   traffic stop, from our point of view, is a law enforcement

1    officer attempting to stop a vehicle and the occupants

2    therein.  Whether or not a violation of the Illinois Vehicle

3    Code was a predicate for the stop is not what the, the

4    reference to "traffic stop" is.

5        Q    Sir, you never once say that this stop was

6    predicated upon probable cause for -- you never once in the

7    report say that the stop was based upon an alleged controlled

8    sale that had occurred back in the trailer, correct?

9        A    None of the reports reflect that.  You are correct.

10       Q    There are over 81 pages of reports, close to 100,

11   and nowhere does it say that my client was stopped on the

12   basis of an alleged controlled buy from him to the

13   confidential source -- by the confidential source that

14   occurred in that trailer, correct?

15       A    Correct.

16       Q    Not one report says that, correct?

17       A    I believe you are correct.

18       Q    And, in fact, several reports claim that the basis

19   of the stop was a traffic stop, correct?

20       A    I believe the reports characterize the traffic

21   stop.  I don't believe they state that it is the basis, as you

22   put it.

23       Q    Sir, if -- one of the reports at 12:14 p.m. says

24   "agents attempted to conduct a traffic stop on Sutton,"

25   correct?

1          A      Yes.

2          Q      In the area of 4000 South and 13000 East Road in

3    Hopkins Park, correct?

4          A      Yes.

5                 THE COURT:  And that's the one we just let into

6    evidence and --

7                 MR. HILL:  That's Exhibit 4.

8                 THE COURT:  Right.  It doesn't say --

9                 MR. HILL:  Exhibit 5, I'm sorry.

10                THE COURT:  As I read it, it doesn't say what the

11   traffic stop is for.

12                MR. HILL:  Judge, but it's at 4000 South and 13000

13   East.

14                THE COURT:  I know.  But it doesn't say what the

15   traffic stop is for.

16   BY MR. HILL:

17         Q      Well, at 13000 East and 4000 South, that's the

18   intersection where the stop sign is, correct?

19         A      Yes.

20         Q      And if they were attempting to conduct a traffic

21   stop at that location, it would have been for the blown stop

22   sign that Sutton had made, had run at that location, correct?

23         A      No, sir.

24         Q      Well, what other violation had been conducted or --

25   what other traffic violation occurred at the intersection of

1    4000 South and 13000 East Road?

2        A    No violations of the Illinois Vehicle Code.

3        Q    Well, you said that the U-turn wasn't imp-- wasn't

4    citationable, correct, in your opinion?

5        A    In my opinion.

6        Q    Right?

7        A    Correct.

8        Q    Going south on 13000 East Road, at that

9    intersection of South -- I'm sorry, at 13000 East Road and

10    4000 South Road, you've got the stop sign, correct?

11        A    Yes, sir.

12        Q    You say that Sutton ran the stop sign at that

13    location, correct?

14        A    Yes, sir.

15        Q    And when he ran that stop sign, both Martin and

16    Powers attempted to conduct a traffic stop; is that correct?

17        A    They were in the process of attempting to stop his

18    vehicle to conduct that traffic stop prior to his arrival at

19    that intersection and --

20        THE COURT:  Let me clarify this.

21        Do you agree with Christopher Hoyt's testimony when

22    he testified that he had no arrest warrant, and there was no

23    violation of any traffic laws until he, meaning Mr. Sutton,

24    went through the stop sign at East 4000 South Road and South

25    1300 East Road as the defendant turned right to go west and

1   did not stop for that stop sign?

2              From what you observed in the plane, would you

3   agree with that?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Now, is it your testimony that if he

6   had stopped at that stop sign and turned right to go west

7   after a stop, there wouldn't have been any violation at that

8   moment of any traffic law; but he still would have been

9   stopped by the officers?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Okay.  That's what I wanted to clarify.

12  BY MR. HILL:

13     Q    But, of course, at that time, you -- Lockwood had

14  not yet spoken to -- Lockwood had not yet spoken to, allegedly

15  spoken to this confidential source, had he?

16     A    No, sir.  You're incorrect.

17     Q    What time did Lockwood talk to the confidential

18  source?

19     A    I don't know the approximate time.  I can tell you

20  the sequence of events, but I don't know the approximate time.

21     Q    Give me a report.  You've got reports to the

22  minute.  What time does Lockwood talk to the confidential

23  source?

24             MR. MILLER:  I believe he's answered that question,

25  Your Honor.

1          MR. HILL:  Judge, I'm trying to exhaust his

2    recollection because I don't see anywhere in any of these

3    reports where that happened.

4          THE COURT:  Well, I know one thing.  I don't have

5    it in my notes yet.  So you'll -- objection is overruled.  You

6    may ask.

7    BY MR. HILL:

8        Q    What time did Lockwood talk to the CS?

9        A    I'm going to guess approximately 12--

10         THE COURT:  Is your recollection exhausted, and is

11   there anything that would refresh it?

12         THE WITNESS:  I don't -- from my recollection, I

13   don't believe it's specifically stated in any of the reports,

14   the specific time and notation that Trooper Lockwood notified

15   the units that he had met with the confidential source and had

16   been provided the information.

17         THE COURT:  So what you're saying is:  Your

18   recollection is merely, you might say, an educated guess of

19   something that happened 11 months ago, and you wouldn't have a

20   report that would refresh your recollection?

21         THE WITNESS:  Correct.

22         THE COURT:  Okay.

23   BY MR. HILL:

24       Q    In fact, Agent Bodemer, there are no reports that

25   show Lockwood talking to the confidential source; isn't that

1    correct?

2         A     [No response.]

3         Q     After he walked out of that trailer, no reports,

4    correct?

5         A     Out of the 83 pages, I -- I do not remember whether

6    or not there's a notation.  I believe there is.  There's a

7    notation somewhere that indicates he had met with the

8    informant, received the four and a half ounces of crack

9    cocaine, and identified it in his report with an exhibit

10   number.

11        Q     Sir, Sutton leaves the trailer at approximately

12   12:05 p.m., correct?

13        A     Yes, sir.

14        Q     And departs in his black GMC truck, correct?

15        A     Yes, sir.

16        Q     At approximately 12:14 p.m., Special Agent J.

17   Martin and Special Agent John Powers activated their emergency

18   lights, right?

19        A     Yes, sir.

20        Q     And attempted to make a traffic stop on Sutton's

21   truck on 4000 South and 13000 East Road in Hopkins Park,

22   Illinois, correct?

23        A     Yes, sir.

24        Q     So, if the confidential source had spoken to the

25   agents that were conducting surveillance -- yourself, Martin,

USA v. GENE SUTTON, No. 07-20009

1    and Powers -- and he had spoken to them before 12:14 p.m.,

2    they wouldn't have been trying to conduct a traffic stop; they

3    would have been making a stop based upon the controlled buy

4    that occurred in the trailer.  Isn't that correct?

5        A    That's where I believe -- our reference to a

6    traffic stop, I think, is the semantics here.  The motor

7    vehicle was attempting to be stopped and the driver placed

8    under arrest for the vio--

9        Q    Sir, --

10            THE COURT:  For the drug violation?

11            THE WITNESS:   For the drug violation, yes.

12            THE COURT:  So what he's asking, though, is that

13   the sequence of that conversation with Lockwood, while it may

14   not appear in a report, it has to happen between 12:05 and

15   12:14?

16            MR. HILL:  No.  No, that's not --

17            THE COURT:  For him to be right.

18            MR. HILL:  For him --

19            THE COURT:  For him to be right.

20            MR. HILL:  That's right.  For him to be right.

21            THE COURT:  That's what I just said.

22            MR. HILL:  Okay.  I'm sorry, Judge.

23            THE COURT:  For him to be right.  If it happens

24   before 12:05, he doesn't know what happened in the trailer.

25   And if it happens after 12:14, it's too late.

1              MR. HILL:  It's too late.

2              THE COURT:  And what you're saying, Mr. Bodemer, is

3    you don't believe in any of the reports that we're going to

4    find what time that Lockwood told you or anybody else about

5    what happened in the trailer between the confidential source

6    and the defendant?

7              THE WITNESS:  Correct.

8              THE COURT:  Okay.

9              MR. HILL:  If I may approach, Judge.

10             THE COURT:  Yep.

11             MR. HILL:  I'd like to refer to page 40 of the

12   discovery that I received to refresh -- I guess this would be

13   Defendant's Exhibit 6.

14             THE COURT:  Okay.

15   BY MR. HILL:

16      Q    Mr. Bodemer, I'm showing you Defendant's Exhibit

17   Number 6.  You see the portion that I've highlighted here or

18   surrounded, right?

19      A    Yes, sir.

20      Q    Would you read that to the Court, please.

21      A    "At approximately 12:05 p.m., Sutton exits the

22   trailer and departs in a black GMC truck with Illinois

23   registration of 95348F-B.  At approximately 12:14 p.m., S/A J.

24   Martin and S/A J. Powers activated their emergency lights and

25   attempted to make a traffic stop on Sutton's truck on 4000

1     South and 13000 East Road, Hopkins Park, Illinois."

2          Q     Okay.  Now, that -- what are you reading from?

3     What is that that you've just read, Defendant's Exhibit 6?

4          A     A report authored by Mike Lockwood that documents

5     the drug investigation which resulted in the arrest of Gene

6     C. Sutton Jr.

7          Q     Okay.  That's Lockwood's report, correct?

8          A     Yes, sir.

9          Q     Okay.  Now, and you've read it; you've had a chance

10    to review Lockwood's report, correct?

11         A     A while ago, yes.

12         Q     Okay.  And I showed you page 40, which is

13    Defendant's Exhibit 6, correct?

14         A     Yes.

15         Q     It says at 12:05 Sutton left the trailer, correct?

16         A     Yes, sir.

17         Q     And it says at approximately 12:14 Martin and

18    Powers attempted to make a traffic stop, correct?

19         A     Yes, sir.

20         Q     And they say at the intersection of 4000 South and

21    13000 East Road, correct?

22         A     At the intersection, yes.

23         Q     Which is where the stop sign is located, right?

24         A     Correct.

25         Q     The stop sign that you say you saw my client run,

1    correct?

2         A    Yes, sir.

3         Q    Now, Lockwood does not say that they attempted to

4    make a stop based upon an alleged controlled sale that had

5    occurred inside the trailer, does he?

6         A    You are correct.

7         Q    Never once mentions that, correct?

8         A    You're correct.

9         Q    And the reason he doesn't mention it is because he

10   didn't know what had happened inside the trailer at the time

11   that they attempted to make the traffic stop.  Otherwise, he

12   would have said "arrest for controlled sale," not "traffic

13   stop"?

14        A    I don't agree with that.

15             THE COURT:  Well, it would be speculation unless he

16   had talked to Lockwood about that report recently.

17             When's the last time you talked to him about his

18   report?

19             THE WITNESS:  A long time ago.

20             THE COURT:  Okay.

21   BY MR. HILL:

22        Q    And it goes on to say, does it not, Mr. Bodemer,

23   that "Sutton failed to stop and drove to the area of 11000

24   East and 4000 South Road," correct?

25        A    Yes, sir.

1        Q    It doesn't say anything about trying to stop my

2    client for an alleged sale or controlled sale that had

3    occurred inside the trailer, correct?

4        A    You're correct.

5        Q    Throughout -- in fact, going beyond Defendant's

6    Exhibit 6, looking at all of the discovery that we've been

7    tendered, nowhere in any of it does it say that my client was

8    being stopped for a controlled sale that occurred inside the

9    trailer, correct?

10       A    I believe you're correct.

11       Q    The only reference, the only reference for stopping

12   him, according to all of the discovery that we've got, is

13   based upon a traffic stop that started at 4000 South and 13000

14   East Road in Hopkins Park, Illinois, correct?

15       A    The initiation of the attempt to stop, in that

16   general area, yes.

17       Q    No reference regarding a controlled sale inside the

18   trailer, correct?

19       A    You're correct.

20       Q    And, of course, no traffic citation was given,

21   correct?

22       A    Correct.

23       Q    Because you say that's discretionary?

24       A    Yes, sir.

25       Q    Marked cars -- I'd like to mark this as Defendant's

Exhibit 7.

           MR. HILL:  May I approach, Judge?

           THE COURT:  Yes.

BY MR. HILL:

    Q    Mr. Bodemer, I'm showing you what's marked as
Defendant's Exhibit Number 7.  What is that?

    A    It appears to be a photograph of a police car.

    Q    Would you describe that as a marked police car?

    A    Yes, sir.

    Q    Why do you call it marked, sir?

    A    Emergency lights, spotlight, states it's the
Kankakee County Sheriff's Police on the side of the car.

    Q    And it has a star on the side of it also; does it
not?

    A    Yes, sir.

    Q    And Mars lights on top, correct?

    A    The emergency lights, yes.

    Q    Is this customarily in your parlance referred to as
a marked squad car?

    A    That is one.  Yes.

           MR. HILL:  Judge, I'd offer this into evidence,
even though it's in the government's case at this point.

           THE COURT:  Well, how about Defendant's 6?

           MR. HILL:  As well as Defendant's 6.

           THE COURT:  Defendant's 6, any objection, Mr.

1    Miller?

2              MR. MILLER:  No objection, Your Honor.

3              THE COURT:  Defendant's 7, Mr. Miller, any

4    objection?

5              MR. MILLER:  No objection, Your Honor.

6              THE COURT:  7's admitted also, --

7              MR. HILL:  And --

8              THE COURT:  -- no objection.

9              MR. HILL:  -- I'm going to give this to the deputy

10   clerk, Judge, for purposes -- but I'll probably need it for

11   the next --

12             THE COURT:  Okay.

13   BY MR. HILL:

14        Q    But it's fair to say that no one else talked to

15   Lockwood -- I'm sorry.

16             No one else talked to this confidential source

17   prior to my client being arrested other than allegedly

18   Lockwood, correct?

19        A    I believe that's incorrect.

20        Q    Well, who else talked to him?

21        A    I believe Special Agent Dave Krinzke [phonetic] was

22   with Lockwood on that date.

23        Q    Okay.  Did Krinzke prepare a report?

24        A    He may or may not have had a conversation with him,

25   but he was with him.

USA v. GENE SUTTON, No. 07-20009

1    Q    All right.  But you place it at Lockwood, correct?

2    A    Yes, sir.

3    Q    And, of course, we've got Lockwood's report,

4    correct?

5    A    Yes, sir.

6    Q    That's Defendant's Exhibit Number 6 that you just

7    read, correct?

8    A    Yes, sir.

9    Q    And he doesn't say a thing about a sale occurring

10   inside the trailer as the basis for the stop; isn't that

11   correct?

12   A    That's correct.

13   Q    He says it was a traffic stop, right?

14   A    Yes.

15        MR. HILL:  No further questions -- oh, just a

16   moment, please.

17              (Brief pause in proceedings.)

18        MR. HILL:  Excuse me, Judge.

19              (Brief pause in proceedings.)

20   BY MR. HILL:

21   Q    All of the agents that were involved in this

22   surveillance, they were all narcotics agents, correct, KAMEG?

23   A    I believe so.  Yes.

24   Q    Okay.  There were no officers that were involved in

25   traffic patrol, correct?

USA v. GENE SUTTON, No. 07-20009

1       A       Of the ones that were on the surveillance team,

2    that they weren't traffic officers; is that what you're --

3       Q       Yes, sir.

4       A       You are correct.

5       Q       They were all doing narcotics, alleged narcotics

6    surveillance, correct?

7       A       Yes.

8       Q       Even though they may have had a traffic book in

9    their car, correct?

10      A       They, they were assigned to KAMEG.   The officers

11   with the traffic books, in addition to serving search

12   warrants, helping on surveillance and controlled buys, also

13   conduct traffic duties, making stops on vehicles.

14      Q       Yeah, but that wasn't their job that day to conduct

15   traffic stops, correct?

16      A       The -- Martin and Powers were assigned -- that's

17   why they were in the marked KAMEG car as opposed to, with the

18   rest of the group that was preparing to execute the search

19   warrant -- they were pre-positioned in the event that we had

20   to have a marked squad car make a stop on any of the vehicles.

21      Q       You were all there for narcotics activities,

22   though, correct?

23      A       Yes.

24      Q       Not, not -- I'm sorry.   Narcotics activities,

25   right?

1    A    Yes.  This was a narcotics investigation.

2    Q    Not traffic patrol, correct?

3    A    Correct.

4         THE COURT:  So if I understand you, the marked

5    vehicle's there in the event they have to have a stop of

6    somebody so that person doesn't later claim that they were

7    being stopped by an unmarked vehicle that they didn't know was

8    a police vehicle?  Is that why the marked squad car is there?

9         THE WITNESS:  Yes.  That's why they were assigned

10   to be in the marked car.  Yes, sir.

11        THE COURT:  Okay.

12        MR. HILL:  No further questions, Judge.

13        THE COURT:  Mr. Miller.

14            REDIRECT EXAMINATION BY MR. MILLER:

15   Q    I'd like to just put up Defendant's Exhibit 6.

16   Defense counsel had you read two sentences about the traffic

17   stop -- is that right? -- on Mr. Sutton's truck?

18   A    Yes, sir.

19   Q    That was from --

20        THE COURT:  Let me ask a question, since I haven't

21   looked at page 40.

22        Did you put -- were you putting in the whole report

23   of Lockwood or just page 40?

24        MR. HILL:  Just the paragraph, in fact, Judge, that

25   I referred to, which is circled.

1                    THE COURT:  Okay.  And Mr. Miller, do you want to

2       put in more of 40?

3                    MR. MILLER:  I do, Your Honor.  I want to put in

4       the preceding paragraph to put in context the defense

5       allegations that there was no discussion of the sale of the

6       controlled substance or the meeting with Lockwood.

7                    THE COURT:  That's on page 40?

8                    MR. MILLER:  That's immediately preceding the

9       paragraph that was read.

10                   THE COURT:  Okay.  So rather than excise it, you're

11      asking that the remaining portion of page 40 be admitted?

12                   MR. MILLER:  The paragraph before, immediately

13      preceding the defendant's paragraph, yes.

14                   THE COURT:  Mr. Hill, any objection?

15                   MR. HILL:  Judge, the report is what it is.

16                   THE COURT:  Well, I haven't seen it.

17                   MR. HILL:  Well, may I --

18                   THE COURT:  I don't want to see -- I don't want to

19      see any portion of it that --

20                   MR. HILL:  May I see --

21                   THE COURT:  -- neither one of you want into

22      evidence.  All I have is page 40.  Now we're narrowing the

23      scope of page 40.  And I know what's going to happen is my

24      clerk is going to take a picture of page 40; and then if the

25      Court in issuing its decision talks about anything other than

1    what you both wanted on page 40, somebody's going to tell me

2    it's outside of the record.

3              All I'm trying to establish is what is the record

4    on page 40 since that's all that's been referenced until this

5    very moment.

6              MR. HILL:  Judge, I would object to the portion

7    before because that deals with what the confidential source

8    had to allegedly say who's not here to be subject to

9    cross-examination.

10             This officer --

11             THE COURT:  That's  Crawford v. Washington.

12             MR. HILL:  Well, it's a -- well, yeah.

13             THE COURT:  What's the objection?

14             MR. HILL:  But it's a motion to suppress.  I know

15   hearsay is permitted.

16             But the point being is that I would object to those

17   portions being, without the agent being produced -- without

18   the confidential --

19             THE COURT:  Well, you're going to get the agent.

20             MR. HILL:  I'm sorry.  The con--

21             THE COURT:  You're going to get Lockwood.

22             MR. HILL:  I meant the confidential source, Judge.

23             THE COURT:  Okay.  And it may be irrelevant.  By

24   the time we get Lockwood, we may get all of his report.

25             MR. MILLER:  And, Your Honor, this is simply

1    redirect.   There were allegations made by defense counsel

2    that --

3              THE COURT:   Now, hold it.   I just want to know why

4    don't -- what do you -- you want one more paragraph?   And he's

5    objecting to that paragraph.

6              Now, is that paragraph you want what the

7    confidential informant said or what Lockwood said?

8              MR. MILLER:   It's to respond to two claims by

9    defense counsel that he's making during questioning:   One,

10   that the report nowhere discusses the controlled purchase of

11   the four and a half ounces as the basis for the traffic

12   stop, --

13             THE COURT:   That's what I heard.

14             MR. MILLER:   -- when this information immediately

15   precedes it; and, two, that there's no way that the report

16   discusses a meeting between Lockwood and the confidential

17   source when that paragraph details that meeting.

18             MR. HILL:   Judge, what that paragraph that precedes

19   the one that I referenced -- I'm sorry.   What that paragraph

20   that precedes the one that I referenced alludes to are alleged

21   representations by the confidential source to Lockwood.

22             THE COURT:   But is there the objection that this

23   Court is unable to sift through what might be irrelevant and

24   I'll be confused if ultimately I see more than what the two of

25   you ask questions about?

1          MR. HILL:  No, no, not at all, Judge, absolutely

2     not.  I'm sure --

3          THE COURT:  Because it sounds to me as if we're

4     arguing that I'm the jury, and somehow I'll see something

5     irrelevant that I won't be able to exclude versus, when we're

6     talking about a jury as the finder of fact, versus a motion to

7     suppress finder of fact.

8          MR. HILL:  Judge, the purpose for my introducing

9     this was to show what was in Lockwood's head.  All right?  If

10    he had --

11         THE COURT:  Well, what Mr. Miller's saying is that

12    you're trying to limit it to one sentence, and that is not

13    what was in his head; that it's taken out of context.

14         MR. HILL:  Well, then, in that case, Judge, I will

15    allow -- no objection to it coming in.

16         THE COURT:  Okay.

17         MR. HILL:  But I'd like to -- but, again, my

18    point --

19         THE COURT:  Is there any reason why we can't just

20    take a picture of page 40?

21         MR. HILL:  Let's take a picture of page 40, Judge.

22         THE COURT:  And then I'll know what everybody's

23    talking about.

24         MR. MILLER:  I would ask him -- my understanding

25    was when defense counsel offered page 40 there was no

1    redactions.  He offered page 40; we agreed to it --

2              THE COURT:  Yep.

3              MR. MILLER:  -- and that it was entered.  But --

4              MR. HILL:  Wait.

5              MR. MILLER:  That being --

6              THE COURT:  Hold it.  Hold it.  Hold it.

7         I'm asking that page 40 come in over both of your

8    objections so we can move along.  Because if this was a trial,

9    the jury would be irritated.  But I'm a judge; I'm not

10   irritated.  So let's just have page 40 come in over both

11   objections.

12             MR. HILL:  Fine.

13             THE COURT:  And then the Seventh Circuit can tell

14   me if I made a mistake, but this will move things along more

15   quickly.

16             Madam Clerk, will you take a picture of page 40 so

17   I can have it right in front of me so then I can know what

18   everybody's talking about instead of guessing.

19             So page 40 comes in of Lockwood's report over the

20   objection of both parties who only wanted a portion of page

21   40, and now the Court wants all of page 40.

22             LAW CLERK KLOCK:  I don't think the government

23   objected to it.

24             THE COURT:  It doesn't matter.  At this point, it

25   doesn't matter.  40's in.

```
1                    (Brief pause in proceedings.)

2              MR. MILLER:  Your Honor, if the Court is simply

3    going to review the preceding paragraph, we'd have no

4    additional questions.

5              THE COURT:  Well, the preceding paragraph you're

6    talking about, "At a predetermined location . . . "?

7              MR. MILLER:  Yes, Your Honor.  The starred/circled

8    two sentences were the sentences that defense counsel had

9    Mr. -- Director Bodemer read; and we simply wanted to bring to

10   the Court's attention the information in the preceding

11   paragraph that discussed the meeting with Lockwood and the

12   purchase of the controlled substance.

13             THE COURT:  Yeah.  Well, it starts out, "At a

14   predetermined location, the CS met with me" -- and that means

15   Lockwood since it's his report -- "and they" -- and this is

16   interesting -- "they handed me a clear plastic bag."

17             Can you tell me, Officer Bodemer, who "they" is, if

18   you know?  It sounds -- do we have two confidential sources?

19             THE WITNESS:  No.  At the time he authors the

20   report, to try to help maintain the identity of the informant,

21   he does not refer to a he/she.  He uses "they."

22             THE COURT:  And not intending to be they as in

23   plural?

24             THE WITNESS:  Correct, sir.

25             THE COURT:  Okay.  Thank you.
```

1          (Brief pause in proceedings.)

2          THE COURT:  And where it says "the CS in their

3     vehicle," that is not intended to be plural?

4          THE WITNESS:  That is correct.

5          THE COURT:  Now, on page 40 -- and I know you've

6     said this before; but as it goes through the sequence in the

7     entirety of Defendant's Exhibit 6, page 40, there is no time

8     statement of Lockwood saying at a specific time I told anybody

9     about the transaction that he's reporting on.

10          THE WITNESS:  Correct.

11          THE COURT:  Okay.  You may continue, gentlemen.

12          MR. MILLER:  I have no additional questions, Your

13     Honor.

14          RECROSS-EXAMINATION BY MR. HILL:

15     Q     But it does give a time line as to when Lockwood

16     said that the traffic stop occurred, correct?

17     A     Yes, sir.

18     Q     And, of course, if Lockwood had known about the

19     controlled, alleged controlled buy before 12:14, wouldn't you

20     have expected that to have been in his report?

21     A     Not on the surveillance report.  Those are usually

22     detailing physical observations that are noticed.

23     Q     There's nowhere in any report where we have

24     Lockwood saying that he spoke to the confidential source about

25     what had happened in the trailer before the traffic stop was

1    attempted on Sutton, correct?

2        A    Not in writing, correct.

3            MR. HILL:  No further questions.

4            THE COURT:  Mr. Miller.

5        FURTHER REDIRECT EXAMINATION BY MR. MILLER:

6        Q    What was the basis for the traffic stop on the

7    Defendant Gene Sutton?

8        A    Prior to -- when Mr. Sutton pulled out from the

9    Spinning Wheel Road, he proceeded north approximately a

10   quarter of a mile to the Gamble Road area.  He turned off to

11   the right, made a U-turn and went southbound.

12           At approximately his return southbound passing

13   Spinning Wheel Road, the marked car, our maroon Chevrolet

14   Impala, arrived into the area.  They were directed to stop him

15   based on at that time Mike Lockwood had told us that he had

16   received the four and a half ounces of crack cocaine from the

17   informant.  We knew that we had the delivery from the trailer

18   from Mr. Sutton, and they were directed to attempt -- they

19   were directed to stop him.

20           They attempted to stop him as he approached the

21   four-way intersection with Central and Main Street.  He went

22   through -- Mr. Sutton went through the intersection to the

23   west and continued till he turned left into a ditch area or

24   field area where his truck became stopped.

25           THE COURT:  Now, we won't find, though, that

1    sequence in the report of the officers who were driving that

2    marked vehicle.  They're not going to say, "We were called

3    into the area, Pembroke Township/Hopkins Park, to stop Gene

4    Sutton because of a drug transaction"?  Their reports aren't

5    going to say that, are they?

6              THE WITNESS:  I don't believe they wrote it in

7    their reports.  No, sir.

8              THE COURT:  So they don't tell why they were called

9    to Hopkins Park/Pembroke Township?

10             THE WITNESS:  Yes, they were.  At the briefing

11   before the --

12             THE COURT:  But, I mean, will it be in their

13   report?

14             THE WITNESS:  Oh, in the reports?  I don't believe

15   I saw in their reports that they wrote that in.  No, sir.

16             THE COURT:  Okay.

17             MR. HILL:  May I?

18             THE COURT:  Yes.

19             FURTHER RECROSS-EXAMINATION BY MR. HILL:

20        Q    But they were all narcotics officers, correct,

21   KAMEG, right?

22        A    Yes, sir.

23        Q    And they were on the scene for purposes of

24   conducting their narcotics activity, correct?

25        A    Yes, sir.

```
 1              MR. HILL:  No further questions.

 2              MR. MILLER:  Nothing further, Your Honor.

 3              THE COURT:  Okay.  You may step down.

 4                   (Witness Bodemer excused, 3:16 p.m.)

 5              THE COURT:  Let's take a break until 3:30.  We'll

 6   be in recess.

 7                   (Recess, 3:16 p.m. to 3:30 p.m.)

 8              THE COURT:  We're back on the record in the -- you

 9   may be seated -- in the case of United States of America

10   versus Gene Sutton, Case Number 07-20009.

11              You may call your next witness, Mr. Miller.

12              MR. MILLER:  The United States would call Special

13   Agent Jeffrey Martin.

14                   JEFFREY MARTIN, sworn, 3:34 p.m.,

15                   DIRECT EXAMINATION BY MR. MILLER:

16      Q      Could you tell us your name?

17      A      Jeffrey Martin.

18      Q      And you are an officer with the Kankakee Police

19   Department?

20      A      Yes, sir, I am.

21      Q      How long have you been an officer with the Kankakee

22   Police Department?

23      A      Since June of '98.

24      Q      And as an officer with the Kankakee Police

25   Department, did you receive training at the Illinois State
```

Police Academy?

    A     Yes, sir, I did.

    Q     And where is that located?

    A     Springfield, Illinois.

    Q     And how long is that training?

    A     I believe it's 12 weeks.

    Q     Now, since you've been assigned -- since you've
been with the Kankakee Police Department, have you been
assigned to the Kankakee Area Metropolitan Enforcement Group?

    A     Yes, sir.

    Q     And that's referred to as KAMEG?

    A     It is.

    Q     And when were you first assigned to KAMEG?

    A     January of 2003, I believe.

    Q     And are you still assigned to KAMEG?

    A     Yes, sir.

    Q     And you've been assigned there throughout the time
since January of 2003?

    A     I have.

    Q     And have you received various training in the
investigation of, interdicting the trafficking of illegal
drugs?

    A     Yes, sir.

    Q     And now are you also a canine handler?

    A     I am.

1      Q     And have you received training in respect to being

2   a canine handler?

3      A     I have.

4      Q     Let me turn your attention to December 14, 2006.

5   On that date, were you assigned as a special agent with the

6   Kankakee Area Metropolitan Enforcement Group?

7      A     Yes, sir.

8      Q     And on that day, do you recall assisting in the

9   controlled purchase of crack cocaine from an individual?

10     A     Yes, sir.

11           MR. HILL:  Your Honor, there is a continuing

12   objection to this characterization of a controlled substance

13   as "crack."

14           THE COURT:  And why?

15           MR. HILL:  Because I --

16           THE COURT:  At a motion to suppress, does it

17   matter?

18           MR. HILL:  Well, Judge, we would just like the

19   record to show that we're not acquiescing in the terminology.

20           THE COURT:  I'll show a continuing objection to the

21   terminology, but it -- I don't think we have to talk about

22   cocaine base, controlled substance, whatever.  If they've

23   referred to it in their reports as "crack," they may refer to

24   it today as "crack," but I'll show a continuing objection

25   because this isn't a forensic hearing.  It's a motion to

1    suppress, and so we'll proceed with that continuing objection

2    shown.

3    BY MR. MILLER:

4         Q    And, now, what was your role in the controlled

5    purchase on December 14th of 2006?

6         A    I was assigned as a take-down unit if the target

7    was to go mobile.

8         Q    Okay.  And who was the target?

9         A    Eugene Sutton, sir.

10             THE COURT:  How do you know that?

11             THE WITNESS:  We were told that in a briefing.

12             THE COURT:  You were told in a briefing that, that

13   Mr. Sutton was a target?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  So that's before you even went out

16   to --

17             THE WITNESS:  Yes, sir.

18             THE COURT:  -- Pembroke Township/Hopkins Park?

19             THE WITNESS:  Correct, sir.

20             THE COURT:  Who told you that?

21             THE WITNESS:  The case agent, DEA, Mr. Hoyt, Agent

22   Hoyt.

23             THE COURT:  Thank you.

24   BY MR. MILLER:

25        Q    And as part of that briefing, were you informed

1    that prior controlled purchases of crack cocaine from Gene

2    Sutton had taken place?

3         A    Yes, sir.

4         Q    Now, you indicated your role was to be in a

5    take-down car?

6         A    Yes, sir.

7         Q    And was anyone else assigned with you?

8         A    Yes, sir.  My partner for that day was Agent Joe

9    Powers.

10        Q    And --

11             THE COURT:  Powers or Bowers?

12             THE WITNESS:  Powers, P-o-w-e-r-s.

13             THE COURT:  Thank you.

14             And he was present, too, at the time you heard that

15   from Case Agent Hoyt?

16             THE WITNESS:  Yes, sir.

17   BY MR. MILLER:

18        Q    And what -- when you say "take-down car," what type

19   of vehicle were you and Agent Powers in?

20        A    It's an unmarked KAMEG squad car.

21        Q    And how does that appear?  What does it look like?

22        A    Officer Powers' squad car is a -- it's a red Chevy

23   Impala with emergency lights on the interior, also in the, the

24   head lamps and the tail lamps, as well as the rear window.

25        Q    Were -- and other KAMEG agents were involved in

1    this operation as well?

2         A    That's correct, sir.

3         Q    Now, were you in radio contact with other agents

4    during the operation?

5         A    Yes, sir.

6         Q    Now, and so through regular contact were you

7    informed of when the confidential source had arrived at the

8    trailer?

9         A    Yes, sir.

10        Q    Now, where were you and Special Agent Powers

11   located, approximately, at the time you were made aware that

12   the source, confidential source, had arrived at the trailer?

13        A    We were positioned approximately two miles south

14   and west of the four-way intersection of 13000 and 4000 South.

15        Q    And at some point, did you then approach that

16   four-way intersection?

17        A    Yes, sir.

18        Q    And why was it that you approached that four-way

19   intersection?

20        A    We were advised via radio that Mr. Sutton had left

21   the trailer and was now mobile in his black GMC pickup truck.

22        Q    And so what were you attempting to do?

23        A    We were attempting to intercept him.  We were led

24   in to intercept with him so that we could issue a traffic

25   stop.

1          Q     Okay.  Now, let me show you what's been previously

2    marked as Government Exhibit 1A and, I believe, admitted into

3    evidence.  Do you recognize that?

4          A     Yes, sir.

5          Q     And what is Government Exhibit 1A?

6          A     This is a map of the Pembroke area.  This

7    intersection right here would be Main and Central.  A four-way

8    is what it's commonly known as.

9          Q     And when you came into this area, on what road were

10   you traveling, after the confidential source and the defendant

11   had left the trailer?

12         A     We were -- we came off of 5000 East, made a

13   left-hand turn and went northbound on Main through the

14   four-way intersection.

15         Q     Now, was someone directing you as you were

16   traveling?

17         A     Yes, sir.

18         Q     And who was that?

19         A     Master Sergeant Bodemer.

20         Q     Okay.  And what information -- generally, what

21   types of information was he giving?

22         A     He was pretty much calling out a play-to-play,

23   leading us into an interception with him.

24         Q     And where, where were you when you first had any

25   contact -- and let me step back.  Had you received a

1    description of the vehicle the defendant was driving?

2        A    Yes, sir.

3        Q    And what was that description?

4        A    Black GMC, black and silver GMC pickup truck.

5        Q    And did you come into contact with that truck?

6        A    We did.

7        Q    And where approximately were you when you first saw

8    the truck?

9        A    Just south of Spinning Wheel Road on Main Street,

10   or Main Avenue.

11       Q    And which direction were you heading when you saw

12   the truck?

13       A    When we first observed the vehicle, we were heading

14   northbound and it was heading southbound.

15       Q    When you saw the truck, what did you do?

16       A    We executed a U-turn and got, positioned ourselves

17   behind that vehicle.

18       Q    Now, I take it at some point while you're in

19   contact with Director Bodemer, there was instructions issued

20   to make a stop on the vehicle?

21       A    That's correct, sir.

22       Q    And if you recall, approximately when did you

23   receive that information?

24       A    While on that same road as we're both heading

25   southbound now towards the four-way.

1          Q     Okay.  So tell me, how did you get to be headed

2     southbound then?

3          A     We executed a U-turn right around Spinning Wheel

4     Road.

5          Q     And you were then following the vehicle?

6          A     We were.

7          Q     And around that point you received the command to

8     conduct the traffic stop of the vehicle and arrest the

9     defendant?

10          A     Correct, sir.

11          Q     What did you do then?

12          A     We initiated our lights probably, approximately 100

13     to 150 yards prior to the four-way intersection.  I initiated

14     our lights and sirens and attempted to pull the vehicle over.

15          Q     Approximately how far away were you from the

16     vehicle, best estimate, when you initiated your traffic lights

17     and siren?

18          A     When we first put our lights on, I'd say

19     approximately four car lengths.

20          Q     And what did you observe the GM truck do as you

21     approached the intersection of what I'll call Central and Main

22     Street?

23          A     The vehicle then made a right-hand turn,

24     disregarding the stoplight, or stop sign, and our emergency

25     lights.

Russel GENE SUTTON, No. 07-20009

1      Q    And which direction did the black GMC go?

2      A    It then turned right and proceeded westbound on

3  Central Street.

4      Q    And what did you do?

5      A    We pursued the vehicle, or followed the vehicle.

6      Q    And what did you observe the vehicle do?

7      A    Accelerated and we continued to follow it.

8      Q    Did the GMC come to a stop at some point?

9      A    It did, sir.

10      Q    And where did it come to a stop?

11      A    Approximately two miles west on that road at around

12  the --

13      Q    Let me help you out here and show you Government

14  Exhibit 1B.

15      A    Yes, sir.

16      Q    Do you recognize Government Exhibit 1B?

17      A    Yes, sir.

18      Q    And what is Government Exhibit 1B?

19      A    It's a larger view of A, of the same area, of

20  Pembroke.

21      Q    And do you see on Government Exhibit 1B the

22  location where the truck came to a stop?

23      A    Yes, sir.  It would be right around, right in that

24  area, sir.

25      Q    And how -- can you describe for us how it was that

1    the black GMC came to a stop?

2        A    On the left side of the road, on the south side of

3    that road of 4000 South, there is a private driveway, like a

4    dirt driveway.  On either side of that driveway is small

5    embankments.  The vehicle went wide and went to the outside of

6    that driveway to the, to the west and went up the embankment,

7    got itself stuck.  The driveway itself was obscured with

8    branches and all kinds of debris.

9            THE COURT:  Now, was this vehicle out of control or

10    just trying to make a maneuver that got it stuck?

11            THE WITNESS:  Well, our -- I believe our average

12    speed on 4000 South was approximately 70, 70 to 75 miles an

13    hour.  It wasn't weaving or anything like that.  I believe he

14    just wasn't -- he didn't slow down enough to go into that

15    driveway.  I believe his truck probably could have made it

16    over the obstacles in the driveway.  I think our vehicle would

17    have had problems with it.  But I think he just took it too

18    wide and went up the embankment where he got stuck.

19            THE COURT:  So in your observation, did you believe

20    he was making a turn versus losing control?

21            THE WITNESS:  I believed he was make making a turn.

22    Yes, sir.

23            THE COURT:  Okay.

24    BY MR. MILLER:

25        Q    Now, at any point, when you were -- while the GMC

1    truck was moving, were you ever ahead of the GMC truck?

2        A    No, sir.

3        Q    Did you ever cut -- when you were on 4000 South

4    Road, did you ever cut off the GMC truck?

5        A    No, sir.  Our position was always behind it.

6        Q    Approximately how far behind it were you at the

7    time that it turned off of 4000 South Road?

8        A    Two to three car lengths.

9        Q    I'd ask to play Government Exhibit 4, which is the

10   audio and video.

11                 (Government Exhibit 4 playing in open court.)

12       Q    Is this -- does Government Exhibit 4 depict the

13   vehicle that you were, you and Agent Powers were in on

14   December 14, 2006?

15       A    Yes, sir.  This is Agent Powers' patrol vehicle.

16            THE COURT:  Is it the same vehicle?

17            THE WITNESS:  It is the exact -- the same vehicle,

18   sir.

19            THE COURT:  Okay.

20   BY MR. MILLER:

21       Q    For the record, there were sirens blaring and

22   lights flashing.  Would that be a fair and accurate

23   representation of the way those sirens would have sounded and

24   the lights would have looked on December 14, 2006?

25       A    Yes, sir.

1          Q      Now, how were, how were you and Agent Powers

2    dressed on that day?

3          A      Blue jeans, our tactical vest, bulletproof vest and

4    vest covers, plus our duty gear with our side arms, our

5    firearms, strapped to our right legs or -- I don't know -- our

6    legs.

7          Q      Does the tactical vest indicate "police" on it?

8          A      It does, sir, on the front and the rear.

9          Q      Now, as you were following the defendant down 4000

10   South Road, was it your intent to place him under arrest?

11         A      Yes, sir.

12         Q      And I think you said this.  That was based on the

13   instruction you'd received from Director Bodemer at that

14   point?

15         A      Yes, sir.

16         Q      After the GMC pulled off the road, where did your

17   vehicle go?

18         A      We positioned ourselves behind the vehicle, sir.

19         Q      And what did you do after you stopped your vehicle?

20         A      Officer Powers and I exited our squad car and

21   approached the vehicle, myself on the passenger side and Agent

22   Powers on the driver's side.

23         Q      And what did you do as you approached the vehicle?

24         A      We directed the -- we ordered the subject to stop.

25   He was -- the wheels were still spinning.  Informed him -- or

1    instructed him to stop the vehicle, get out of the vehicle,

2    identified ourselves as police officers, and proceeded up to

3    the, to the doors.

4         Q    Now, did you have your guns drawn at that time?

5         A    Yes, sir.

6         Q    This was what you would consider -- is that typical

7    protocol for what you would consider a felony arrest?

8         A    Yes, sir.

9         Q    And was this considered a felony arrest?

10        A    Yes, sir.

11        Q    Now, let me show you what's been previously marked

12   as Government Exhibit 5A.  Do you recognize that?

13        A    I do, sir.

14             THE COURT:  5A?

15             MR. MILLER:  Yes.

16   BY MR. MILLER:

17        Q    And what is Government Exhibit 5A?

18        A    Mr. Sutton's black GMC, black and silver GMC pickup

19   truck.

20        Q    And is that a fair and accurate representation of

21   where it had come to rest after you followed it on December

22   14, 2006?

23        A    Yes, sir.

24        Q    And if -- in referring to Exhibit 5A, could you

25   describe for us where it was that you and Agent Powers went?

1      A      We are right directly to the rear of this, of this

2  vehicle.  We're back on, but still on the road, partially in,

3  partially in the dirt but mostly on the road to the rear of

4  this vehicle.

5      Q      And then could you describe for us in relation to

6  Government Exhibit 5A where it was that you and Agent Powers

7  went after you got out of the vehicle?

8      A      Yes, sir.  Agent Powers proceeded to the driver's

9  side and stayed right here behind this pillar.  I circled the

10  vehicle to the passenger side and eventually circled the whole

11  vehicle where I was, ended up here on this side.

12      Q      And were you yelling instructions as you did that?

13      A      We were, sir.

14      Q      And what were those instructions?

15      A      "Get out of the vehicle.  Step out of the vehicle.

16  Police officers.  Show us your hands.  Show us your hands."

17  Things of that nature.

18      Q      And how did -- what did the defendant do as you

19  walked around the vehicle?

20      A      He remained in the vehicle.  He refused to show us

21  his hands, or he did not show us his hands.  The driver's door

22  was partially open as Agent Powers was walking up there.

23      Q      Okay.  And now, again, indicate for us what it is

24  that you did as you circled the vehicle and what you observed.

25      A      As I circled the vehicle, I observed Mr. Sutton

1    sitting in the driver's seat and just sitting there, not

2    exiting the vehicle as he's being directed to.

3         Q    Where were his hands at that time?

4         A    Below, below the -- like near his waistband, I

5    guess, because I couldn't see them.  They weren't up in the

6    air or anything.

7         Q    And then what did you do?

8         A    I circled the vehicle to the driver's door where I

9    met up with Agent Powers.  We then opened up the door, the

10   driver's door, and pulled Mr. Sutton from the vehicle.

11        Q    Okay.  And could you be descriptive for us.  When

12   you say you pulled him from the vehicle, what did you do?

13        A    We reached in, put our hands on him, and pulled him

14   out of the vehicle by his clothing.

15        Q    And at that point, still, had he shown you his

16   hands?

17        A    No.  But I -- as his body came out, I was able to

18   see his hands were free of any, any weapons.

19        Q    And what happened as you pulled him from the

20   vehicle?

21        A    Then the three of us went, all went to the ground

22   with Mr. Sutton underneath us.

23        Q    And is that area depicted in Government Exhibit 5A?

24        A    Yes, sir, right here.

25        Q    Okay.

1    A    Right in this area is where we went to the ground.

2    Q    And please describe for us what happened as you

3    went to the ground.

4    A    Mr. Sutton went down face-first.  Myself and Agent

5    Powers went on top of him.  Mr. Sutton's hands were underneath

6    his body, near his waistband.  So Agent Powers and I attempted

7    to extract his hands from his, from underneath him.

8    Q    And how did you do that?

9    A    Pulled and pulled and pulled.

10   Q    One of you on each arm?

11   A    Correct, sir.

12   Q    And were you able to pull his arms out from

13   underneath him?

14   A    After a brief amount of time, yes, we were.

15   Q    And what did you do after you were able to pull his

16   arms free?

17   A    I cuffed one hand, and Agent Powers cuffed the

18   other hand; and then shortly thereafter, Agent Wolfe arrived

19   and assisted us in cuffing the cuffs together.

20   Q    So to be clear, when you say you cuffed one hand,

21   you put -- handcuffs typically have two portions that can be

22   attached to the wrist?

23   A    Yes, sir, one for each wrist.

24   Q    And you attached one part of your handcuffs to his

25   one arm?

1    A    Correct, sir.

2    Q    And Agent Powers used a different set of handcuffs

3    to attach a handcuff to the other arm?

4    A    That's correct, sir.

5    Q    And were you, the two of you able to then join the

6    handcuffs together?

7    A    Eventually.  After Agent Wolfe arrived and assisted

8    us, we were able to get the cuffs finally together.

9    Q    Why were you not able to join them together until

10   Agent Wolfe arrived?

11   A    Mr. Sutton was, was fighting with us, or refusing

12   to bring his hands back to his rear in enough room so that we

13   could get them cuffed together.

14   Q    You stated, though, that Agent, Agent Wolfe arrived

15   and was able to assist in that?

16   A    That's correct, sir.

17   Q    Approximately how long was it after you went down

18   to the ground with Mr. Sutton until Agent Wolfe arrived?

19   A    Approximately seven to eight, maybe ten seconds.

20   Q    And after Agent Wolfe arrived, you were able to

21   handcuff the defendant?

22   A    That's correct, sir.

23   Q    Then what happened?

24   A    Then we did a pat-down of the subject, of Mr.

25   Sutton, made sure he had no weapons on him, and sat him up.

USA v. GENE SUTTON, No. 07-20009

```
 1         Q    And when you say "sat him up," how did you sit him
 2   up?
 3         A    Pulled in his knees to his chest, turned him, and
 4   let him sit on his rear end.
 5         Q    Did any other agents arrive after Agent Wolfe?
 6         A    Mr., or Special Agent Hoyt.
 7         Q    And approximately how long was that did he
 8   arrive -- was it after Agent Wolfe arrived that he arrived?
 9         A    Yes, sir.
10         Q    Approximately how long was it after Agent Wolfe
11   arrived that Special Agent Hoyt arrived?
12         A    Maybe a minute later, two minutes later.
13         Q    And what did, what took place -- strike that.
14              At some point after Agent Hoyt arrived, did other
15   persons besides law enforcement officers come in the general
16   area?
17         A    I'm not aware of that, sir.
18         Q    And when you were there with the defendant -- and
19   let me step back.  I don't think I've had you do this.
20              Do you see in the courtroom here today the person
21   whom you arrested who was driving the black GMC truck on
22   December 14, 2006?
23         A    Yes, sir.
24         Q    And could you please point him out for the Court?
25         A    The gentleman with the full beard and orange
```

1    jumpsuit.

2              MR. MILLER:  Your Honor, we'd request that the

3    record reflect that the witness identified the defendant.

4              THE COURT:  The record will so reflect.

5    BY MR. MILLER:

6         Q    Now, at any time during your arrest of the

7    defendant, did you observe Special Agent Powers to punch or

8    strike the defendant?

9         A    No, sir.

10        Q    At any time, did you punch or strike the defendant?

11        A    No, sir.

12        Q    At any time, did you observe Agent Powers to kick

13   the defendant?

14        A    No, sir.

15        Q    At any time, did you kick the defendant?

16        A    No, sir.

17        Q    At any time, did you observe Special Agent Wolfe or

18   Special Agent Hoyt to in any way strike the defendant?

19        A    No, sir.

20        Q    During the arrest at any time, did you observe any

21   law enforcement officer to punch or kick the defendant?

22        A    No, sir.

23        Q    Now, after the defendant was arrested and

24   handcuffed, did you -- at some point, you put away your, your

25   revolver?

1    A    Yes, sir.

2    Q    And when did you do that?

3    A    As we were extracting him from the vehicle, sir.

4    Q    At the time you saw that he had nothing in his --

5    A    In his hands, yes, sir.

6    Q    Okay.  And what happened to the defendant, if you

7  know, following his arrest at that location?

8    A    I believe he was put into a squad car and

9  transported.  I'm not actually sure, sir.

10    Q    Did you transport him anywhere?

11    A    I did not.

12    Q    And as far as your interactions with the defendant,

13  did those end after you left the location of the arrest?

14    A    Yes, sir.

15          MR. MILLER:  I don't believe I have any further

16  questions for the witness, Your Honor.

17          THE COURT:  You may examine.

18             CROSS-EXAMINATION BY MR. HILL:

19    Q    Special Agent Martin, --

20    A    Yes, sir.

21    Q    -- you indicated that you were instructed that if

22  the target were to go mobile you were to conduct a traffic

23  stop; is that correct?

24    A    That's correct, sir.

25    Q    All right.  So that was the plan.  If the target

1   were to go mobile, you were to conduct a traffic stop, right?

2        A    That's correct, sir.

3        Q    Now, at the time that you turned on your mobile

4   lights, or attempted to do this traffic stop, you hadn't

5   observed the defendant violate any traffic laws, had you?

6        A    No, sir.

7        Q    So you hadn't seen any traffic laws violated,

8   correct?

9        A    Correct, sir.

10       Q    And, of course, nobody told you that any traffic

11  laws had been violated, correct?

12       A    That's correct, sir.

13       Q    You had been told, however, that the defendant had,

14  was going -- the target was going mobile, correct?

15       A    Yes, sir.

16       Q    And you were told that he was driving a pickup

17  truck, correct?

18       A    Correct, sir.

19       Q    And that's the reason that you turned on your

20  lights to try to stop him, correct?

21       A    Yes, sir.

22       Q    Because you had been told that if the target were

23  to go mobile, you were instructed to conduct a traffic stop,

24  right?

25       A    That's correct, sir.

1      Q      Now, a traffic stop customarily is something based

2  on a violation of the traffic laws, correct?

3      A      Normally, sir.

4      Q      And, of course, you didn't see any traffic laws

5  violated, correct?

6      A      Prior to initiating our lights, no, sir.

7      Q      Okay.  So, you didn't see anything other than the

8  defendant's vehicle going mobile, correct -- the defendant

9  going mobile?

10     A      Yes, sir.

11     Q      And that was the plan, right, that had been

12  discussed before you went to the location?

13     A      That if the vehicle was mobile, that we would

14  initiate a traffic stop?

15     Q      Right.

16     A      Yes, sir.

17     Q      And the reason that you went after the vehicle was

18  because it had gone mobile, right?

19     A      Correct, sir.

20     Q      You hadn't seen any violations of the law, correct?

21     A      No, sir.

22     Q      Nobody told you about any violations of the law, --

23     A      No, sir.

24     Q      -- correct?

25     A      That's correct, sir.

1    Q    You went mobile because -- you went after him

2  because you were told that he had gone mobile, right?

3    A    Correct, sir.

4    Q    And you were told that you were to conduct a

5  traffic stop, right?

6    A    Yes, sir.

7    Q    Tell the judge what a traffic stop is.

8    A    [No response.]

9    Q    I'll withdraw that question and ask you:  Is a

10  traffic stop routinely a stop where there's been a violation

11  of a traffic law?

12    A    Routinely, sir.

13    Q    But, of course, you didn't see any violation of any

14  traffic laws, correct?

15    A    Correct.

16    Q    Now, you indicated that you were driving an

17  unmarked squad car, I believe, was your testimony, correct?

18    A    Yes, sir.

19    Q    Not a marked squad car, but an unmarked squad car,

20  right?

21    A    Correct.

22    Q    There were no marked squad cars on the scene, were

23  there?

24    A    No, sir.

25    Q    And, in fact, all of the cars that were out there

1    were for purposes of narcotics surveillance, correct?

2        A    I believe so, sir.

3        Q    For purposes of taking down the target if the, in

4    the event that the target went mobile, correct?

5        A    No.  That wasn't what all their purposes were.

6        Q    Well, that was your purpose?

7        A    Yes, sir.

8        Q    And you had been specifically instructed that if

9    the target were to go mobile, you would have taken it down on

10   the basis of a traffic stop, correct?

11       A    Well, there also was the previous buy; so the

12   probable cause arrest --

13       Q    Well, you didn't know about the previous buys,

14   though, did you?

15       A    Yes, sir, I did.

16       Q    Well, you never --

17       A    We talked about that at the briefing, sir.

18       Q    Well, you don't know that there was a buy; no one

19   told you that it occurred.  It was supposed to occur, but you

20   didn't know that it occurred when you turned those lights on,

21   did you?

22       A    No, sir.  You're losing me here.

23       Q    When you turned on your lights to stop the vehicle,

24   you did not know whether or not the buy had actually occurred

25   or not?

1      A      That's correct, sir.

2      Q      Your basis for stopping Sutton was because you had

3   been instructed that if the target went mobile you were to

4   take him down --

5              MR. MILLER:   Asked and answered for --

6              THE COURT:  Sustained.

7              MR. MILLER:  -- three or four times, Your Honor.

8   Thank you.

9   BY MR. HILL:

10     Q      Now, and your lights came on before you got to the

11  intersection of East 4000 South and South 13000 East Road,

12  correct?

13     A      Correct, Main and Central.

14     Q      Now, after that, you said that Sutton ran a stop

15  sign, right?

16     A      Yes, sir.

17     Q      But, of course, he hadn't run a stop sign when you

18  took on, turned on your lights to take him down, had he?

19     A      Say that again, please.

20     Q      He had not violated any traffic laws at the time

21  that you turned on your lights to take him down?

22     A      Prior to turning on my lights, he had not committed

23  any traffic violations.  That's correct, sir.

24             MR. HILL:  No further questions.

25             THE COURT:  Mr. Miller.

1              REDIRECT EXAMINATION BY MR. MILLER:

2        Q    Just to clarify, I think, the one confusing part of

3   cross, you were aware of the two prior controlled purchases --

4              MR. HILL:  Objection, Your Honor.  Objection to him

5   leading.

6              THE COURT:  Sustained.

7   BY MR. MILLER:

8        Q    Were you aware of the two prior controlled

9   purchases of cocaine from the defendant that had taken place

10  prior to December 14, 2006, on December 14, 2006?

11       A    Yes, sir.  We were made aware of those purchases

12  during the pre-operation briefing.

13       Q    And you were asked several times about your role in

14  making the traffic stop if the defendant went mobile.  Did

15  that -- when you referred to "mobile," does that depend on

16  whether the controlled purchase took place or not?

17       A    Yes, sir.

18       Q    And why would you make the traffic stop?

19       A    As --

20             MR. HILL:  Your Honor, objection, Your Honor,

21  speculation.

22             THE COURT:  Well, --

23             MR. HILL:  Why would he do it?  He said why he did

24  it.  He was told if he went mobile he was to stop him.

25             MR. MILLER:  And we want to clarify what that

1    means.

2            THE COURT:  Okay.  Well, ask him to clarify what

3    that means.

4    BY MR. MILLER:

5        Q    And when you say --

6            THE COURT:  Objection overruled.

7        Q    -- you were supposed to make the traffic stop if

8    the defendant went mobile, what did that mean?

9        A    That meant if Mr. Sutton left the trailer where the

10   controlled purchase was being made, left the trailer following

11   the controlled purchase, that our, our activity was to take

12   the vehicle down and place him under arrest.

13        Q    If it took place following the controlled purchase?

14        A    Following the controlled purchase, sir.

15        Q    And you indicated you received information that

16   that had occurred from Inspector --

17            MR. HILL:  Objection, Your Honor.  He didn't say

18   that.

19            THE COURT:  Sustained.  He didn't testify --

20   BY MR. MILLER:

21        Q    Did you receive any information from Special

22   Agent -- from Director Bodemer about the controlled purchase?

23        A    We received information that -- we were told to

24   take the vehicle down.

25        Q    And were you -- by Director Bodemer?

1      A    Yes, sir.

2         MR. MILLER:  Okay.  I have no further questions,

3  Your Honor.

4         RECROSS-EXAMINATION BY MR. HILL:

5      Q    You were never told that a controlled buy had

6  occurred inside that trailer, though; isn't that correct?

7      A    I don't remember receiving that information.  No,

8  sir.

9      Q    All right.  And with respect to the previous

10  occasions that you had been told about, to your knowledge,

11  there was no arrest warrant for Mr. Sutton for those previous

12  occasions; isn't that correct?

13      A    No.  We were advised that there was probable cause

14  to arrest; but no warrant, yes, sir.

15      Q    There were no arrest warrants for Mr. Sutton, --

16      A    Just probable --

17      Q    -- correct?

18      A    -- cause to arrest, sir.

19      Q    All right.  Yeah, but when you took him down, or

20  took him down on the 14th, or were attempting to take him

21  down, that was not based on an arrest warrant, was it?

22      A    No, sir.

23      Q    It was based upon the fact that the target had gone

24  mobile, correct?

25      A    It was based on the previous drug purchases,

1    probable cause to arrest, and the assumption that he had just

2    completed a drug transaction.

3         Q    Well, you were testifying earlier, sir, that your

4    instructions were solely that if he was seen going mobile --

5         A    Yes, sir.

6         Q    -- that you were to take him down, correct?

7         A    That's correct, sir.

8         Q    So whether anything else had happened or not, your

9    instructions were:  If you see him go mobile, take him down,

10   correct?

11        A    Yes, sir.

12        Q    And that was it, correct?  That was the extent of

13   your instructions, correct?

14        A    Yes, sir, in a nutshell.

15        Q    Yeah, because you don't know what, if anything,

16   happened inside the trailer, did you?

17        A    I wasn't privy to that information.

18        Q    And no -- and Bodemer didn't tell you that when you

19   talked to him, did he?

20        A    Didn't tell me what, sir?

21        Q    What had happened inside the trailer.

22        A    No, sir.

23             MR. HILL:  No further questions.

24             THE COURT:  Mr. Miller.

25             MR. MILLER:  I have no further questions, Your

USA v. GENE SUTTON, No. 07-20009

1    Honor.

2              THE COURT:  You may step down.  You're free to go.

3              THE WITNESS:  Yes, sir.

4                   (Witness Martin excused, 4:05 p.m.)

5              THE COURT:  You may call your next witness.

6              MR. MILLER:  I'd call Special Agent Joe Powers.

7              JOSEPH R. POWERS, sworn, 4:05 p.m.,

8              THE COURT:  The people in the audience are directed

9    not to speak to the defendant or counsel.

10                  DIRECT EXAMINATION BY MR. MILLER:

11       Q    Could you please tell us your name and spell your

12   last name for the court reporter?

13       A    Joseph R. Powers, P-o-w-e-r-s.

14       Q    And you're a deputy with the Kankakee County

15   Sheriff's Department?

16       A    Yes.

17       Q    How long have you been assigned -- how long have

18   you been employed with the Kankakee County Sheriff's

19   Department?

20       A    Four and a half years.

21       Q    And during that time, have you received training at

22   the Police Training Institute in Champaign, Illinois?

23       A    Yes.

24       Q    Approximately how long is that training?

25       A    Twelve weeks.

1    Q    Are you currently assigned to the Kankakee Area

2    Metropolitan Enforcement Group?

3    A    Yes, sir.

4    Q    How long have you been assigned there?

5    A    A year and half.

6    Q    And during that time, have you received training in

7    the area of interdiction of illegal narcotics?

8    A    Yes.

9    Q    Let me turn your attention to December 14, 2006.

10   On that date, were you engaged in assisting in a controlled

11   purchase of crack cocaine that was to take place at 3973 South

12   Ridge Road in Kankakee County, Illinois?

13   A    Yes.

14   Q    And what was your role in the controlled purchase?

15   A    Take-down unit.

16   Q    And was anyone else assigned with you?

17   A    Yes.

18   Q    And who was that?

19   A    Special Agent Jeff Martin.

20   Q    And what type of vehicle were you in?

21   A    We were in a squad car, unmarked.

22   Q    And could you just describe for us how that

23   appeared?

24   A    It's a red Impala with a spotlight on the side,

25   tinted windows, and there's a -- lights in the back and the

1    front.

2         Q    And I think you said -- and it has a siren?

3         A    It has a siren.  Yes.

4         Q    Now, was there a briefing held about the operation?

5         A    Yes.

6         Q    And is that when you were informed about your role?

7         A    Yes.

8         Q    And what was your understanding during the briefing

9    of what was to take place?

10        A    There was going to be a controlled purchase of

11   crack cocaine.  If the subject, the target, left in a vehicle,

12   our assignment was to pull over the vehicle.

13        Q    And do you recall, just to cut to the chase, did

14   you enter into that area?

15        A    Excuse me?

16        Q    Did you enter into the area --

17        A    Yes.

18        Q    -- of where the patrol -- general area where the

19   controlled purchase had taken place?

20        A    Yes.

21        Q    And how was it that you knew where to go?

22        A    Director Bodemer was in a plane.

23        Q    And he was providing you information over the

24   radio?

25        A    Yes.

USA v. GENE SUTTON, No. 07-20009

1    Q    And so at some point, did he indicate to you

2    whether you should stop the vehicle?

3    A    Yes.

4    Q    And what did he indicate?

5    A    Indicated that we can pull over the vehicle.

6    Q    And where were you when -- let me ask.  Did you

7    have contact with a vehicle that you believed was the target

8    vehicle?

9    A    Yes.

10    Q    And how did you know what that vehicle looked like?

11    A    From the radio traffic of what the vehicle was, it

12    was a black and silver truck we were looking for.

13    Q    And did you come in contact with that truck?

14    A    Yes, sir.

15    Q    And where was it that you first came in contact

16    with that truck?

17    A    On 13000 East, also called Main, in Hopkins Park,

18    Illinois.

19    Q    And I'm going to show you what's been marked as

20    Government Exhibit 1A.  Do you see on Government Exhibit 1A

21    approximately where it was that you first came in contact with

22    the black GMC?

23    A    Yes.

24    Q    And could you please point that out by touching the

25    screen?

1        A      [Indicating.]

2        Q      Fair to say that's -- just for the record, that's

3    north of Central Street but south of East Spinning Wheel Road?

4        A      Correct.

5        Q      And which direction were you headed when you saw

6    the black GMC truck?

7        A      We were headed north.

8        Q      And which direction was the black GMC truck headed?

9        A      South.

10       Q      When you saw the truck, what did you do?

11       A      We did a U-turn.

12       Q      And after you did the U-turn, what did you do?

13       A      Once we caught up to it, we initiated a traffic

14   stop.

15       Q      Well, at, at some point, did you put on your lights

16   and siren?

17       A      Yes, at that point, or -- we don't have overheads;

18   but inside the windshield, we have red, red and blue, and then

19   our front headlights, wigwags.

20       Q      And when did you put those, employ your sirens and

21   your lights?

22       A      Probably about a, roughly 100 yards from this

23   four-way intersection right here.

24       Q      Now, is that four-way intersection, does that have

25   any traffic control devices?

1      A      A stop sign.

2      Q      How many stop signs are there?

3      A      Four.

4      Q      And were you following -- were you then behind the

5  GMC as it approached that intersection?

6      A      Yes.

7      Q      And did you have your lights and sirens on at that

8  time?

9      A      Yes.

10     Q      And what did you observe the GMC do?

11     A      It didn't make a complete stop, just outside, and

12  then went west on Central Road, also called 4000 South.

13     Q      And what did you do as it did that?

14     A      Followed it.

15     Q      And how far did you follow it?

16     A      Approximately two miles, a little bit beyond two

17  miles, just past 11000 East Road.

18     Q      And what did it do -- what did that GMC vehicle do

19  at that point?

20     A      Attempted to make a turn into a -- it looked like

21  he overshot a driveway and went into an embankment, I guess,

22  is the best way to put it.

23     Q      And at that point, where was your -- when it turned

24  off of 4000 South Road, where was your vehicle located?

25     A      I was about maybe two car lengths behind, maybe

1    three.

2         Q    At any point while you were on 4000 South Road, did

3    you cut off the GMC truck?

4         A    No.

5         Q    At any point, did you get beside the GMC truck?

6         A    No.

7         Q    After the vehicle pulled off the road, did it stop?

8         A    Yes.

9         Q    And what did you do with your vehicle?

10        A    It -- the vehicle stopped into an embankment.  It

11   was stuck.  Then I -- we parked just kind of on the bottom of

12   the hill.  We parked our vehicle, and I approached the

13   driver's side.

14        Q    Now, when you say you approached the driver's side,

15   were you going to make a felony arrest?

16        A    Yes.

17        Q    Did you have your gun drawn?

18        A    Yes.

19        Q    What did Special Agent Martin do?

20        A    He approached the passenger side.

21        Q    And did he have his gun drawn?

22        A    Yes.

23        Q    And let me just ask you:  What were, what were each

24   of you wearing?

25        A    Our police tactical units, our regular uniform.

1    It's a black vest.  It says "police" across the chest with our

2    shoulder rig and all of our equipment on our belt.

3        Q    When you got out of your vehicle, did you say

4    anything to the defendant when he was in the truck?

5        A    Told him to get out of the vehicle.

6        Q    Now, when you say -- were you yelling at this

7    point?

8        A    I was just giving him verbal commands to step out

9    of the vehicle.

10       Q    And did you indicate whether you were the police?

11       A    I don't recall if I told him we were the police.

12       Q    Did -- when you asked him to get out of the

13   vehicle, did he get out of the vehicle?

14       A    No.

15       Q    What, what did you observe him do?

16       A    He was turning to his left like he was trying to

17   look for me or look at me.

18       Q    Did he get out of the vehicle then?

19       A    No.

20       Q    So what did you do?

21       A    He had the door halfway cracked open.  He

22   wouldn't -- I told him to open the door, and he wouldn't open

23   the door.

24       Q    So what did you do then?

25       A    By that time, Agent Martin was around to the side

```
1    of the vehicle, and we opened up the door.

2         Q      And after you opened the door, what did you do?

3         A      We had to pull Mr. Sutton out of the vehicle.

4         Q      And how did you pull him out of the vehicle?

5         A      We grabbed him and pulled him out.

6         Q      And what happened as you and Agent Martin pulled

7    him out of the vehicle?

8         A      We got -- when we pulled him out of the vehicle, he

9    got on our feet, and we went down.  We fell.

10        Q      And when you fell, who was on top?

11        A      We ended up being on top.

12        Q      And as you were on top, what did you do?

13        A      Tried to handcuff him.

14        Q      And how did you attempt to do that?

15        A      Just, I grabbed an arm, and I was pulling it.  He

16   was on the bottom face-down.  His hands were underneath his

17   stomach, and I probably took a couple seconds and got his arm

18   free.  And I know I put a handcuff on, and Agent Martin put on

19   a handcuff; and we had to double-cuff him.

20        Q      Was it, was it difficult to double-cuff him?

21        A      Yes.

22        Q      And why was that?

23        A      He's a pretty big man.

24        Q      Was there any resistance to attempting to cuff him?

25        A      Yes.  There was, there was resistance.  We
```

1    couldn't -- he wasn't freely giving us his arm to put behind

2    his back.

3         Q     Now, at any point -- and then what did you do after

4    you were able to put the cuffs together?

5         A     After I handcuffed him, we searched him.

6         Q     Now, after that, did anyone else -- or even before

7    that, did someone else arrive besides you and Agent Martin at

8    that scene?

9         A     Yes.

10        Q     And who was that?

11        A     Special Agent Wolfe.

12        Q     And when did Special Agent Wolfe arrive?

13        A     He was there to help assist when we were

14   handcuffing him.

15        Q     And after --

16        A     Around that time is when he was there.

17        Q     And besides Agent Wolfe, did anyone else arrive

18   after Agent Wolfe?

19        A     Shortly after, Special Agent Hoyt showed up.

20        Q     Now, at any time during your arrest of the

21   defendant, did you punch him in the head?

22        A     No.

23        Q     Did you kick him?

24        A     No.

25        Q     Did you observe Special Agent Martin to punch him?

1          A      No.

2          Q      Did you observe Special Agent Martin to kick him?

3          A      No.

4          Q      Did you observe Special Agent Clayt Wolfe to punch

5     him?

6          A      No.

7          Q      And did you observe Special Agent Clayt Wolfe to

8     kick him?

9          A      No.

10         Q      Did you observe any law enforcement officers to

11    punch or kick the defendant?

12         A      No.

13         Q      After the defendant was placed under arrest, are

14    you aware of where he was transported from there?

15         A      Yes.

16         Q      And where was that?

17         A      Transported -- I followed them to the Aroma Park, I

18    guess, Village Hall.

19         Q      Okay.  And you said Aroma Park?

20         A      Yes.

21         Q      And could you spell Aroma?

22         A      A-r-o-m-a, Park, P-a-r-k.

23         Q      And you said you followed Special Agent Hoyt there?

24         A      Yes.

25         Q      And he was transporting the defendant?

1      A      Yes.

2      Q      What happened after you arrived at the Aroma Park

3   location?

4      A      Agent Bodemer took my spot.  They ended up putting

5   a third cuff on Mr. Sutton because he wasn't feeling very

6   comfortable, and so Special Agent Hoyt put another pair of

7   cuffs on him.  So then he had three; so he had a little more

8   room.

9      Q      So when you say three cuffs, could you describe for

10  us how that makes him more comfortable?

11     A      Just more room to move with your arms; you're not

12  so constricted on the back; so --

13     Q      So those were three cuffs attached all to each

14  other --

15     A      Yes.

16     Q      -- to make a longer cuff?

17     A      To make a chain, yes.

18     Q      Okay.  And after you left the Aroma Park location,

19  did you have any further contact with the defendant?

20     A      No.

21     Q      I just want to show you --

22            THE COURT:  Before we get to that question, did you

23  observe any cuts, scrapes, or lacerations under Mr. Sutton's

24  right eye?

25            THE WITNESS:  I believe there was a little cut or

1     laceration somewhere on his face.  I don't know exactly where.

2              THE COURT:  Now, did he get any cuts or scrapes

3     that you observed on the back of his head?

4              THE WITNESS:  No.  I didn't witness anything on the

5     back of his head, sir.

6              THE COURT:  Okay.

7     BY MR. MILLER:

8         Q    And just to explain, did he -- went you went down,

9     did he, did he go down on his back or on his front?

10        A    He went down on his front.  We went from sand to

11    gravel, and he was -- he was on -- he was on top -- he was on

12    bottom, and we were on top.

13        Q    Now, let me show you what's been marked as

14    Government Exhibit 5E.  Do you recognize that?

15        A    Yes.

16        Q    And what is Government Exhibit 5E?

17        A    Looks like where the truck -- that's where his

18    truck was at when it stopped.

19        Q    Was this a photograph that was taken after the

20    truck was removed from that location?

21        A    Yes.  It -- I believe it looks like that.

22             THE COURT:  Is that a house trailer in the

23    background?

24             THE WITNESS:  Yes, sir.  I believe it's an

25    abandoned trailer.

USA v. GENE SUTTON, No. 07-20009

1              THE COURT:  Okay.

2    BY MR. MILLER:

3        Q    And how would you describe the condition of the

4    ground where he had pulled off?

5        A    Very sandy, loose soil.

6        Q    I take it this area here, from your observations at

7    the scene, was that a driveway or a, any type of road?

8        A    To the left was a driveway.  I believe he was

9    trying to go into -- you can see the timber on the left.

10             MR. MILLER:  I have no further questions, Your

11   Honor.

12             CROSS-EXAMINATION BY MR. HILL:

13       Q    Did you ever apologize to the defendant at Aroma

14   Park?

15       A    No.

16       Q    You don't recall apologizing to him at Aroma Park?

17       A    No.

18       Q    Okay.  Do you recall Special Agent Hoyt saying that

19   he was not going to let that happen anymore?

20       A    No.

21       Q    You don't recall that at the time?

22       A    No, sir.

23       Q    Okay.  Now, your instructions were that if the

24   target went mobile, your job was to take down the subject by

25   making a traffic stop, correct?

USA v. GENE SUTTON, No. 07-20009

1        A       Yes, sir.

2        Q       Those were the instructions that you were given,

3    correct?

4        A       Yes, sir.

5        Q       And at the time that you attempted to take down the

6    subject by making the traffic stop, you hadn't seen him

7    violate any traffic laws, had you?

8        A       No, sir.

9        Q       Bodemer told you that the subject had gone mobile,

10   correct?

11       A       Yes, sir.

12       Q       And he described the vehicle that he was in?

13       A       Yes, sir.

14       Q       And that was all that Bodemer told you, correct?

15       A       That the, to go ahead and make a traffic stop and

16   that the vehicle was --

17       Q       Was mobile?

18       A       Yes.

19       Q       That was it, right?

20       A       Yes.

21       Q       And that was the plan, right?

22       A       Yes.

23       Q       That if the subject went mobile, your job was to

24   conduct a traffic stop, right?

25       A       Yes.

1      Q      Whether you observed a traffic violation or not,

2    correct?

3      A      Correct.

4      Q      And, of course, you never observed a traffic

5    violation at the time that you attempted to make the traffic

6    stop, did you?

7      A      No.

8      Q      In fact, he hadn't yet gotten to the stop sign

9    where he continued going at the time that you turned your

10   lights on, right?

11     A      I didn't see a traffic stop before the stop sign.

12   Yes.

13     Q      Okay.  No traffic violation that you saw,

14   correct, --

15     A      Correct.

16     Q      -- before you turned your lights on and attempted

17   to bring him to a stop, --

18     A      Correct.

19     Q      -- right?

20     A      Correct.

21     Q      Now, you described the vehicle that you were

22   driving as an unmarked squad car, correct?

23     A      Yes.

24     Q      Now, the reason that you described it as an

25   unmarked squad car is because that's exactly what it is,

1    unmarked, correct?

2        A    Yes, sir.  There's no markings on the side.

3             MR. HILL:  I have no further questions.

4             THE COURT:  Mr. Miller.

5                 REDIRECT EXAMINATION BY MR. MILLER:

6        Q    Now, were you instructed by Director Bodemer to

7    make a traffic stop?

8        A    To make a traffic stop?  Yes.

9        Q    And were you instructed to do that after -- did you

10   receive that instruction after you'd been told that the

11   defendant went mobile?

12       A    Correct.

13            MR. MILLER:  I have no further questions, Your

14   Honor.

15                RECROSS-EXAMINATION BY MR. HILL:

16       Q    Yeah, but that's all you were told; the defendant

17   had gone mobile, correct?

18       A    And that there was a drug transaction, yes.

19       Q    Well, no.  You didn't say that when I questioned

20   you about that before.

21            MR. MILLER:  Judge, he's, he's -- you don't tell

22   the witness no.  He quibbling with the witness.  He has to

23   take the answer that was given.

24            MR. HILL:  Well, wait.  When did, when did -- let

25   me put another question.

1           THE COURT:   You may.

2    BY MR. HILL:

3        Q    You never said anything about Bodemer telling you

4    that a drug transaction had occurred, did you, when I

5    questioned you before, did you?

6        A    I --

7        Q    You never said that, did you?

8        A    That a drug transaction had --

9        Q    Yes, sir.

10       A    I believe so.  Can that be read back?

11       Q    Sir, the only thing that you stated was that

12   Bodemer told you that the subjects had gone mobile?

13       A    Yes.

14       Q    That was it; you didn't say anything else when I

15   questioned you about that, correct?

16       A    Then I answered that incorrectly.

17       Q    Who told you it was incorrect?

18       A    Me.

19       Q    Well, the fact of the matter is that -- well, wait

20   a minute.  You were in the same car as Martin, right?

21       A    Yes.

22       Q    And were you listening to -- were you and Martin

23   listening to the same radio?

24       A    Yes, sir.

25       Q    If Martin said that the only thing that he had said

1    was that he'd gone mobile, he'd be wrong?

2              MR. MILLER:  Objection, Your Honor, to asking the

3    witness to characterize the testimony of another witness.

4              THE COURT:  Sustained.

5    BY MR. HILL:

6         Q    I believe your testimony was that you had been

7    instructed that if the target was to go mobile that you were

8    to take him down, correct?

9         A    If the drug transaction happened, yes.

10        Q    Yeah.  But nobody told you that a drug transaction

11   had taken place; isn't that right, Mr. Powers?

12        A    Uh, --

13        Q    You're under oath, Mr. Powers.

14        A    Yes.  We were told a drug transaction had happened

15   and to pull him over.

16        Q    When were you told that?

17        A    Before we saw Mr. Sutton.

18        Q    When?

19        A    En route to find the vehicle.

20        Q    You were?

21        A    Yes.

22        Q    Did you prepare a report to that effect, Mr.

23   Powers?

24        A    No.  I didn't write anything, sir.

25        Q    In fact, Mr. Powers -- I'd like to approach the

1    witness, Judge.

2                THE COURT:  You may.

3         Q    Mr. Powers, I'm going to show you page 47, which is

4    included in Defendant's Exhibit Number 5.  I show you

5    Defendant's Exhibit Number 5, sir.  Directing your attention

6    to 12:14 p.m., you see that?  It says Martin and Powers,

7    correct?

8         A    Yes.

9                MR. MILLER:  I'm going to object, Your Honor.  The

10   foundation to present this document to the witness -- I'm not

11   sure what the basis is of presenting the document.  It's not

12   his report.

13               MR. HILL:  I'll lay the foundation.

14               THE COURT:  Objection overruled.

15   BY MR. HILL:

16        Q    You had a chance to review that report prior to

17   testifying, didn't you?

18        A    Yes.

19        Q    And you saw -- you looking at Mr. Miller?

20        A    When?

21        Q    You had a chance to review this report; isn't that

22   correct?

23        A    I hadn't seen it, but --

24        Q    You reviewed it, didn't you, before testifying?

25        A    No, sir.

1     Q     Didn't you just say you reviewed it before

2     testifying?

3     A     You said could I have reviewed it, and I said yes;

4     but I didn't.

5     Q     Well, Mr. Powers, --

6     A     Yes, sir.

7     Q     -- does your name appear on this report?

8     A     Yes.

9     Q     Did you review the report prior to testifying, Mr.

10    Powers?

11    A     No, sir.

12    Q     Oh, you did?

13    A     I did not.

14    Q     Are you taking cues from Mr. Hoyt and Mr. Powers?

15          MR. MILLER:  I'm object-- objection, Your Honor.  I

16    don't see any basis for the record --

17          MR. HILL:  Judge, I see people moving their heads

18    back here.  There's testimony changing with it.

19          THE COURT:  I didn't see that.  Objection's

20    overruled.

21          MR. HILL:  Why don't you take a look at it now and

22    see if it refreshes your recollection.

23          MR. MILLER:  He hasn't testified his recollection

24    is exhausted, Your Honor.  I'm not even certain to what

25    subject we're referring right here.

1              THE COURT:  Sustained.  Direct him to what you

2       want.

3              Defendant's 5, I think, is in evidence.

4              MR. HILL:  Defendant's 5 is in evidence.

5              THE COURT:  Right.

6       BY MR. HILL:

7       Q     It says at 12:14 p.m., you conducted a traffic

8       stop, attempted to contact a traffic stop, right?

9       A     Yes, sir.

10      Q     That's what you attempted to do, correct?

11      A     Yes, sir.

12      Q     You don't -- have you ever written a report where

13      you say that you knew that a drug transaction had occurred

14      before you attempted to make your traffic stop?  Have you ever

15      written any report to that effect?

16      A     Can you say that again, sir?

17      Q     Have you, --

18             THE COURT:  In this case.

19      Q     -- have you -- I'm sorry, Judge?

20             THE COURT:  In this case you're asking about.

21      Q     In this case.  In this case, have you written any

22      report where you say that you attempted to conduct a traffic

23      stop after you knew a drug transaction had occurred?

24      A     In this case, --

25      Q     Yes, sir.

USA v. GENE SUTTON, No. 07-20009

1    A    -- have I written a report?

2    Q    Yes, sir.

3    A    No.  I haven't written a report.

4    Q    Have you reviewed any of the reports in this case

5    where that's stated?

6    A    No.  I have not.

7    Q    In fact, it's not stated in any report in this case

8    that you're aware of; isn't that correct?

9    A    That would be true.  I haven't read anything.

10    Q    Pardon me?

11    A    Yes.  That would be true.  I haven't read anything.

12    Q    Now, when I was questioning you earlier, did you

13    take a cue from Mr. Hoyt?

14    A    No.

15    Q    Did you look at Mr. Hoyt, and did he shake his head

16    up and down yes at one point during your testimony?  You're

17    under oath.

18    A    I have not looked directly at anyone over there.

19    Q    My question is:  Did he shake his head up and down

20    in response after I had asked you a question and before you

21    answered it?

22    A    No.

23    MR. HILL:  I have no further questions.

24    THE COURT:  Mr. Miller.

25    MR. MILLER:  I have no further questions, Your

1    Honor.

2              THE COURT:  You may step down.

3                   (Witness Powers excused, 4:29 p.m.)

4              THE COURT:  You may call your next witness.

5              MR. MILLER:  Call Special Agent Clayt Wolfe.

6    CLAYT WOLFE, sworn, 4:30 p.m.,

7              MR. HILL:  Judge, may I just inquire whether or not

8    these cameras are on that would have been able to take a

9    picture --

10             THE COURT:  These cameras here --

11             MR. HILL:  -- of what was happening in the

12   courtroom?

13             THE COURT:  -- unfortunately -- I don't like to

14   tell people -- have never worked.  So anybody in the audience

15   could shoot anybody they wanted and never be seen --

16             MR. HILL:  Okay.

17             THE COURT:  -- on camera.

18             MR. HILL:  All right.

19             THE COURT:  I've never figured out why they put in

20   cameras that are not operational.  We have no cameras that

21   shoot back towards the audience.

22             MR. HILL:  I was going to make a request --

23             THE COURT:  So we've been lucky over the ten years

24   I've been here.  The audience has maybe assumed they work.

25   They don't.

1           MR. HILL:  All right.  Thank you, Judge.

2               DIRECT EXAMINATION BY MR. MILLER:

3      Q     Could you please tell us your name and spell your

4    first and last name for the court reporter?

5      A     It's Clayt Wolfe, C-l-a-y-t, W-o-l-f-e.

6      Q     And you are an officer with Kankakee City Police

7    Department?

8      A     Yes.

9      Q     How long have you been employed by the Kankakee

10   City Police Department?

11     A     Approximately four and a half years.

12     Q     And as an officer with the Kankakee Police

13   Department, did you receive training at the Police Training

14   Institute, Champaign, Illinois?

15     A     Yes.

16     Q     And how long is that class?

17     A     It's 12 weeks.

18     Q     Since you've been employed by the Kankakee City

19   Police Department, have you been assigned to the Kankakee Area

20   Metropolitan Enforcement Group?

21     A     Yes.

22     Q     And when were you first assigned to the Kankakee

23   Area Metropolitan Enforcement Group?

24     A     July of 2006.

25     Q     And as an agent with the Kankakee Area Metropolitan

USA v. GENE SUTTON, No. 07-20009

1  Enforcement Group, have you received narcotics training?

2       A    Yes.

3       Q    Let me turn your attention to fall of 2006.  During

4  that time, were you involved in the investigation of Gene

5  Sutton regarding the distribution of controlled substances?

6       A    Yes.

7       Q    And were you aware of allegations of a confidential

8  source developed by the Kankakee Area Metropolitan Enforcement

9  Group who indicated he had previously purchased cocaine from

10 the defendant?

11      A    Yes.

12      Q    Were you also involved in using that confidential

13 source on November 1, 2006, to make a controlled purchase of

14 cocaine from the defendant?

15      A    Yes.

16      Q    And how were you involved in that controlled

17 purchase?

18           MR. HILL:  I'm sorry.  I'm sorry.  Which date?

19           MR. MILLER:  November 1, 2006.

20           MR. HILL:  Objection, Judge, relevancy.

21           THE COURT:  On the --

22           MR. HILL:  As well as cumulative.

23           THE COURT:  On what?

24           MR. HILL:  November the 1st.

25           THE COURT:  I don't have that date.  Maybe I do

1    somewhere.  Let me look in my notes.

2           MR. MILLER:  It's one of the two prior controlled

3    buys.

4           THE COURT:  I've got November 27.

5           MR. HILL:  There was a November 1st date, Judge.

6           THE COURT:  Was it 1st?  For some reason, I thought

7    it was the 6th.

8           But the question, Lisa, read it back because I

9    don't have real time going.

10           THE REPORTER:  Question:  Were you also involved in

11    using that confidential source on November 1, 2006, to make a

12    controlled purchase of cocaine from the defendant?

13           Answer:  Yes.

14           Question:  And how were you involved in that

15    controlled purchase?

16           THE COURT:  And then the objection is?

17           MR. HILL:  Relevancy.  We're talking about a motion

18    to suppress based on probable cause --

19           THE COURT:  Where are we going with this?

20           MR. HILL:  -- on December 14th.

21           MR. MILLER:  Your Honor, we've already put on

22    evidence, but we're just establishing -- and we can go very

23    quickly -- that this agent and the other agents were aware of

24    two prior distributions of cocaine by the defendant before

25    December 14, 2006.  Those are obviously --

1              THE COURT:   Okay.  But you're not going any farther

2    than that?

3              MR. MILLER:   No, Your Honor.

4              THE COURT:   Objection overruled.  You may ask.

5              MR. MILLER:   Okay.

6    BY MR. MILLER:

7        Q     And how were you involved in the November 1, 2006,

8    purchase?

9        A     My assignment was basically surveillance.

10       Q     And turn your attention to November 27, 2006.  Were

11   you aware of a controlled purchase of cocaine made from the

12   defendant on that date by KAMEG using a confidential source?

13       A     Yes.

14       Q     And were you also personally involved in that

15   controlled purchase?

16       A     Yes.

17       Q     Now, let me turn your attention to December 14,

18   2006.  On that date, did KAMEG agents arrange to make a third

19   controlled purchase of cocaine from the defendant?

20       A     Yes, sir.

21       Q     And did agents arrange to use the same confidential

22   source?

23       A     Yes.

24       Q     And up to that point, had that confidential source

25   proven to be reliable to KAMEG agents?

1        A     Yes.

2        Q     And where, if you recall, --

3              MR. HILL:  Excuse me.  Objection as to that

4     conclusion.

5              THE COURT:  Sustained.  I think that was leading

6     the witness.  You may ask it in a different manner as far as

7     his reliability.

8              MR. MILLER:  Do you want me to lay a foundation?

9              THE COURT:  Well, I don't know what the reliability

10    of the confidential source is for this motion to suppress

11    since --

12             MR. MILLER:  Well, I'll --

13             THE COURT:  -- that to me is not an issue.

14             MR. MILLER:  It's, it's one aspect, Your Honor, as

15    defense counsel appears to have, wants to call Officer

16    Lockwood as to his conversations with the confidential source.

17    There are other bases to arrest the defendant -- prior

18    controlled purchases, running a stop sign -- but there's also

19    the controlled purchase on December 14, 2006, that came from

20    information provided by the confidential source to Agent

21    Lockwood.

22             MR. HILL:  Judge, I --

23             MR. MILLER:  So his reliability is in issue.

24             THE COURT:  But his prior reliability I don't think

25    is an issue here.

1              MR. MILLER:  If he's not questioning the

2     confidential source's reliability on December 14, 2006, I'll

3     move on.

4              THE COURT:  Well, I don't think that's come up yet.

5     So objection sustained.  You may move on.

6              MR. MILLER:  Now, --

7              THE COURT:  We're starting to get a trial within a

8     trial within a trial.

9     BY MR. MILLER:

10        Q    Now, on December 14, 2006, was there a briefing

11    held about the controlled purchase?

12        A    Yes, there was.

13        Q    And were -- at that briefing, were various agents

14    provided with what their roles were to be?

15        A    Yes.

16        Q    What was your role to be during the controlled

17    purchase of December 14, 2006?

18        A    Surveillance.

19        Q    And were you in radio contact with other agents

20    during this operation?

21        A    Yes, I was.

22        Q    Did you learn through the radio contact that the

23    confidential source had arrived at that trailer at 3973 South

24    Ridge Road?

25        A    Yes.

1    Q    Where were you when you, approximately, when you

2    learned that information?

3    A    Approximately two, two and a half miles west of the

4    location.

5    Q    And at some point, did you leave that location?

6    A    Yes.

7    Q    And why did you leave that location?

8    A    I left that location on learning the departure of

9    the CS and Mr. Sutton from that residence.

10    Q    I'm sorry.  Could you repeat that?

11    A    I left my surveillance area and began heading

12    towards the location of the residence upon learning the

13    departure of the confidential informant and Mr. Sutton.

14    Q    And --

15    THE COURT:  How did you learn that?

16    THE WITNESS:  Through radio contact.

17    THE COURT:  From whom?

18    THE WITNESS:  Mr. Lockwood and also Mr. Bodemer.

19    THE COURT:  They told you what?

20    THE WITNESS:  That the CS and Mr. Sutton had

21    departed the residence.

22    THE COURT:  Okay.  You may continue.

23    BY MR. MILLER:

24    Q    And where did you go then after you left your

25    surveillance, your initial surveillance location?

```
1       A       I drove directly to the 3973 address.

2       Q       And why did you drive there?

3       A       To assist with the search warrant that was going to

4   be executed there.

5       Q       And when had agents obtained the search warrant

6   that was to be executed at 3973 South Ridge Road?

7       A       The day before, the 13th.

8       Q       And you're aware that -- well, let me strike that.

9               You were aware of the existence of that search

10  warrant prior to going to that location?

11      A       Yes.

12      Q       When you got to the trailer, did you continue to

13  receive radio information regarding the location of the

14  defendant?

15      A       Yes.

16      Q       At some point, did you yourself observe the

17  defendant's vehicle?

18      A       Yes.

19      Q       And let me step back.  How did you know what type

20  of vehicle the defendant was in?

21      A       The description of the vehicle was given upon the

22  departure.

23      Q       And what was the description of the vehicle?

24      A       A black pickup truck.

25      Q       And when you were at the trailer, did you continue
```

USA v. GENE SUTTON, No. 07-20009

1   to receive -- I think you said this -- radio traffic as to the

2   location of the GMC truck?

3        A     Yes.

4        Q     At some point, did you personally see the GMC

5   truck?

6        A     Yes, I did.

7        Q     And where was the GMC truck when you saw it?

8        A     It was on the roadway driving westbound.

9        Q     And on what roadway?

10       A     Be 4000 South.

11       Q     And where were you at that time?

12       A     I was at, in the driveway of the 3973 Ridge Road

13   address.

14       Q     And after you observed the black GMC truck to go

15   by, what did you do?

16       A     I got back in my vehicle and proceeded to follow

17   it, the GMC truck.

18       Q     Were there any other vehicles behind the GMC truck

19   at the time you observed it?

20       A     Yes, a police car.

21       Q     And did you know from radio traffic who was in that

22   car?

23       A     Yes, I did.

24       Q     And who was in that car?

25       A     Agent Martin and Agent Powers.

1          Q      And so you got back in your car and began to follow

2     those vehicles?

3          A      Yes, sir.

4          Q      And why was that?

5          A      Because from the radio contact I received, it

6     sounded like Mr. Sutton was not stopping his vehicle.

7          Q      So you were going to that location for what

8     purpose?

9          A      To --

10         Q      To assist?

11         A      Yeah, to assist.

12         Q      Okay.  Now, did you, did you at some point then see

13    the GMC truck again?

14         A      Yes.

15         Q      And where was the GMC truck when you next saw it?

16         A      It was on the south side of the 4000 South Road in

17    the ditch area.

18         Q      And did you see Agent, Special Agent Powers'

19    vehicle?

20         A      Yes, I did.

21         Q      And where was it?

22         A      It was parked on the side of the roadway just east

23    of the truck.

24         Q      And when you say "just east of the truck," would

25    that have been -- where is that in relation to which direction

1    the vehicles were traveling?

2        A    The police vehicle was parked facing the direction

3    they was traveling when I saw it previously, and the truck was

4    facing southbound off the roadway.

5        Q    And you said the car was parked east of the truck?

6        A    Right.

7        Q    Now, what did you observe -- did you observe

8    individuals, people at that location when you arrived?

9        A    Yes, I did.

10       Q    And who did you observe at the location?

11       A    I observed Agent Martin and Agent Powers outside

12   the vehicle, along with Mr. Sutton.

13       Q    And where -- please describe for us what you saw.

14       A    When I, when I had the truck and police car in my

15   sight, I observed Agent Powers and Agent Martin removing Mr.

16   Sutton from the vehicle and going to the ground with him.

17       Q    And what, what did you observe after that took

18   place?

19       A    I stopped my vehicle and got out to assist and

20   observed a struggle between Mr. Sutton and Agent Martin and

21   Agent Powers as they attempted to handcuff Mr. Sutton.

22       Q    And could you be more descriptive for us?  What was

23   the struggle that you observed?

24       A    It appeared Mr. Sutton was attempting to lay on top

25   of his arms to avoid being handcuffed.

1          Q       Was Mr. -- let me step back here.  When you -- the

2    person you referred to as "Mr. Sutton," do you see that person

3    in the courtroom here today?

4          A       Yes, I do.

5          Q       And could you please point him out for the Court?

6          A       There wearing an orange jumpsuit.

7                  MR. MILLER:  Your Honor, request the record reflect

8    that the witness has identified the defendant.

9                  THE COURT:  The record will so reflect.

10   BY MR. MILLER:

11         Q       And then what did you do as they were struggling to

12   handcuff the defendant?

13         A       I got out of my vehicle and ran up to where they

14   were on the ground and assisted in handcuffing Mr. Sutton.

15         Q       And how did you do that?

16         A       When I got up there, they had a handcuff on each

17   arm.  I just assisted pulling his arms together to get the two

18   handcuffs placed together.

19         Q       Now, at any time while you were at that location,

20   did you observe Agent Martin to strike the defendant in the

21   head?

22         A       No.

23         Q       Did you observe Agent Martin to kick the defendant

24   in the head?

25         A       No.

1      Q      Did you observe Special Agent Powers to strike the
2   defendant in the head?
3      A      No.
4      Q      And did you observe Special Agent Powers to kick
5   the defendant in the head?
6      A      No.
7      Q      Did you strike the defendant in the head?
8      A      No.
9      Q      Did you kick the defendant in the head?
10     A      No.
11     Q      Did you observe any law enforcement officer to
12   strike or kick the defendant?
13     A      No.
14     Q      Now, after the defendant was handcuffed, what did
15   you do?
16     A      We searched Mr. Sutton as he laid on his stomach,
17   by rolling him side to side; and then we assisted in sitting
18   him on his bottom.
19     Q      And was a search of the truck conducted?
20     A      Yes, it was.
21     Q      And who conducted the search of the truck?
22     A      Myself and Agent Hoyt.
23     Q      And then let me step back.  At some point, Special
24   Agent Hoyt arrived at that location?
25     A      Yes, he did.

1    Q    Was that after you?

2    A    Yes, it was.

3    Q    Do you know approximately how long after you'd

4    arrived that he had arrived?

5    A    Thirty seconds or less.

6    Q    And what did you -- what, if anything, did you find

7    during the search of the truck?

8    A    Outside the vehicle we found several baggies of a

9    controlled substance, crack cocaine and powder cocaine.

10   Inside the vehicle we found a wad of rubber-banded money, as

11   well as a firearm, a magazine on the driver's side floorboard.

12   On the passenger side floorboard, we observed a firearm and a

13   black gun case.

14   Q    Now, for the wad of bundled-up money, did you --

15   were you able to determine the location of that -- I'm sorry.

16   Strike that.

17        For that money, had you seen those serial numbers

18   before?

19   A    Yes, we had.

20   Q    And could you please tell us where that was?

21   A    The serial numbers were previously pre-recorded in

22   our office as money to be used during the controlled buy.

23   Q    The controlled buy of December 14, 2006?

24   A    Yes.

25   Q    And you found that where in the truck?

1        A     On the driver's side floorboard.

2        Q     I'm going to show you what's been previously marked

3   as Government Exhibit 5B.  Do you recognize that?

4        A     Yes, I do.

5        Q     And what is Government Exhibit 5B?

6        A     That is the truck Mr. Sutton was driving on

7   December 14.

8        Q     And is that a fair and accurate representation of

9   the truck as it appeared that day?

10       A     Yes, it is.

11       Q     Now, we see something that appears to be something

12  on the ground next to the truck.  Do you see that?

13       A     Yes, I do.

14       Q     And what is that?

15       A     That is the several baggies of a controlled

16  substance.

17       Q     And those were located outside of the truck?

18       A     Yes.

19       Q     And did you -- did you seize those items?

20       A     Yes, we did.

21       Q     I show you what's been previously marked as

22  Government Exhibit 5C.  Do you recognize that?

23       A     Yes, I do.

24       Q     And what is Government Exhibit 5C?

25       A     That is a picture of the passenger floorboard of

USA v. GENE SUTTON, No. 07-20009

1      Mr. Sutton's vehicle.

2          Q     And were there any items in Government Exhibit 5C

3      that were seized by agents?

4          A     Yes.  The firearm, as well as the black gun case.

5          Q     I'll show you what's been marked as Government

6      Exhibit 5D.  Do you recognize that?

7          A     Yes, I do.

8          Q     What is Government Exhibit 5D?

9          A     That is the driver's side floorboard of Mr.

10     Sutton's vehicle, which is the firearm magazine as well as the

11     wad of pre-recorded money.

12         Q     Now, after Mr. Sutton's placed under arrest, were

13     you involved in his transport?

14         A     I was not.

15         Q     And so he was removed from the scene?

16         A     Yes, he was.

17         Q     Now, after his arrest, did someone provide him with

18     what's known as his  Miranda  warnings?

19         A     Yes.

20         Q     And who did that?

21         A     Agent Hoyt.

22         Q     And was that done verbally?

23         A     Yes, it was.

24         Q     Did you observe that take place?

25         A     Yes, I did.

USA v. GENE SUTTON, No. 07-20009

1    Q    Where was, where was the defendant located when

2    Special Agent Hoyt read him his rights?

3    A    In the area of his vehicle, standing up directly in

4    front of Mr. Hoyt and I.

5    Q    You indicated he was standing at that point?

6    A    Yes.

7    Q    Did you hear the defendant ask Special Agent Hoyt

8    any questions about his rights?

9    A    I don't recall.

10    MR. MILLER:  And, Judge, just to clean up, since

11    we're getting late in the day, we'd move to admit Government

12    Exhibits 1A and 1B, the maps.

13    MR. HILL:  No objection.

14    THE COURT:  No objection to 1A and 1B -- in fact,

15    they've already been admitted without objection.

16    MR. MILLER:  Government Exhibit 2, the booking

17    photograph.

18    THE COURT:  Any objection --

19    MR. HILL:  No objection.

20    THE COURT:  -- to the mug shot photo?

21    MR. HILL:  No objection.

22    THE COURT:  It's admitted without objection.

23    MR. MILLER:  Government Exhibit 3, the Miranda --

24    MR. HILL:  Yeah.  We would object to that.

25    THE COURT:  The page with the defendant's signature

1    testified to by Robert Bodemer is Government 3.  It's admitted

2    over Defendant's objection.

3              MR. MILLER:  Government Exhibit 4, which is the

4    videotape.

5              THE COURT:  Well, we're actually -- let's get back

6    to B.  B is what came in under Bodemer.  That's the Miranda

7    advisement.

8              MR. MILLER:  That's 3, Your Honor.  I'm sorry.

9    Government Exhibit 3.

10             MR. HILL:  Which one is that?

11             THE COURT:  I put down B.  Is that wrong?

12             MR. MILLER:  It's 3, Your Honor.

13             THE COURT:  It 3, not B.  That's the Miranda.  But

14   then you had 3 is also -- is that -- that's a multiple page or

15   just one page?

16             MR. MILLER:  One-page exhibit, Judge.

17             THE COURT:  Okay.  Bodemer testified relative to

18   the defendant's signatures -- the initials, I mean, and his

19   signature.  And so that is admitted over Defendant's

20   objection.

21             Now, we move to 4, which I'm trying to see who that

22   came through, and --

23             MR. MILLER:  That's the videotape through Special

24   Agent Martin.

25             THE COURT:  Right.  That was testified by Martin

```
 1    relative to the same vehicle, same siren, same lights.  Any

 2    objection to 4, the video?

 3              MR. HILL:  No objection.

 4              THE COURT:  And 5 came in through --

 5              MR. MILLER:  And then 5A through E came in through

 6    actually the last three witnesses -- Agent Powers, Agent

 7    Martin, and Agent Wolfe -- regarding the stop photographs.

 8              MR. HILL:  We would object to those.

 9              THE COURT:  Okay.  4 came in through Martin.  It's

10    been admitted without objection.

11              Now, 5A is the picture of the -- 5A I have is the

12    picture of the defendant's black GMAC truck -- GMC truck.  Is

13    there any objection to 5A, that photo?

14              MR. HILL:  Excuse me, Judge.  I'd like to back up

15    for a moment, if I could.

16              THE COURT:  Yeah.

17              MR. HILL:  We would object to the video of the

18    sirens and the lights.

19              THE COURT:  Okay.

20              MR. HILL:  I'm sorry.  I neglected --

21              THE COURT:  It's admitted over Defendant objection.

22              MR. HILL:  And we would also object to the balance

23    of the exhibits regarding --

24              THE COURT:  Okay.  5A is the photo of the

25    defendant's truck testified to by Jeffrey Martin.  That's
```

1    admitted over the Defendant's objection.

2            Now the next exhibit sequentially I show is 5E.

3            MR. HILL:  Judge, is it possible to finish this

4    witness before we get --

5            THE COURT:  Well, if I go to the exhibits on

6    another day, I won't remember anything.

7            MR. HILL:  Okay.

8            THE COURT:  So we've got to do the exhibits.

9            MR. HILL:  All right, fine.  I didn't want to --

10           THE COURT:  5E was through Powers.  That's the

11   photo showing the loose sandy soil where he testified the

12   defendant got his truck stuck.  That's admitted over the

13   defendant's objection.

14           5B came in through this very witness here.  That's

15   the defendant's truck with the baggies.  He testified of a

16   controlled substance on the ground outside the defendant's

17   truck.  That's admitted over the defendant's objection.

18           And 5C is the photo which he identified as a gun on

19   the interior floor of the defendant's vehicle.  That's

20   admitted over the defendant's objection.

21           5 -- 5 shows a wad of money that Mr. Wolfe

22   testified was the money found in the defendant's vehicle which

23   he said was the pre-recorded money.

24           MR. MILLER:  That's 5D as in dog, Your Honor.

25           THE COURT:  5D.  That's admitted over the

1    defendant's objection.

2            And do we have any other exhibits that I haven't

3    touched on?

4            MR. MILLER:  No, Your Honor.

5            THE COURT:  Okay.  So we've got all the exhibits in

6    from both sides.  The last ones that the defendant had today

7    were Defendant's 4 and 5, which was over the government's

8    objection; Defendant 6, which the Court allowed page 40 in its

9    entirety to come in, whether anyone objected to or not, based

10   on it necessary for the Court to see that entire page; 7,

11   Defendant's 7, was the picture of a Kankakee County marked

12   squad car which was admitted without objection.

13           I hope we haven't missed any exhibits from either

14   party today.

15           DEPUTY CLERK:  That's it as far as I'm concerned.

16           THE COURT:  Is that what you've got, Madam Clerk?

17   Thank you.

18           You may continue with Mr. Wolfe.

19           MR. MILLER:  I have no further questions, Your

20   Honor.

21           THE COURT:  Okay.  Mr. Hill.

22               CROSS-EXAMINATION BY MR. HILL:

23       Q   Mr. Wolfe, I'd like to show you what's marked as

24   Defendant's Exhibit Number 4 in evidence and ask you if you

25   recognize this?

1          A      Yes, I do.

2          Q      What do you recognize that as?

3          A      The arrest report from the Kankakee County

4    Detention Center.

5          Q      Okay.   That's the arrest report that was prepared

6    by yourself as well as Lockwood, correct?

7          A      Yes.

8          Q      Would you tell the judge what you specified in the

9    narrative, please?   Read that.

10         A      "Arrested after traffic stop and found to be in

11   possession of a controlled substance (over 15/less than 50

12   grams) and a handgun."

13         Q      And that's a true and accurate copy of an arrest

14   report that was prepared by both you and your partner,

15   Lockwood, --

16         A      Yes.

17         Q      -- correct?

18         A      Yes.

19         Q      It says that he was arrested after a traffic stop,

20   correct?

21         A      Yes.

22         Q      And found to be in possession of a controlled

23   substance and a handgun, correct?

24         A      Yes.

25         Q      It doesn't say anything about arrested after a

USA v. GENE SUTTON, No. 07-20009

1    controlled buy, does it?

2        A    No.

3        Q    All right.  Now, I'd also like to show you what's

4    marked as Defendant's Exhibit Number 5 for identification and

5    ask you if you've had occasion to review this before?

6                MR. HILL:  This would be page 46 and 47, Judge.

7                THE COURT:  Okay.

8        Q    You've had a chance to see that before; have you

9    not?

10       A    Yes, I have.

11       Q    Okay.  And what this does is it shows the

12   observations that occurred on December 14th; is that correct?

13       A    Yes.

14       Q    It says at 10:00 a.m. that surveillance began at

15   3973 South Ridge Road, and that was Detective -- I mean

16   Director Bodemer, correct?

17       A    Yes.

18                MR. HILL:  Judge, can you just take a look, if you

19   would, at that exhibit?  I want to show you something there.

20                THE COURT:  Well, I don't have it.  The copies were

21   never made.

22                MR. HILL:  Oh, here.  Here's one.

23                THE COURT:  Okay.

24   BY MR. HILL:

25       Q    You see that 10:00 a.m.?  It says that that's

1    Director Bodemer, correct?

2              THE COURT:  Okay.  And I have -- I previously read

3    5.

4              MR. HILL:  Correct, Judge.

5              THE COURT:  And you're pointing out which part of

6    it?

7              MR. HILL:  I'm looking at observations, --

8              THE COURT:  Okay.

9              MR. HILL:  -- starting at 10:00 a.m.

10             THE COURT:  Thank you.

11   BY MR. HILL:

12        Q    It shows observations starting at 10:00 a.m.,

13   Director Bodemer, correct?

14        A    Yes.

15        Q    And then it says at 11:33 a.m. "Special Agent

16   Lockwood," correct?

17        A    Yes.

18        Q    And it says that he, that he was found -- that he

19   followed the confidential source to the area of 4000 South to

20   11000 East Road, correct?

21        A    Yes.

22        Q    And Special Agent Lockwood's name does not appear

23   as an observer or a participant anymore on 4-- 12/14/07 -- I'm

24   sorry, '06, does it?

25        A    No.  It does not.

USA v. GENE SUTTON, No. 07-20009

1      Q    It doesn't show him having any conversation with

2  the confidential source after he left the confidential source

3  at 11:33 a.m., does it?

4           THE COURT:  Well, actually, it doesn't say there

5  was a conversation --

6           MR. HILL:  It doesn't.

7           THE COURT:  It just says he followed him.  So

8  there's nothing that says he has a conversation with Lockwood

9  on Defendant's Exhibit 5.

10 BY MR. HILL:

11     Q    Is that correct?

12     A    Yes.

13     Q    But it does make reference to Lockwood being,

14 following the confidential source at 11:33 a.m., correct?

15     A    Yes.

16     Q    And if you look up at the heading -- you see the

17 heading above it?

18     A    Yes.

19     Q    The paragraph above it?

20     A    Yes.

21     Q    It doesn't show Lockwood being involved at all,

22 does it, in this drug investigation, does it?

23     A    [No response.]

24     Q    His name's not mentioned in one spot up there, is

25 it?

```
 1         A    No.
 2              THE COURT:  Let me stop because Mr. -- let's see.
 3    Defendant's 4 -- do you have that?
 4              The question that Mr. Hill asked, so that we don't
 5    get confused, he said that Lockwood and -- you and Lockwood
 6    prepared Defendant's Exhibit 4.  Do you have that in front of
 7    you?
 8              THE WITNESS:  I do not.
 9              THE COURT:  Okay.
10              MR. HILL:  I've got a copy of it, Judge.
11              THE COURT:  Well, I'll hand it to him.
12              Whose signature is that?
13              THE WITNESS:  Which one, Your Honor?
14              THE COURT:  Bottom right.  You've got your thumb on
15    it.
16              THE WITNESS:  That is the supervisor at the county
17    jail, sir.
18              THE COURT:  Okay.  I mean, so when you say you and
19    Lockwood prepared that, whose handwriting is that?
20              THE WITNESS:  That is my handwriting, sir.
21              THE COURT:  Okay.  So when you say "prepared," that
22    means you talked to him about it before you wrote it up?
23              THE WITNESS:  Talked to Lockwood, sir?
24              THE COURT:  Yes.
25              THE WITNESS:  No.
```

1          THE COURT:  So, really, it's just your report?

2          THE WITNESS:  My handwriting, yes, sir.

3          THE COURT:  Right.  And it's not his joint report?

4          THE WITNESS:  No.

5          THE COURT:  Okay.  Now, 5, Defendant's Exhibit 5,

6     you put -- it says, "I, S/A Clayt Wolfe from KAMEG."   You

7     prepared that?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  But that doesn't have any signature on

10    it.  You typed it up?

11         THE WITNESS:  I did.  Yes.

12         THE COURT:  Okay.  Thank you.

13    BY MR. HILL:

14        Q    Did Lockwood ever indicate to you in your report

15    that he had talked to the confidential source after the

16    trailer?

17        A    It was known that he did.  Yes, sir.

18        Q    Well, no.  Did Lockwood ever tell you that he had

19    talked to the confidential source?

20        A    Yes.

21        Q    Did you include it in any report that you prepared?

22        A    No.

23        Q    In fact, you prepared Defendant's Exhibit Number --

24    page 46 and 47, which would be Defendant's --

25         THE COURT:  5.

USA v. GENE SUTTON, No. 07-20009

1    Q    You've got that, right?

2    A    Yes, sir.

3    Q    And it shows observations, correct?

4    A    Yes.

5    Q    It shows what Bodemer did at 10:00 a.m., right?

6    A    Yes.

7    Q    What Lockwood did at 11:33, --

8    A    Yes.

9    Q    -- correct?

10   A    Yes.

11   Q    Goes on to show what Bodemer did at 12:01, 12:05,

12   and 12:05, correct?

13   A    Yes.

14   Q    It shows what Hoyt did at 12:06, correct?

15   A    Yes.

16   Q    At 12:14, it shows what Martin and Powers did,

17   correct?

18   A    Yes.

19   Q    And at 12:15, it shows what Martin, Powers, and

20   Wolfe did, correct?

21   A    Yes.

22   Q    And at 12:16, it shows what Martin, Powers, and

23   Wolfe did, correct?

24   A    Yes.

25   Q    Nowhere does it show Lockwood talking with the

1    confidential source about what had happened in the trailer,

2    correct?

3         A    Yes.

4         Q    And in your report, Defendant's Exhibit Number 4,

5    you specify, do you not, that the defendant was arrested after

6    a traffic stop, correct?

7         A    Yes.

8         Q    Not after a controlled buy that occurred allegedly

9    inside a trailer, correct?

10        A    Yes.

11        Q    You know the difference between a traffic stop and

12   a controlled buy inside a trailer, right?

13        A    Yes.

14        Q    And, of course, you had the ability to make that

15   determination when you wrote this report; isn't that correct?

16        A    Yes.

17        Q    And you chose to write it the way you wrote it as

18   reflected in Defendant's Exhibit Number 4, correct?

19        A    Yes.

20        Q    As it being a traffic stop, correct?

21        A    Yes.

22        Q    Not a controlled buy in a trailer, correct?

23        A    Yes.

24        Q    And by the way, Lockwood reviewed this report with

25   you; did he not?

1        A       No.  He was not there when it was filled out.

2        Q       Well, you never showed Lockwood this report?

3        A       He would have -- there would be a copy in our case

4    file.  Yes, sir.

5        Q       This is -- did he ever review it?  Your supervisor

6    reviewed it, correct?

7        A       Yes.

8        Q       As far as you know, Lockwood reviewed it, too,

9    correct?

10       A       As far as I know, yes.

11       Q       Lockwood made no changes to this report, did he?

12       A       No.

13       Q       He never told you that it should be an arrest

14   subsequent to a controlled buy, did he?

15       A       No.

16       Q       He told you that it was okay to submit it this way;

17   otherwise, you would have changed it, correct?

18       A       Yes.

19       Q       And the way you submitted it was subsequent to a

20   traffic stop, not a controlled buy, correct?

21       A       Yes.

22               MR. HILL:  No further questions.

23               THE COURT:  Mr. Miller.

24                 REDIRECT EXAMINATION BY MR. MILLER:

25       Q       You're not the only per-- are you the only person

1    who prepared any reports in this case?

2        A    No.  I'm not the only person.

3        Q    Did Agent Lockwood prepare reports in this case?

4        A    Yes, he did.

5        Q    Would you include in your report information

6    regarding what Special Agent Lockwood knew when you weren't

7    present?

8        A    No.  I would not.

9        Q    Would Special Agent Lockwood include that in his

10   report?

11       A    Yes, he would.

12       Q    Have you reviewed the case file in this case?

13       A    Yes, I have.

14       Q    Did Special Agent Lockwood in his report detail the

15   controlled buy and his meeting with the confidential source?

16       A    Yes, he did.

17       Q    Now, are you trained in protecting the safety and

18   identity of confidential sources?

19       A    Yes.

20       Q    Does that -- did that training have anything to do

21   with the way you wrote the documents that were filed with the

22   Court?

23       A    Yes.

24       Q    And how so?

25       A    We didn't want to reveal the CS at the time, sir.

1        Q      So you did not indicate the information in there

2    about the prior controlled purchase?

3                  MR. HILL:  Objection, Your Honor, to him leading.

4                  THE COURT:  Sustained.

5                  MR. MILLER:  No further questions, Your Honor.

6                  THE COURT:  Mr. Hill.

7                      RECROSS-EXAMINATION BY MR. HILL:

8        Q      You said it was a traffic stop, right?

9        A      Yes.

10       Q      And you said that that was the basis upon which you

11   were able to get the controlled substance and the handgun

12   which are the subject of this motion, correct?

13       A      Yes.

14       Q      You didn't say it was based upon a controlled buy,

15   correct?

16       A      Yes.

17       Q      In fact, you don't even indicate that you knew that

18   a controlled buy had occurred, do you?

19       A      In which report, sir?

20       Q      In your report.

21       A      I have several reports, sir.  Which one are you

22   referring to?

23       Q      In any of these reports out of -- you've seen all

24   of the reports; have you not?

25       A      Yes.

USA v. GENE SUTTON, No. 07-20009

1    Q    You've had occasion to review them, correct?

2    A    Yes.

3    Q    In none of the reports that were generated -- in

4    none of them that was generated -- does it state that the stop

5    was as a result of a controlled buy, do they?  None of them

6    say that, correct?

7    A    No, sir.

8         MR. HILL:  No further questions.

9         THE COURT:  Mr. Miller.

10         MR. MILLER:  Nothing further, Your Honor.

11         THE COURT:  Okay.  You may step down.

12              (Witness Wolfe excused, 5:02 p.m.)

13         THE COURT:  Mr. Miller, you had indicated that you

14    would be having, I think, five witnesses.  So Christopher

15    Hoyt, you're still going to call him?

16         MR. MILLER:  Yes, Your Honor.

17         THE COURT:  Okay.  And then the Court had indicated

18    that, because Mr. Hill appeared surprised relative to answers

19    that had -- to questions to Mr. Bodemer relative to what

20    Mr. Lockwood said to Mr. Bodemer or the time that he said it,

21    that I would allow him to reopen for Mr. Lockwood.

22         MR. HILL:  Judge, if I may.

23         THE COURT:  Yes.

24         MR. HILL:  I think that in light of what Wolfe had

25    to say and in light of this other testimony, that, you know, I

1    don't need Lockwood.  I think the government might, but we

2    don't.

3                   THE COURT:  Okay.  So you don't wish to reopen?

4                   MR. HILL:  Not for Lockwood, not based on what

5    Wolfe just said --

6                   THE COURT:  Okay.

7                   MR. HILL:  -- as well as the others.

8                   THE COURT:  So we have to reschedule relative to

9    Christopher Hoyt since we're past 5:00, and I don't know about

10   Lisa.  She has small children.

11                       (Discussion off the record.)

12                   MR. MILLER:  We'll call Special Agent Christopher

13   Hoyt.

14                   CHRISTOPHER HOYT, sworn, 5:04 p.m.,

15                   DIRECT EXAMINATION BY MR. MILLER:

16       Q     Could you please state your name?

17       A     Christopher Hoyt, H-o-y-t.

18       Q     And you're a special agent with the Drug

19   Enforcement Administration?

20       A     That's correct.

21       Q     And how long have you been so employed?

22       A     Ten and a half, almost eleven years.

23       Q     And during that time, have you received training in

24   the investigation of illegal trafficking of narcotics?

25       A     Yes.

1    Q    I want to turn your attention to December 14, 2006,

2    and will be very specific here.  On that date, were you

3    involved in the briefing that took place prior to the

4    controlled purchase of cocaine from the defendant?

5    A    Yes.

6    Q    At that briefing, was it made aware to agents that

7    a confidential source had been used to purchase cocaine from

8    the defendant on November 1st of 2006?

9    A    Yes.

10    Q    Was -- were agents also made aware that a purchase

11    of cocaine had been made from the defendant utilizing a

12    confidential source on November 27, 2006?

13    A    Yes.

14        MR. HILL:  Again, Your Honor, continuing objection

15    to the relevancy of those prior dates.

16        THE COURT:  Sustained.

17        Who conducted the briefing?

18        THE WITNESS:  I did.  We were at the KAMEG office.

19        THE COURT:  Who was present?

20        THE WITNESS:  Everybody on the list, everybody --

21    all agents that were listed in the report, the people who were

22    out there for the surveillance and --

23        THE COURT:  And you were in charge?

24        THE WITNESS:  I guess, yeah.

25        THE COURT:  Okay.  You may continue.  Continuing

1    objection is shown.

2    BY MR. MILLER:

3         Q     And we're done with that.  Let's jump right ahead

4    to the stop where the defendant was placed in handcuffs.

5              Did you arrive at a location where the defendant

6    was placed in handcuffs?

7         A     Yes.

8         Q     And what other agents were present when you

9    arrived?

10        A     Powers, Martin, and Wolfe.

11        Q     When you were at that location, at any time did you

12   see any law enforcement officer strike the defendant?

13        A     No.

14        Q     Did you see any law enforcement officer kick the

15   defendant?

16        A     No.

17        Q     Did you see any law enforcement officer in any way

18   batter the defendant?

19        A     No.

20        Q     At that location, after the defendant was placed

21   under arrest, did you read him his  Miranda rights?

22        A     Yes, I did.

23        Q     And how did you do that?

24        A     I carry a yellow card in my wallet.

25        Q     And did you provide those rights to him?

USA v. GENE SUTTON, No. 07-20009

1      A      Yes, I did.

2      Q      Did he make any indication whether he understood

3  those rights?

4      A      He said he understood.

5              THE COURT:  Who was present when he said that?

6              THE WITNESS:  Wolfe, Agent Wolfe.

7              THE COURT:  Okay.

8  BY MR. MILLER:

9      Q      Now, were you later involved in transporting the

10  defendant?

11      A      Yes, I was.

12      Q      And where was he transported to?

13      A      The Bourbonnais Police Department.

14      Q      At the Bourbonnais Police Department, was the

15  defendant again provided his Miranda rights?

16      A      This time in writing.

17              THE COURT:  Who was present?

18              THE WITNESS:  Director Bodemer.

19      Q      And yourself?

20      A      Correct.

21      Q      And did you provide him with his rights?

22      A      Yes, I did.

23      Q      And how did you do that?

24      A      I read it to him and then allowed him to read it

25  and initial each of the lines as he understood them.

USA v. GENE SUTTON, No. 07-20009

1      Q    And I'll show you what's been previously marked as

2    Government Exhibit -- or actually introduced into evidence as

3    Government Exhibit 3.  Do you recognize that?

4      A    Yes, I do.

5      Q    And what is Government Exhibit 3?

6      A    It's a form that I carry with me.  It's a *Miranda*

7    form that was signed by Gene Sutton and witnessed by Master

8    Sergeant Bodemer and myself.

9      Q    And there are initials, "GS," beneath the points

10   under the *Miranda* warning.  How did they get there?

11     A    Gene Sutton initialed those.

12     Q    And following you providing him with his *Miranda*

13   rights, did he agree to speak with you?

14     A    Yes, he did.

15     Q    And without going into the specifics, did he make

16   admissions regarding his involvement in drug trafficking?

17     A    Yes, he did.

18     Q    How would you characterize the interview that took

19   place between you, Special Agent Bodemer, and the defendant?

20          MR. HILL:  Your Honor, I'm going to object as to

21   the relevancy of what happens after the stop.

22          MR. MILLER:  If --

23          MR. HILL:  If the stop is suppressed, all of this

24   goes out anyway.

25          MR. MILLER:  If he's not moving to suppress the

1   statements on any basis other than the stop, we'll stop the

2   questioning.

3                THE COURT:  Is that correct, Mr. Hill, that there

4   is --

5                MR. HILL:  No.  That is not correct, Judge.

6                THE COURT:  Okay.  Then objection's overruled.  He

7   can go into the matters relative to the <u>Miranda</u>.

8   BY MR. MILLER:

9       Q     Again, how would you characterize the nature of

10  that interview?

11      A     Very -- it was cordial.  We were speaking like you

12  and I are.

13      Q     And during the interview --

14               THE COURT:  Let me ask you.  Did you -- you've been

15  here as a case agent.  Bodemer testified that under Mr.

16  Sutton's eye was a swelling or a laceration.  Did you observe

17  that?

18               THE WITNESS:  Yes.  There was a scrape.  There was

19  a scrape on his cheek.  It wasn't bloody.  There was no blood

20  pouring from his face.

21               THE COURT:  Right.  Now, do you know where that,

22  where that came from?

23               THE WITNESS:  My understanding was it came from

24  when he hit the ground when they took him out of the car.

25               THE COURT:  Now, that happened before you got

1    there?

2                  THE WITNESS:  That would have happened before I got

3    there.

4                  THE COURT:  Now, in this case, Gene Sutton Sr. has

5    testified.  Did you meet him on December 14, 2006?

6                  THE WITNESS:  Yes, I did.

7                  THE COURT:  And was he already at the scene of the,

8    where they were trying to get Mr. Sutton handcuffed; or did he

9    come after he was handcuffed?  When did you see him there?

10                  THE WITNESS:  He actually came from behind that

11    abandoned trailer while Clayt Wolfe and I were standing with

12    Mr. Sutton when I was reading him his rights.  That's the

13    first --

14                  THE COURT:  After he'd been handcuffed?

15                  THE WITNESS:  Yes, sir.

16                  THE COURT:  Okay.  Did he have any conversation

17    with you about making certain that no one struck his son?

18                  THE WITNESS:  He did.  He said --

19                  THE COURT:  What was the conversation?

20                  THE WITNESS:  He said he didn't want anyone to beat

21    his son, and I told him that that would not happen.

22                  THE COURT:  And when you said that would not

23    happen, you meant would not happen in the future or that you

24    knew it happened in the past?

25                  THE WITNESS:  No.  I said that it would not happen

USA v. GENE SUTTON, No. 07-20009

1    because I don't do that.

2              THE COURT:  Okay.  So if he was struck by officers,

3    if the defendant was struck by the officers, you didn't see

4    that?

5              THE WITNESS:  I did not see that.

6              THE COURT:  Okay.  You may continue.

7              MR. MILLER:  I have no further questions, Your

8    Honor.

9              THE COURT:  Mr. Hill.

10                  CROSS-EXAMINATION BY MR. HILL:

11        Q    Yeah.  Mr. Hoyt, you were -- I'll show you

12   Defendant's Exhibit Number 5.  You've had occasion to see

13   Defendant's Exhibit Number 5; --

14        A    I believe so.

15        Q    -- is that correct?

16              MR. HILL:  Judge, do you have a copy of Defendant's

17   Exhibit Number 5?

18              THE COURT:  I did a while ago, but I don't know.  I

19   gave it back.

20              MR. HILL:  I need to give you this.  Okay.

21              THE COURT:  Thank you.

22   BY MR. HILL:

23        Q    Special Agent Hoyt, you indicate at 12:06, 12:06,

24   approximately 12:06, you and Bodemer observed Sutton traveling

25   eastbound in a dark-colored pickup truck on 4000 South?

1              MR. MILLER:  Objection, Your Honor, beyond the

2    scope of direct.  We didn't get into any of that.  He already

3    questioned him about it at the last hearing, and --

4              MR. HILL:  Well, Judge, this is --

5              MR. MILLER:  -- we didn't get into any of the

6    following.

7              MR. HILL:  Judge, --

8              THE COURT:  Well, he didn't go into this.  He's

9    correct.  And you actually called Hoyt as a witness, I

10   think, --

11             MR. MILLER:  He did.

12             THE COURT:  -- looking back on October 18.

13             MR. HILL:  I'll withdraw that question and put

14   another question, Judge.

15             THE COURT:  So objection sustained.

16   BY MR. HILL:

17      Q    Mr. Hoyt, you were in radio communication with

18   Bodemer; isn't that correct?

19      A    Yes.

20      Q    And, of course, you indicate that you were in radio

21   communications; and we can tell that from, of course, looking

22   at Defendant's Exhibit 5, correct?

23      A    I was in radio communication.

24      Q    And nowhere in your observations, in your radio

25   communication summary, do you indicate that Bodemer said that

1    the controlled sale had occurred inside the trailer, correct?

2              MR. MILLER:  Still beyond the scope of direct

3    examination, Your Honor.

4              THE COURT:  Sustained.

5              MR. HILL:  Well, Judge, I was trying to save time

6    by call-- I'd have to call him in rebuttal to bring him back.

7    I mean, it's my motion.  I was just trying to save some time

8    on this.

9              THE COURT:  Mr. Miller?

10             MR. MILLER:  I'm not sure what issue was raised to

11   call him in rebuttal.

12             MR. HILL:  The issue is that of impeaching Bodemer.

13             MR. MILLER:  Your Honor, we'll withdraw the

14   objection --

15             THE COURT:  Okay.

16             MR. MILLER:  -- for purposes --

17             THE COURT:  Thank you.

18             MR. MILLER:  -- of finishing the hearing at some

19   point.

20             MR. HILL:  Okay.  Thank you.

21             Bodemer.  You and -- may I give that back to you

22   then, Judge?  Do you have it -- if you take --

23             THE COURT:  And this is -- you're talking about

24   Wolfe's report?

25             MR. HILL:  No.  We're talking about -- but we're

1    talking about Wolfe.

2            THE COURT:  Right, right.  But I just asked Wolfe.

3    I mean, I want the record clear that you're talking about

4    12:06 p.m., Defendant's Exhibit 5, which was prepared by

5    Wolfe, --

6            MR. HILL:  That's correct.

7            THE COURT:  -- not Hoyt.

8            MR. HILL:  That's correct.

9            THE COURT:  Okay.

10   BY MR. HILL:

11       Q     But Mr. Hoyt, you've had occasion to review this,

12   correct?

13       A     Yes, I have.

14       Q     And you wouldn't disagree with the fact that you

15   were in communication with Bodemer, correct?

16       A     I was in communication.

17       Q     You heard what Bodemer had to say, and he heard

18   what you had to say, correct?

19       A     Correct.

20       Q     Because that scenario of the conversation is shown

21   under 12:06, correct?

22       A     We had a conversation.

23       Q     It shows all of the detail --

24       A     Oh.

25       Q     -- that you and Bodemer had, correct?

1       A     Correct.

2       Q     And it doesn't show one place in there where

3   Bodemer says that he's been told by Lockwood that a controlled

4   buy has occurred, does it?

5       A     No.

6       Q     And, of course, you would have heard that if he had

7   said it to you, correct?

8       A     Correct.

9       Q     And, of course, you would have heard it if Lockwood

10  had said it to Bodemer because you were all in radio

11  communication; isn't that correct?

12      A     We were in radio communications.

13      Q     And, of course, you never heard Lockwood say to

14  Bodemer who was up in the airplane that the confidential

15  source has just said that he made a controlled buy, did you?

16      A     It was said.  I don't remember who, but it was

17  said.

18      Q     But it is not --

19      A     It's not in the report.  You're correct.

20      Q     And, in fact, you have an indication of what

21  Bodemer is saying to you and you saying to Bodemer because you

22  were in radio communication, correct?

23      A     We were.

24      Q     Not one mention of Lockwood ever saying that a

25  controlled sale had occurred, correct?

1       A       It's not in the report.

2       Q       It's not stated, is it?

3       A       No, it's not.

4       Q       And it's not stated by any of the agents who have

5       testified that they heard it?

6               MR. MILLER:  Your Honor, asked and answered and

7       well beyond the scope.

8               THE COURT:  Well, we've heard it more than once.

9       Objection sustained, asked and answered.

10              MR. HILL:  Now, if there were --

11              THE COURT:  Comment -- the comment would be is if

12      it was a jury and you thought that they weren't very bright

13      and you needed to keep reminding them, then you would keep

14      repeating and repeating and repeating.  But I'm hoping that --

15              MR. HILL:  No, Judge.

16              THE COURT:  -- you're not saying that about me.

17              MR. HILL:  Absolutely not, Judge.

18              THE COURT:  Because I have heard it many times.

19              MR. HILL:  Absolutely not.  And I do apologize.

20      BY MR. HILL:

21      Q       But the point that I do want to emphasis is that

22      you were in radio communications throughout, --

23      A       Yes.

24      Q       -- correct?

25              And there's no indication in this radio

1    communication of Lock-- what's his name?  Lock--

2              THE COURT:  Wood.

3    Q      -- Lockwood saying anything about a controlled sale

4    having taken place, correct?

5    A      There's nothing in the report.

6              MR. HILL:  No further questions.

7              THE COURT:  Mr. Miller.

8                REDIRECT EXAMINATION BY MR. MILLER:

9    Q      What was the reason that this operation was taking

10   place on that day?

11   A      For the controlled purpose --

12             MR. HILL:  Judge, beyond the --

13   A      -- for the controlled purchase.

14             THE COURT:  Beyond the scope of the cross?

15             MR. HILL:  It's --

16             THE COURT:  Sustained.

17             MR. MILLER:  It's very responsive to the scope.

18             THE COURT:  Well, I know, but we just keep going on

19   and on, and it's like I'm not smart enough to figure this out.

20             MR. MILLER:  I have no further questions, Your

21   Honor.

22             THE COURT:  Okay.  And you're done?

23             MR. HILL:  I am, Judge.

24             THE COURT:  Very good.  Thank you.

25             MR. HILL:  May I have one second to consult with my

1      client before we go?

2                       (Brief pause in proceedings.)

3                  MR. MILLER:  May the witness step down, Your Honor?

4                  THE COURT:  Well, I don't know if we're done.

5                  MR. MILLER:  Oh.

6                       (Brief pause in proceedings.)

7                  MR. MILLER:  I don't think I asked any question.

8      The only one I asked was sustained.  So I don't believe

9      there's any basis for redirect -- or recross.

10                 THE COURT:  Have to wait.

11                     RECROSS-EXAMINATION BY MR. HILL:

12        Q     Just one other question.  I inquired of you

13     regarding Defendant's Exhibit 5, correct?

14                 THE COURT:  Mr. Miller, your objection?

15                 MR. HILL:  I'm sorry.

16                 MR. MILLER:  I'll wait to hear the question, Your

17     Honor.

18                 MR. HILL:  Another question?

19                 THE COURT:  See, I didn't let him have a question.

20                 MR. HILL:  Oh, I'm sorry.  Did I stop?  I --

21                 THE COURT:  I didn't let him have a question.

22                 MR. HILL:  Okay.

23                 THE COURT:  So because he didn't get a question,

24     that's the end.

25                 MR. HILL:  Oh, all right.

1          THE COURT:  Unless you want to reopen, Mr. Miller.

2          MR. MILLER:  No, Your Honor.

3          THE COURT:  Okay.  So we are done.  Now, we're done

4     with this witness.  You may step down.

5                   (Witness Hoyt excused, 5:17 p.m.)

6          THE COURT:  Is the government rested with all

7     presentation of evidence?

8          MR. MILLER:  Yes, Your Honor.

9          THE COURT:  Mr. Hill, do you have any rebuttal

10    witnesses you wish to call?

11         MR. HILL:  Yeah, Judge.  We want to call Lockwood.

12         THE COURT:  Okay.  Can we get him on the telephone?

13         MR. HILL:  I spoke with him, Your Honor, at your

14    instruction.  He indicated that Wednesday morning he is in

15    court, but he could be here Wednesday afternoon.  I don't know

16    the Court's schedule.

17         THE COURT:  How about 1:00?

18         MR. HILL:  Judge, if I may.

19         THE COURT:  Yes.

20         MR. HILL:  I'm supposed to be -- I'm not sure how

21    this plays out, but I'm supposed to be catching a flight from

22    Chicago to Southern Illinois for this death penalty seminar on

23    Thursday and Friday.  I have to be there in order to keep my

24    certification.

25         THE COURT:  To keep your qualifications.  I

1    understand.  Well, let's go off the record and talk.

2                    MR. HILL:  So I don't want to get caught in that

3    bind.

4                    THE COURT:  Okay.  Let's talk about next week.

5                        (Discussion off the record.)

6                    MR. HILL:  Judge, we've decided that we're not

7    going to call him.  We rest on the presentation.

8                    THE COURT:  Okay.  Both parties have rested?

9                    MR. MILLER:  Yes, Your Honor.

10                   THE COURT:  No further presentation of evidence.

11                   It's the defendant's motion.  I will want, in lieu

12   of obviously the argument relative to the extensive testimony,

13   I'll want that in the form of memorandum in support of the

14   motion.  So -- and I know that -- I don't know if Mr. Hill or

15   Mr. Miller want any portion of the transcripts to be prepared,

16   but I do know that I want to give time in case that is true.

17   So -- and we have a holiday coming up this month.

18                        (Discussion off the records regarding

19                         further scheduling of this matter.)

20                   THE COURT:  Okay.  Back on the record.

21                   We will set this matter for a telephone status at

22   1:15 on Monday, December 17th.

23                   All of the evidence has been presented.  However,

24   Mr. Hill has indicated he would like to order a transcript;

25   and rather than set a time that could cut him short on an

1    adequate time or force the -- we've got a couple jury trials
2    coming up -- and force the court reporter on a difficult
3    schedule, we'll set this for Monday, December 17th at 1:15.
4    Hopefully, we'll find out that the transcripts are prepared
5    and in the hands of counsel so that we can then at that time
6    set a reasonable briefing schedule for the memorandums of law.
7              The Court will initiate the telephone call.  The
8    period of delay from today's date to and including Monday,
9    December 17th, will be excluded from the time limits for
10    commencing trial.  The Court finds the ends-of-justice finding
11    served by taking this action which outweighs the best
12    interests of the public and the defendant in a speedy trial.
13    The Court makes the ends-of-justice finding pursuant to 18
14    United States Code, Section 3161(h)(8)(A).
15              Mr. Sutton, we'll get you on the telephone.  Where
16    are you being housed at this time?
17              DEFENDANT SUTTON:  DeWitt County Jail.
18              THE COURT:  DeWitt County Jail.
19              THE COURT:  Okay.  So we'll have the deputy clerk
20    make a note of that.  We'll get you on the telephone.  We'll
21    get -- now, Mr. Sutton, I don't know anything about your
22    medical condition.  Were you supposed to go back to
23    Springfield, Missouri?
24              DEFENDANT SUTTON:  I was supposed to.
25              THE COURT:  Well, we can direct you back to

USA v. GENE SUTTON, No. 07-20009

1    Springfield, Missouri, and we can get you on the telephone

2    down there.

3              DEFENDANT SUTTON:  Okay.

4              THE COURT:  So I'm going to direct that Mr. Sutton

5    be transported back to Springfield, Missouri, and I'm also

6    going to -- and, Diane, you need to write this down -- I'm

7    going to be writing the Springfield, Missouri, medical

8    facility and asking them for an update about your medical

9    condition so I can have a medical report on your scalp to

10   determine how much longer they need you down there since,

11   obviously, you're going to be in custody for the coming months

12   until we get this motion to suppress resolved.

13             So we'll direct the marshals to transport him back

14   to Springfield, Missouri.  We'll get him on the telephone from

15   Springfield at 1:15 on December 17; and I'll start the process

16   to get the warden to have the medical director down there give

17   me a medical report on his scalp condition.

18             Is there anything further, Mr. Miller?

19             MR. MILLER:  No, Your Honor.  Thank you.

20             THE COURT:  Mr. Hill, anything further?

21             MR. HILL:  Judge, it's my understanding that the

22   next date will be the telephone status --

23             THE COURT:  That's correct.

24             MR. HILL:  -- on December 17th at 1:15.

25             THE COURT:  Right.

USA v. GENE SUTTON, No. 07-20009

1          MR. HILL:  And at that time, we'll determine the

2     briefing schedule?

3          THE COURT:  Absolutely.

4          MR. HILL:  All right, fine.

5          THE COURT:  Thank you.  That's all for the record.

6     Defendant's remanded to the custody of the marshals to be

7     transported back to the Springfield, Missouri, medical

8     facility.

9                    (Hearing concluded, 5:28 p.m.)

10

11                * * * * * * * * * * * *

12

13                    REPORTER'S CERTIFICATE

14          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

15     that the foregoing is a correct transcript from the record of

16     proceedings in the above-entitled matter.

17          Dated this 8th day of January, 2008.

18

19

20               S/Lisa Knight Cosimini
                 Lisa Knight Cosimini, RMR-CRR
21               Illinois License # 084-002998

22

23

24

25

**LISA KNIGHT COSIMINI, RMR-CRR**
**Official Court Reporter -- U.S. District Court**
**(217) 384-2290**