UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Docket No. 07-20009 |
| ) | |
| GENE SUTTON, ) | Honorable Michael P. McCuskey, |
| Defendant. ) | Chief U.S. District Judge |

**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE**

NOW COMES the defendant, GENE SUTTON, by and through his attorney, STANLEY L. HILL, and in support of defendant's motion to suppress evidence submits the following memorandum in support of the motion to suppress evidence.

### FACTS

The government called Robert Bodemer, who testified he is the director of the Kankakee Area Metropolitan Enforcement Group (KAMEG). R. 110. He testified the plan for December 14, 2006 was to have a confidential informant make a controlled purchase from the defendant inside a trailer in Pembroke Township, Illinois. R. 121. The informant was fitted with an audio and video recording device. R. 122. If the controlled purchase took place, two search warrants which were acquired the previous day to search the trailer and another residence would be executed; and the defendant would be taken into custody for the delivery of that day and also two previous alleged deliveries. R. 122. Bodemer's specific role that day was to supervise and conduct surveillance. R. 124. He was riding in an airplane and to aid his observations was using binoculars. R. 146.

Before defendant was arrested, Bodemer claims he received information that the confidential informant had purchased 4 ½ ounces of crack cocaine from the defendant. R. 145. According to Bodemer, after the confidential informant departed the trailer where the controlled buy is alleged to have

1

occurred, the informant met with two agents and produced approximately 4 ½ ounces of crack cocaine. After the meeting with the informant, Trooper Mike Lockwood allegedly told Bodemer the controlled purchase of crack cocaine had taken place. R. 150.

Bodemer did not have an arrest warrant to arrest defendant for the alleged controlled buys on November 1st and 27th, 2006. R. 168, 175, 176. The audio and video recording devices the informant was wearing on December 14th were "not working" so Bodemer did not see or hear what, "if anything" transpired between defendant and the informant inside the trailer, R. 170. Bodemer admitted that "in real time" he had no knowledge of what transpired inside the trailer. R. 171. Because he had no knowledge in real time of what happened inside the trailer, he had no facts upon which to base probable cause, based on personal knowledge. R. 172. Bodemer admitted none of the officers had any basis upon which to base probable cause because they had no real-time knowledge of what had transpired inside the trailer. R. 172. At the time that defendant left the trailer, Bodemer admitted he did not know whether or not an alleged transaction involving alleged crack cocaine had occurred. R. 172. Bodemer admitted that at the time defendant drove away from the trailer he "didn't have probable cause for incidents on the date of the 14th at that time." R. 173. When defendant walked out of the trailer, got into his truck and drove away, Bodemer did not know what happened inside the trailer, nor if any transaction occurred. R. 173. When defendant came out of the trailer got into truck and drove away, Bodemer saw Special Agent Hoyt follow defendant. R. 173. Bodemer admitted when Sutton drove away there had been no conversation with the confidential source, the video wasn't working, the audio wasn't working, and they didn't know what, if anything, happened inside the trailer; but Hoyt began to follow defendant. R. 174.

While Sutton is being followed by Hoyt, and surveiled by Bodemer, they still had not talked to the confidential source so Bodemer still did not know what had happened inside the trailer. R. 176-177. In the general area of Mondy's Garage when Sutton pulls out and drives back south on Main Street,

Bodemer claims he then knew what happened inside the trailer because he had allegedly talked with Trooper Lockwood, who had allegedly talked with the confidential source. R. 177-178. Bodemer claims he is notified by Lockwood "approximately a minute, maybe a minute and a half, in that time period, before the black pick-up truck (that defendant was driving) came to a final stop." R. 179. The pick-up truck was stopped at about 12:14 p.m. according to a report, "agents attempt to conduct a traffic stop at about 12:14 p.m." R. 179. Bodemer admits any time prior to approximately 12:13 p.m. he had no knowledge of what defendant allegedly did inside the trailer. R. 180. Bodemer testified it was not until Lockwood talked with the confidential informant did any agent know what allegedly happened inside the trailer. R. 184.

Bodemer testified he was the supervisor and the agents who assisted in defendant's arrest were working under his supervision and control. R. 185. He admitted throughout their reports the agents indicate they tried to make a traffic stop of the defendant. R. 185. However, none of the agents issued a traffic citation to the defendant. R. 185-86, R. 188-89. Bodemer admitted none of the reports say the stop of the defendant was based upon an alleged controlled sale that occurred in the trailer. R. 190. The reports claim the basis for the stop was a traffic stop. R. 190.

> **The Court** inquired of Bodemer as follows:
>
> Do you agree with Christopher Hoyt's testimony he testified that he had no arrest warrant and there was no violation of any traffic laws until he, meaning Mr. Sutton, went through the stop sign at East 4000 South Road and South 1300 East Road as the defendant turned right to go west and did not stop for that stop sign? From what you observed in the plane, would you agree with that?
> **Bodemer**: Yes, sir.
> **The Court**: Now, is it your testimony that if he had stopped at that stop sign and turned right to go west after a stop, there wouldn't have been any violation at that moment of any traffic law; but he still would have been stopped by the officers?
> **Bodemer**: Yes, sir.
> **The Court**: Okay. That's what I wanted to clarify. R. 192-93.

Bodemer does not know the approximate time Lockwood talked to the confidential informant. R. 193. The specific time and notation that Trooper Lockwood notified the units that he had met with the confidential source and had been provided the information is not stated in any of the reports. R. 194. The Court surmised that the sequence of the conversation with Lockwood had to happen before 12:14 p.m. to provide probable cause for the stop of the defendant. R. 195-196. The Court stated "For him to be right. If it happens before 12:05, he doesn't know what happened in the trailer. And if it happens after 12:14, **it's too late.**" R. 196. (emphasis added). Bodemer admitted that none of the reports state the time Lockwood allegedly told Bodemer or anybody else about what happened in the trailer between the confidential source and the defendant. R. 197.

Trooper Mike Lockwood's report, Defendant's Exhibit 6 at page 40, states at approximately 12:14 Martin and Powers attempted to make a traffic stop at 4000 South and 13000 East Road-at the intersection where the stop sign is located. R. 195. Lockwood's report does not say they attempted to make a stop based upon an alleged controlled sale that had occurred inside the trailer. R. 199, 200. Nowhere in Lockwood's report does it state defendant was being stopped for a controlled sale that occurred inside the trailer- the only reference regarding defendant's stopping, is based on a traffic stop that started at 4000 South and 13000 East Road in Hopkins Park, Illinois. R. 200. And, no traffic citation was given. R. 200. No one else talked to the confidential informant prior to the defendant being arrested other than allegedly Lockwood. R. 202. Special Agent Dave Krinzke was with Lockwood on that date. He may or may not have had a conversation with the informant. R. 202. Bodemer admits Lockwood doesn't say a thing about a sale occurring inside the trailer as the basis for the stop. Bodemer admits that Lockwood says in his report that it was a traffic stop. R. 203.

Bodemer admitted that all of the agents involved were narcotics agents; no officers were involved in traffic patrol. R. 203-204. This was a narcotics investigation, not traffic patrol. R. 204-205.

4

This Court observed in reviewing Defendant's Exhibit 6, page 40, "there is no time statement of Lockwood saying at a specific time I told anybody about the transaction that he's reporting on." Bodemer agrees. R. 212. Nowhere in any of the reports is it stated that Lockwood spoke to the confidential source about what happened in the trailer before the traffic stop was attempted on Sutton. R. 212-213.

In questioning by this Court, Bodemer admitted "we won't find ... that sequence in the report of the officers who were driving that marked vehicle. They're not going to say, "We were called into the area, Pembroke Township/Hopkins Park, to stop Gene Sutton because of a drug transaction"? Their reports aren't going to say that. R. 214.

Next the government called Jeffrey Martin, a KAMEG officer assigned as a take-down unit if the target, Gene Sutton, was to go mobile. R. 215, 218. Before going to the location, Martin was briefed that Sutton was a target. R. 218. Martin's partner was Joe Powers. R. 219. On December 14th they were positioned approximately two miles south and west of the four-way intersection of 13000 and 4000 South when they were advised via radio that Sutton had left the trailer and was now mobile in his black GMC pickup truck. R. 220. Martin testified "they were attempting to intercept him. We were led in to intercept with him so that we could issue a traffic stop." R. 220. Bodemer was directing him as to where to travel and gave the command to conduct a traffic stop of the vehicle. R. 221, 223. Martin testified he initiated his lights and sirens and attempted to pull the defendant's vehicle over approximately 100 to 150 yards north of the four-way intersection. R. 223. The vehicle then made a right-hand turn, disregarding the stoplight, or stop sign, and our emergency lights and proceeded westbound on Central Street. R. 223-224. As Martin followed defendant down 4000 South Road, it was his intent to place defendant under arrest based on the instruction he'd received from Bodemer. R. 227. The defendant's

vehicle pulled off the road, Powers and Martin exited their squad and approached defendant's vehicle, with guns drawn to make a felony arrest. R. 228.

Martin had been instructed that if the target were to go mobile he was to conduct a traffic stop - that was the plan. R. 235, 236, 237. When Martin turned on his mobile lights and attempted a traffic stop he had not observed defendant violate any traffic laws and nobody told him that any traffic laws had been violated. R. 236, 237. The reason he turned on his lights to try to stop defendant was because he had been instructed that if the target were to go mobile, he was to conduct a traffic stop. R. 236. That was the reason he went after defendant. R. 237. When Martin turned on his lights to stop the defendant's vehicle he did not know whether or not a controlled buy involving the defendant had actually occurred. R. 239. His basis for stopping Sutton was because he had been instructed that if the target went mobile he was to take him down. R. 240. Martin testified that prior to turning on his lights defendant had not committed any traffic violations. R. 240. Martin was not told that a controlled buy had occurred inside the trailer. R. 243. Whether a controlled buy had occurred or not, Martin's instructions were solely to take defendant down if he went mobile. R. 244.

Next the government called Joseph R. Powers, who was working with Jeff Martin. R. 245, 246. Powers also confirmed that if defendant left in a vehicle, their assignment was to pull over the vehicle. R. 247. If the target went mobile, his job was to take down the subject by making a traffic stop. R. 258. Powers had not seen defendant violate any traffic laws. R. 259, 260. Bodemer told him the subject had gone mobile, described the vehicle and to go ahead and make a traffic stop as was the plan. R. 259.

Next the government called Clayt Wolfe, who was assigned to KAMEG. R. 269. Wolfe testified his role on December 14, 2006, was surveillance. R. 274. Wolfe testified he was in radio contact with other agents during this operation. R. 274. He was in radio contact with Lockwood and Bodemer. R. 275. Wolfe identified Defendant's Exhibit 4 as the arrest report prepared by himself and Lockwood. R.

290. The report specified defendant was "arrested after traffic stop and found to be in possession of a controlled substance (over 15/less than 50 grams) and a handgun." R. 290. Wolfe admitted the report says arrested after a traffic stop, not after a controlled buy. R. 290-291. Wolfe admitted Defendant's Exhibit 5, pages 46 and 47, does not show that Special Agent Lockwood was an observer or participant in any activities after 11:33 a.m. on December 14, 2006. R. 291-293. Also, Wolfe admitted he never included in any report that Lockwood said he had talked to the confidential informant after the informant left the trailer. R. 295. Wolfe admitted that pages 46 and 47 of the report (Defendant's Exhibit 5) details each of the agents activities on 12/14/06 between 10:00 a.m. and 12:16 p.m., but nowhere in the report does it show Lockwood talking with the confidential source about what had happened in the trailer. R. 295-297. As far as Wolfe knows, Lockwood reviewed the report and made no changes to the report. R. 298. In a report written by Lockwood he details the controlled buy and his meeting with the confidential source, but the report does not indicate this occurred prior to the defendant's stop. R. 299. Wolfe admitted he has reviewed several reports generated, and none state that the defendant's stop was a result of a controlled buy. "None of them say that." R. 301.

The government did not call Special Agent Mike Lockwood, although he was an available witness, to testify he spoke with the confidential source and notified Bodemer over the radio about the controlled buy before defendant was stopped.

Next the government called Christopher Hoyt. Tr. 302. Hoyt admitted that from looking at Defendant's Exhibit 5 you can tell he was in radio communications with Bodemer. R. 310. However, nowhere in the radio communication summary, does it indicate that Lockwood stated to Bodemer the confidential source stated the controlled sale had occurred inside the trailer. R. 313-314. Further, Hoyt testified they were all in radio communication and he does not remember that Lockwood said that the confidential source just said he made a controlled buy. R. 313. Hoyt admitted it's not in the report. R.

313-314. And none of the agents testified they heard Lockwood say it. R. 314. Hoyt testified they were in radio communication throughout and there's no indication in any of the reports of Lockwood saying anything about a controlled sale having taken place. R. 315.

## ARGUMENT

When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. , 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, "by means of physical force or show of authority,'" terminates or restrains his freedom of movement, *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)), "*through means intentionally applied*," *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989) (emphasis in original). When there is a governmental termination of freedom of movement through means intentionally applied, the person is entitled to challenge the government action. *Id.*

In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court stated the basic constitutional rule that warrantless searches "are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." *Id.* at 357; see *Terry v. Ohio*, 392 U.S. 1, 20 (1968) ("Police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure."). To satisfy the warrant requirement, an impartial judicial officer must assess whether the police have probable cause to make an arrest, to conduct a search, or to seize evidence, instrumentalities, fruits of a crime, or contraband. See *Warden v. Hayden*, 387 U.S. 294, 301-02 (1967). Courts often use the phrase "neutral and detached" to describe a magistrate's proper posture. In *Shadwick v. City of Tampa*, 407 U.S. 345 (1972), the Supreme Court explained that

"[w]hatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." *Id.* Under federal law, the warrant must be issued by a federal magistrate judge or a state court of record within the federal district. FED. R. CRIM P. 41(a). In *Johnson v. United States*, 333 U.S. 10 (1948), the Supreme Court stated: [t]he point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. *Id.* at 13-14; see *Steagald v. U.S.*, 451 U.S. 204, 212 (1981) (warrant necessary because law enforcers "may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty").

In the instant case, the government agents intentionally terminated or restrained defendant's freedom of movement when they stopped his vehicle. Thus defendant, Gene Sutton, Jr., is entitled to challenge the stop under the Fourth Amendment. The agents did not have an arrest warrant and no exceptions to the warrant requirement existed. The evidence adduced at the hearing in this case established: (a) defendant's stop was not pursuant to an arrest warrant; (b) defendant did not consent to the stop; (c) the agents did not stop defendant for violating any federal, state or municipal laws on December 14, 2006 that they observed - the audio and video recording devices attached to the confidential informant were not working so the agents did not observe defendant engaged in any illegal acts inside the trailer; (d) the agents testified defendant was not stopped for any alleged traffic violations they observed; (e) the alleged prior controlled drug purchases involving the defendant on November 1st and November 27th, 2006, approximately 43 and 16 days respectively, prior to the December 14th 2006 stop of defendant are too remote in time for a warrantless stop- an arrest warrant was required for the

stop of the defendant, if the stop was based on these alleged criminal acts; and (f) the government shall have the burden of proving by a preponderance of the evidence the lawfulness in all respects of the acquisition of all evidence the government will use at trial. The government did not establish the existence of probable cause for the stop by proving by a preponderance of the evidence that prior to the stop Special Agent Mike Lockwood stated to Supervisor Robert Bodemer (who ordered defendant's stop) that the confidential source stated to Lockwood that the planned controlled sale with the defendant had occurred inside the trailer. Christopher Hoyt testified they were all in radio communication. But nowhere in the radio communication summary, does it show Lockwood stated to Bodemer that the confidential source stated the controlled sale had occurred inside the trailer. R. 313-314. Hoyt, who is the government's case agent, does not remember hearing Lockwood say that the confidential source said he made a controlled buy from the defendant. R. 313. Hoyt admitted it's not in any report. R. 313-314. And none of the agents (other than Bodemer) who were all in radio communications with each other testified they heard Lockwood say it. R. 314. Hoyt testified they were in radio communication throughout and there's no indication in any of the reports of Lockwood saying anything about the controlled sale having taken place before defendant was stopped. R. 315.

    The government could have but chose not call Special Agent Mike Lockwood to corroborate he spoke with the confidential source and notified Bodemer before defendant was stopped. The unjustified failure of the government to call an available material witness gives rise to an inference that the testimony of the "missing" witness would, if he had been called, have been adverse to the government. Lockwood was under the control of the government and could have been produced by the government by the exercise of reasonable diligence. Lockwood was not equally available to the defendant. Lockwood was likely to be biased against defendant because of his relationship to the government, who is the party who would be expected to produce Lockwood. A reasonably prudent person under the same

or similar circumstances would have produced Lockwood if he believed Lockwood's testimony would be favorable to him. The government did not provide a reasonable excuse for its failure to call Lockwood. The government's failure to call Lockwood allows this Court to draw an unfavorable inference based on the government's failure to call Lockwood who would normally be expected to support the government's version of events. The inference is based on the common sense notion that the nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its tenor is unfavorable to the party's cause' (quoting 2 Wigmore, Evidence 285, at 192 [Chadbourn rev ed 1979]; *Graves v. U.S.*, 150 US 118, 121 (1893).

This Court found that defendant made a prima facie showing, R. 109, thus the government's burden of proof after defendant presented evidence which established a prima facie case was to establish by a preponderance of the evidence probable cause for defendant's stop. However, the government's proof was lacking. This Court must sustain defendant's motion to suppress the cocaine, handgun and statements allegedly made by the defendant as the fruits of the unlawful stop of the defendant in violation of the Fourth Amendment. The government did not establish any exceptions to the warrant requirement to justify the stop. The evidence established that the plan was to stop defendant if he went mobile. R. 215, 218. Before going to the location, the agents were briefed that Sutton was a target. R. 218. When they were advised that Sutton was mobile in his black GMC pickup truck they were ordered to intercept him so they could issue a traffic stop. R. 220. They had been instructed that if the target were to go mobile he was to be stopped-that was the plan. R. 235, 236, 237. When the agent turned on the mobile lights and attempted a traffic stop the agents had not observed defendant violate any traffic laws and nobody told him that any traffic laws had been violated. R. 236, 237. The reason the agent turned on his lights was to stop defendant because he had been instructed that if the target were to go mobile, he was to conduct a traffic stop. R. 236. Whether a controlled buy had occurred or not, the

agent's instructions were solely to take defendant down if he went mobile. R. 244. The government did not establish by a preponderance of the evidence that before defendant was stopped the agents were aware defendant had engaged in a controlled drug transaction inside the trailer. Therefore, defendant's motion to suppress evidence must be granted.

For these reasons, defendant, GENE SUTTON, moves this Honorable Court to grant the motion to suppress evidence in this case.

                Respectfully submitted,

                /s/ Stanley L. Hill
                  Attorney for Defendant

**STANLEY L. HILL & ASSOCIATES, P.C.**
651 West Washington Boulevard Suite 205
Chicago, Illinois 60661
T. 312.917.8888
F. 312.781.9401
E. stanhill@core.com
W. stanhilllaw.com