**E-FILED**
Tuesday, 01 April, 2008  02:43:28 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

_____

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 07-CR-20009** |
| | ) | |
| **GENE SUTTON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court for ruling on the Motion to Quash Arrest and Suppress Evidence (#14) filed by Defendant, Gene Sutton. This court has carefully reviewed the transcripts of the evidentiary hearing held on October 18 and November 5, 2007. This court has also carefully reviewed Defendant's Memorandum in Support of Motion to Suppress Evidence (#40), the Government's Response (#42) and Defendant's Reply (#43). Following this careful review, this court agrees with the Government that Defendant has not shown a violation of his Fourth Amendment rights. Accordingly, Defendant's Motion to Quash Arrest and Suppress Evidence (#14) is DENIED.

### BACKGROUND

On January 4, 2007, Defendant was charged by indictment (#7) with three offenses. Subsequently, on July 12, 2007, Defendant was charged by superseding indictment (#27) with: (1) knowingly distributing a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) & 841(b)(1)(C); (2) knowingly distributing five grams or more of a mixture and substance containing cocaine base ("crack"), a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); (3) knowingly distributing fifty grams or more of a mixture and substance containing cocaine base ("crack"), a

Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(iii); (4) knowingly possessing five grams or more of a mixture and substance containing cocaine base ("crack"), a Schedule II controlled substance, with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) & 841(b)(1)(B)(iii); and (5) knowingly carrying a firearm during and in relation to the crimes of distribution and possession with intent to distribute as charged in Count 3 and Count 4, in violation of 18 U.S.C. § 924(c).

Prior to the filing of the superseding indictment, on June 4, 2007, Defendant filed a Motion to Quash Arrest and Suppress Evidence (#14).  Defendant argued that his vehicle was stopped "without a legal justification and without articulable facts to support the stop." Defendant contended that his arrest, as well as the search and seizure, were made in violation of his rights under the Fourth Amendment to the United States Constitution.  Defendant asked this court to suppress all the evidence seized as well as all oral statements allegedly made by Defendant.  Defendant also asked this court to quash his arrest.

On June 18, 2007, the Government filed its Response to Motion to Quash Arrest and Suppress Evidence (#18).  The Government set out the facts it expected would be presented at the evidentiary hearing and argued that, based upon those facts, Defendant's Motion should be denied. On July 10, 2007, Defendant filed a Reply to the Government's Response to the Motion to Quash Arrest and Suppress Evidence (#25) and set out a much different rendition of what the evidence would show at the evidentiary hearing.   Defendant asserted that he did not violate any traffic laws and that his vehicle was forced off the road by an unmarked squad car.  Defendant argued that the evidence found during a search of his vehicle and the oral statements he allegedly made should be suppressed because they were all obtained as a result of an illegal stop.

EVIDENCE PRESENTED

An evidentiary hearing began on October 18, 2007.  Defendant's counsel stated that he wished to present evidence first at the hearing.  Defendant first called his father, who is also named

2

Gene Sutton, as a witness. Mr. Sutton testified that, on December 14, 2006, he saw Defendant outside near his vehicle. Mr. Sutton testified that there were two other vehicles and three policemen at that location. Mr. Sutton testified that Defendant was "all swoll [sic] up and bloody and dirty." Mr. Sutton testified that Defendant asked him not to leave because two police officers had "stomped and beat him." Mr. Sutton testified that one of the police officers, Christopher Hoyt, told him he was going to take Defendant in.

Defendant next called Christopher Hoyt to testify. Hoyt testified that he is a special agent with the Drug Enforcement Administration. Hoyt testified that he followed Defendant's vehicle for a period of time on December 14, 2006. Hoyt testified that he saw Defendant make a right-hand turn at a stop sign without stopping.

Defendant then testified on his own behalf. He testified that he was driving a pickup truck on December 14, 2006, and did not drive through a stop sign or exceed the speed limit. Defendant testified that as he approached his parents' home an unmarked police vehicle ran him off the road. Defendant testified that he had not violated any traffic laws before this occurred. Defendant also testified that, after he was ordered out of the vehicle, the police officers started beating him. During cross examination, Defendant testified that the unmarked police vehicle that ran him off the road did not have a siren on or any take-down lights on. Defendant also testified during cross examination that he was pulled out of his vehicle and was beaten after he was handcuffed. He stated that he was struck in the back of the head with some kind of object.

During his presentation of evidence, Defendant's counsel spent a great deal of time presenting testimony regarding the route Defendant took in his vehicle before he was stopped and whether there were any marked police vehicles at the scene of the stop. Defendant's counsel also questioned Agent Hoyt at length regarding the affidavit he prepared in support of the criminal complaint (#1) against Defendant. Defendant then rested.

The Government began its presentation of evidence by calling Robert Bodemer, the director

3

of the Kankakee Area Metropolitan Enforcement Group (KAMEG). Bodemer testified that, during the fall of 2006, he was working with a confidential source who was cooperating with KAMEG agents. The confidential source told Bodemer that he had purchased approximately two and one-half ounces of cocaine powder from Defendant twice a month for one year. The confidential source then participated in a controlled buy of 63 grams of cocaine from Defendant on November 1, 2006. This controlled buy took place in a trailer in St. Anne, Illinois. The confidential source also participated in a controlled buy of 28 grams of crack cocaine from Defendant on November 27, 2006. Both of these controlled buys were audiotaped. In addition, telephone calls between the confidential source and Defendant prior to the controlled buys were also recorded.

Bodemer testified that, on December 14, 2006, he participated in arranging another controlled purchase of cocaine from Defendant by the confidential source. This controlled buy was to take place in the same trailer in St. Anne and involved approximately four and one half ounces of crack cocaine. Bodemer testified that KAMEG had acquired two search warrants the previous day, one to search the trailer and one to search the residence west of the trailer. Bodemer testified that, after the controlled buy was made that day, the plan was to execute the search warrants and arrest Defendant for the delivery that day and the two previous deliveries.

Bodemer testified that he was assigned to surveillance duties that day. He was observing the area from an airplane, using binoculars. He testified that KAMEG special agent Joe Powers and his partner, Jeff Martin, were assigned to be in the area in the event that they needed a uniform presence or a vehicle stopped in a location other than the locations covered by the search warrants. Bodemer testified that the vehicle Powers and Martin were using was equipped with a siren, take-down lights, and a spotlight.

The evidentiary hearing resumed on November 5, 2006, and Bodemer was again called to testify by the Government. In resuming his testimony regarding the events of December 14, 2006, Bodemer testified that he and other KAMEG agents were in the area of Defendant's trailer to

4

"conduct a controlled purchase of crack cocaine from [Defendant], to take him into custody after the delivery of the crack cocaine, and then to execute two search warrants in the general area." Bodemer testified that the confidential source entered the trailer and remained there for about four minutes. During cross-examination, Bodemer stated that the confidential source was wearing audio and video recording devices but that there was a problem with the devices and the officers were unable to hear or see what transpired inside the trailer. Bodemer testified that he observed the confidential source leave the trailer. He observed Defendant leave the trailer three to five seconds later. Defendant got into a black pickup truck and left the area. Bodemer testified that he observed Defendant's pickup truck drive to various locations. Bodemer testified that he saw Defendant's pickup truck turn westbound on East Central Street without stopping at a four-way stop sign at the intersection of Main Street and East Central Street.

Bodemer testified that, after the confidential source left the trailer, he met with two agents, including Trooper Michael Lockwood. Bodemer testified that Lockwood informed him that the confidential source had received approximately four and one half ounces of crack cocaine during the controlled purchase. On cross-examination, Bodemer clarified that he spoke to Lockwood about a minute or minute and one half before Defendant's pickup truck came to a stop. Bodemer testified that he was in radio contact with Powers and Martin. During redirect examination, Bodemer testified that Martin and Powers were directed to stop Defendant because Lockwood said he had received the four and one half ounces of crack cocaine from the informant and so they knew the delivery by Defendant had taken place at the trailer. Bodemer was cross-examined, at length, regarding the fact that various police reports stated that a "traffic stop" of Defendant occurred. Bodemer stated that the "characterization of a traffic stop, from our point of view, is a law enforcement officer attempting to stop a vehicle and the occupants therein." Bodemer further explained that the term "traffic stop" does not refer to whether or not a violation of the Illinois Vehicle Code is a predicate for the stop.

5

Bodemer testified that, after his arrest, Defendant was taken to the Bourbonnais Police Department. Bodemer observed Hoyt advise Defendant of his constitutional rights under <u>Miranda</u>. Defendant placed his initials beside each of the rights, indicating that he understood his rights. Defendant then signed a waiver of his rights and agreed to speak to the officers. Defendant then made inculpatory statements to the officers.

The Government next called Jeffrey Martin to testify. Martin testified that he and Powers were assigned as a take-down unit if the target, Defendant, "was to go mobile." He and Powers were positioned about two miles south of the trailer when the confidential source entered, and later left, the trailer. Martin testified that they were advised via radio that Defendant had left the trailer and was mobile in his pickup truck. Martin testified that they were attempting to intercept him so they could conduct a traffic stop. Martin testified that Bodemer was directing them as they were traveling. Martin stated that they eventually located Defendant's vehicle and positioned their vehicle behind it. Martin testified that, when they were behind Defendant's vehicle, Bodemer instructed them to stop the vehicle. Martin testified that he turned on the take-down lights and siren on their vehicle. Right after that, Defendant made a right-hand turn without stopping at a stop sign. Martin testified that he and Powers pursued Defendant's vehicle, which accelerated. Martin stated they continued to follow the vehicle for about two miles until it came to a stop. Martin testified that Defendant attempted to enter a driveway and got stuck in an embankment on the side of the driveway. He stated that their average speed following Defendant was 70 to 75 miles per hour and that Defendant did not slow down enough to go into that driveway.

Martin testified that he and Powers parked their vehicle directly to the rear of Defendant's truck. They approached Defendant's truck and ordered Defendant to stop his vehicle because the wheels were still spinning. They also identified themselves as police officers and instructed Defendant to get out of the vehicle. Martin testified that Defendant did not get out of the vehicle so they pulled him from the vehicle. As they did so, all three of them went to the ground with

6

Defendant underneath.   Martin testified that they had difficulty handcuffing Defendant.   Martin testified that Defendant was on his stomach with his hands underneath him and was refusing to bring his hands behind him.   Martin stated that Clayt Wolfe arrived and helped them get handcuffs on Defendant.   Hoyt arrived shortly after that.   Martin testified that he did not punch, kick, or strike Defendant and that he did not see Powers, Wolfe or Hoyt punch or kick Defendant.

The Government next called Joseph Powers.   Powers testified that, at a briefing on December 14, 2006, they were told there was going to be a controlled purchase of crack cocaine and, if the target, Defendant, left in a vehicle, they were assigned to pull the vehicle over.   Powers testified that he and Martin were in radio contact with Bodemer and that, at some point, Bodemer told them to pull over the vehicle.   Powers corroborated Martin's testimony regarding following Defendant, how Defendant's truck stopped, and pulling Defendant from the vehicle and handcuffing him.   Powers also testified that no one punched or kicked Defendant.   During cross examination, Powers clarified that Bodemer said a drug transaction had happened and to pull Defendant over.

The Government's next witness was Special Agent Clayt Wolfe.   Wolfe testified that he assisted Martin and Powers with handcuffing Defendant.   Wolfe testified that he did not strike or kick Defendant and did not see Martin or Powers strike or kick Defendant.   Wolfe testified that he and Agent Hoyt conducted a search of the truck.   Wolfe testified that, outside of the truck, they found several baggies of crack cocaine and powder cocaine.   He stated that, inside the vehicle, they found a wad of rubber-banded money as well as a firearm and magazine on the driver's side floorboard.   On the passenger side floorboard, they found a firearm and a black gun case.   Wolfe testified that the serial numbers on the money found in Defendant's truck matched the serial numbers on the money used in the controlled buy.

For its last witness, the Government recalled Hoyt, who is the case agent in this case.   Hoyt testified that he advised Defendant of his Miranda rights after he was handcuffed and placed under arrest.   Hoyt testified that he again advised Defendant of his Miranda rights at the Bourbonnais

7

Police Department while Bodemer was present.

On November 5, 2008, during Bodemer's testimony, Defendant's counsel stated that he needed Lockwood's testimony because he was surprised by Bodemer's testimony that probable cause to stop Defendant was based upon Lockwood's alleged report to Bodemer that the controlled purchase of crack cocaine had occurred. This court reminded defense counsel that, during the proceedings on October 18, the Government listed the five witnesses it intended to call. Lockwood was not included on the Government's list. The prosecutor agreed and stated that the Government did not intend to call Lockwood as a witness because he was not involved in the arrest of Defendant. This court informed defense counsel that if he wanted to have Lockwood subpoenaed, this court would continue the hearing to an additional date so that Lockwood could be subpoenaed and testify. Defense counsel initially indicated that he wanted to subpoena Lockwood. However, after Wolfe finished his testimony, defense counsel stated, "I think that in light of what Wolfe had to say and in light of this other testimony, that, you know, I don't need Lockwood." At the end of the hearing, defense counsel changed his mind and stated that he wanted to call Lockwood. An off the record discussion was held regarding scheduling during which defense counsel conferred with Defendant. Defense counsel then stated that they had decided that they were not going to call Lockwood. Therefore, the hearing was not continued for the presentation of additional testimony and this court indicated that a briefing schedule would be set pending the preparation of a transcript of the evidentiary hearing. On December 17, 2008, this court set a briefing schedule and, on January 24, 2008, transcripts of the evidentiary hearing were filed (#38, #39).

## ANALYSIS

On February 11, 2008, Defendant filed his Memorandum in Support of Motion to Suppress Evidence (#40). Defendant made no mention of any of the evidence he presented on the first day of the evidentiary hearing. Defendant continued to argue that the warrantless stop of Defendant's vehicle violated the Fourth Amendment. Defendant noted that Bodemer testified that he received

8

information from Lockwood shortly before Defendant's vehicle was stopped that the controlled purchase had taken place inside the trailer.  Defendant argued, however, that none of the police reports stated that Lockwood informed Bodemer or anybody else about what happened inside the trailer.  Defendant further argued that the stop of his vehicle could not be justified as a traffic stop because the officers were narcotics agents, none were involved in traffic patrol, and no traffic citation was issued to Defendant.

The Government filed its Response to Defendant's Memorandum (#42) on March 11, 2008.  The Government provided a detailed analysis refuting all of Defendant's arguments.  On March 31, 2008, Defendant filed a Reply (#43).  Defendant responded to the Government's arguments and repeatedly asserted that the stop and search were unlawful because the "prearranged plan was to stop defendant if he went mobile."

As noted previously, this court has carefully reviewed the evidence presented and the arguments of the parties.  Following this careful review, this court does not find any of Defendant's arguments persuasive.  This court concludes that the evidence shows no violation of Defendant's Fourth Amendment rights.

First of all, this court found Bodemer to be a very credible witness.  Bodemer's manner and demeanor was candid and polite and this candid and polite demeanor continued even during defense counsel's intense, and often extremely repetitive, cross examination.[1]  Defendant's only basis for challenging Bodemer's testimony that he was informed that the controlled purchase took place prior to the stop of Defendant's vehicle is the fact that none of the police reports included a statement about that communication and that some of the Government's witnesses testified that they did not specifically recall this communication.  However, Lockwood's police report did state that he met with the confidential source who gave him the crack cocaine he purchased from Defendant.  This

---

[1]  In fact, this court found all of the Government's witnesses to be credible.

9

court does not find it significant that Lockwood's report does not state that he communicated this information to Bodemer, or when this communication took place.  At the hearing, this court noted that police affidavits do not, and cannot, include every fact and detail about a criminal investigation. This court now states that the same is true of police reports.  Bodemer testified that Lockwood informed him that the controlled purchase from Defendant occurred.  This testimony from a credible witness established probable cause to stop and arrest Defendant.[2]  See United States v. Funches, 327 F.3d 582, 586-87 (7th Cir. 2003) (probable cause for warrantless arrest existed where trained narcotics officers observing the defendant reasonably concluded based on experience that a drug transaction took place).

Defendant also argued that, because Lockwood was not called by the Government to testify, this court must infer that Lockwood's testimony would not have been favorable to the Government and would have supported Defendant's claim that no communication occurred between Lockwood and Bodemer regarding the controlled purchase prior to the stop.  Based on the record before this court, this essentially unsupported argument borders on the ludicrous.  The record establishes that Defendant was given the opportunity to call Lockwood as a witness.  This court made clear that the hearing could be continued so that Lockwood could be subpoenaed and testify.  Therefore, Lockwood was not a "missing witness" and the authority cited by Defendant regarding missing witnesses clearly does not apply here.  If Defendant believed Lockwood's testimony would have been favorable, he could have called him.

This court further agrees with the Government that it did not need to call Lockwood as a

---

[2]  This court notes that the Government has presented persuasive, well-supported arguments that no stop actually occurred (because Defendant's truck got stuck trying to turn into a driveway), that Defendant's flight from the officers, in and of itself, provided the officers with reasonable suspicion to pursue him and conduct a Terry investigation, and that the officers had probable cause to arrest Defendant for resisting a peace officer when he refused the agents' command to get out of his truck.  Because this court has concluded that Bodemer's testimony established probable cause to stop and arrest Defendant, this court does not need to address these additional arguments.

10

witness. As noted previously, Bodemer provided credible testimony that Lockwood informed him that the controlled purchase from Defendant took place prior to the stop of Defendant's vehicle. No additional testimony was necessary. In addition, the evidence presented by the Government was sufficient to show that the stop was justified under the "collective knowledge doctrine."

The Seventh Circuit has stated that, "[w]hen law enforcement officers are in communication regarding a suspect, . . . the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine." United States v. Lenoir, 318 F.3d 725, 728 (7th Cir. 2003); see also United States v. Sawyer, 224 F.3d 675, 680 (7th Cir. 2000). Under this doctrine, an "arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." United States v. Parra, 402 F.3d 752, 764 (7th Cir. 2005). In Parra, the Seventh Circuit recognized that courts have applied this doctrine to situations where "officers are in communication with each other while working together at a scene . . . 'even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed . . . .'" Parra, 402 F.3d at 764. In this case, the evidence, including Bodemer's credible testimony and Lockwood's police report which Defendant introduced into evidence, showed that the confidential informant met with Lockwood and gave Lockwood the crack cocaine he purchased from Defendant during the controlled buy. Therefore, the evidence showed that Lockwood had knowledge that the controlled buy took place. The evidence also showed that the officers were in communication with each other. This was enough to establish probable cause under the collective knowledge doctrine. See Sawyer, 224 F.3d at 680 (because officer was in communication with task force officers at the scene, officer's knowledge could be imputed to arresting officer; it did not matter what arresting officer knew at time of initiating arrest). Therefore, the Government did not need to call Lockwood as a witness and no inference adverse to the Government can be made because Lockwood did not testify.

Defendant has also argued at length that, because the police reports state that a "traffic stop"

11

occurred, the stop could not have been based upon the controlled purchase from Defendant.  This argument <u>is</u> ludicrous.  As Bodemer explained, it was called a traffic stop because Defendant was in a vehicle which was stopped.  Moreover, this characterization does not change the justification for the stop.  <u>See</u> <u>United States v. Cervantes</u>, 19 F.3d 1151, 1154 (7th Cir. 1994) (stop justified by the defendant's sale of cocaine to a confidential informant even though the police officers pretended to be stopping the defendant for traffic violations).

In any case, even if this court accepted Defendant's argument that the "traffic stop" could only be justified by a violation of the traffic laws, the evidence established that a traffic violation occurred prior to the stop.  The evidence showed that, prior to the stop, the officers observed Defendant go through a stop sign without stopping.[3]   The Government is correct that it is beyond dispute that a police officer may temporarily detain a motorist whom he or she has probable cause to believe violated even a minor traffic law.  <u>See</u> <u>United States v. Whren</u>, 517 U.S. 806, 810 (1996); <u>United States v. Muriel</u>, 418 F.3d 720, 724 (7th Cir. 2005); <u>United States v. Williams</u>, 106 F.3d 1362, 1365 (7th Cir. 1997).  This court concludes that this is obviously true whether or not a traffic citation is issued.  <u>See</u> <u>United States v. Burks</u>, 490 F.3d 563, 565 (7th Cir. 2007) (an arrest based upon traffic violations may be perfectly reasonable even if the police officer does not charge the suspect for the traffic offense giving rise to the officer's probable cause determination); <u>United States v. Miller</u>, 2005 WL 756160, at *12 (S.D. Ind. 2005) (fact that no citation was issued is of no consequence).

Defendant has argued that the testimony that he did not stop at a stop sign cannot justify the stop because the testimony also established that Martin and Powers had turned on their siren and take-down lights before this happened.  In addition, Defendant has argued that the stop cannot be justified because the testimony at the hearing showed that the agents' plan was to stop Defendant if he "went mobile," whether or not there was a basis for the stop.  He contends that the stop was

---

[3]  The evidence also strongly indicated that Defendant was exceeding the speed limit, causing the officers to travel 70 to 75 miles per hour in order to follow him.

12

based on a "prearranged plan to stop defendant if he went mobile." This court first notes that it understood the testimony to be that the plan was to stop Defendant if he "went mobile" after the controlled purchase, with the controlled purchase providing probable cause for the stop.[4] However, Defendant's arguments fail because, prior to the stop, the officers had probable cause to stop Defendant based upon the controlled purchase and also based upon the traffic violation they observed. The Government is correct that, whatever the officers' subjective motivation may have been, it is black letter law that the subjective motivations of the agents in conducting the stop are irrelevant for purposes of the Fourth Amendment. See Whren, 517 U.S. at 813; United States v. Moore, 375 F.3d 580, 583 n.1 (7th Cir. 2004). The Supreme Court is "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." United States v. Knights, 534 U.S. 112, 122 (2001).

For all of the reasons stated, this court concludes that the Government's evidence supports a finding of probable cause to stop Defendant's vehicle. Considering all of the circumstances, this court concludes that the stop, arrest, and search were based upon probable cause and were therefore reasonable and proper under the Fourth Amendment. See United States v. Huebner, 356 F.3d 807, 816 (7th Cir. 2004). Defendant has only argued that the stop of his vehicle was a violation of his Fourth Amendment rights and has not argued any other basis for challenging the search of his vehicle or the statements he made after he was advised of his Miranda rights and agreed to waive those rights.[5] Therefore, because this court has concluded that the stop was proper under the Fourth Amendment, there is no basis for suppressing the evidence seized or Defendant's statements.

_____

[4] This court agrees with the Government that the agents had good reason to believe that the controlled purchase would take place as arranged based upon the fact that the confidential source had participated in two prior controlled purchases from Defendant.

[5] This court notes, however, that the Government has very adequately set out the reasons why the search was a permissible search incident to arrest and was also justified based upon probable cause.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Quash Arrest and Suppress Evidence (#14) is DENIED.

(2) This case remains scheduled for a status conference on April 4, 2008, at 1:30 p.m.

ENTERED this 1st day of April, 2008

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE